**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCOTTSDALE CAPITAL ADVISORS CORPORATION
7170 E. McDonald Road, Suite 6
Scottsdale, AZ 85253

Plaintiff,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY
1735 K Street, N.W.
Washington, DC 20006

Defendant.

C.A. No. 1:18-cv-2973

**COMPLAINT**

Plaintiff Scottsdale Capital Advisors Corporation ("SCA") files this Complaint against Defendant Financial Industry Regulatory Authority ("FINRA") and alleges, by and through undersigned counsel, on knowledge of Plaintiff and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1. This is an action for breach of contract against FINRA arising from its repeated and continuing breaches of its agreement with and its obligations to its member firms, including its violation of its statutory mandates and its own corporate by-laws. Its violative conduct includes its increasing and current failure to provide fair and meaningful representation to its own members; its affirmative acts that have the effect if not the purpose of burdening competition, harming not only member firms but also issuers and customers, and violating the mandate that it not "impose any burden on competition not necessary or appropriate;" its

improper issuance and deployment against its members of purported industry "guidance;" and its refusal to abide by perhaps the most fundamental of its by-laws and obligations, *i.e.*, the requirements that it undertake only lawful acts that "carry out the purposes of" the Securities Exchange Act of 1934 (the "34 Act" or "Exchange Act"). FINRA's actions in derogation of its agreement with its members, while dating back more than a decade, have become increasingly pronounced in the period since 2014 and, particularly in the aggregate, have resulted in damage to Scottsdale, other FINRA firms, and the market participants that FINRA purports to represent.

2. Perhaps FINRA's most fundamental violation of its obligations, and one that has contributed to other breaches of its agreement with its members, is FINRA's failure to provide meaningful representation to its members in relation to the affairs of FINRA. It has deliberately reduced the number of *industry* members who occupy positions in the management of FINRA and in its disciplinary process, and installed career regulators – not industry participants – in leadership roles. Those regulators have elevated the goal of aggressive enforcement over fair and balanced industry representation and collaboration, with one even bragging about pursuing enforcement actions that rival the aggressiveness of the actual regulator, the Securities and Exchange Commission. Through these actions, FINRA has increasingly taken steps that are contrary to its legal and contractual obligations to its members, and contrary to the interests of its members, critical market participants, and the market itself.

3. For example, FINRA has promulgated "guidance" and then, contrary to law, deployed that purported guidance to penalize its own members. FINRA has also adopted an interpretation of FINRA Rule 2010 that enables it to take action against its members for purported violations of the Securities Act of 1933 ("33 Act" or "Securities Act") although those enforcement actions violate the jurisdictional mandate that limits FINRA's reach to matters

arising under *the 34 Act*. *See* 15 U.S.C. § 78o-3(b)(6). Also contrary to law, FINRA never submitted this interpretation of Rule 2010 to the SEC for notice, comment and evaluation despite its obligation to do so under FINRA By-Laws, Article XI, Section 1.

4. In its failure to provide industry members with fair and meaningful representation, its improper construction and use of "guidance" against its members, and its failure to abide by its fundamental jurisdictional constraints, FINRA has breached By-Laws Article XI, Section 1, and has committed *ultra vires* acts in violation of By-Laws Article VII, Section 1.

5. Through these actions and through other improper enforcement efforts, FINRA has also engaged in "unfair discrimination" against certain of its members in violation of its governing statute and By-Laws. It has aggressively targeted and sought to punish or even eliminate specific segments of the securities market. Through its coercive actions against smaller member firms who are engaged in the microcap and low-priced securities business, FINRA has gotten to the point that it is gutting the ability of firms, issuers and investors to participate in that market.

6. FINRA's breach is the direct cause of damage being inflicted on Plaintiff and other microcap market participants. As a result of its leadership and through its actions, FINRA has increasingly taken irrational and unfounded positions that are "choking" the microcap markets and preventing smaller and startup issuers from being able to finance the operation and growth of their businesses. At this point, only a handful of firms are still willing and able to process and clear sales of microcap securities, and those firms are under intense pressure to cease their participation in the market. FINRA's actions are a clear burden on competition in the market, are depriving smaller firms and issuers of the ability to conduct an entirely lawful business, and are resulting in demonstrable harm to FINRA members.

## THE PARTIES

7. Plaintiff SCA is an Arizona corporation, headquartered in Scottsdale, Arizona. SCA is a retail brokerage firm that trades securities, and has been registered with the SEC as a broker-dealer since 2002. SCA has been a member of FINRA since 2002.

8. FINRA is a non-profit, membership corporation incorporated under the laws of Delaware. FINRA was formed in July 2007 when the National Association of Securities Dealers consolidated its operations and merged with the regulatory function of the New York Stock Exchange. It is the sole "self-regulatory organization" registered with the SEC pursuant to the Maloney Act of 1938, 15 U.S.C. § 78o-3, which amended the Exchange Act.

9. As a registered self-regulatory organization ("SRO"), FINRA has a host of obligations which include, but are not limited to, responsibility for registering and overseeing FINRA member firms and their associated member representatives. FINRA is authorized by Sections 15A and 19 of the 34 Act to adopt rules governing the conduct of its members. FINRA is empowered to investigate its members and their associated member representatives, bring disciplinary proceedings against them, and sanction them for violations related to the 34 Act and rules and regulations thereunder. *See* 15 U.S.C. §§ 78o-3(b), (h); 78s(b), (d), (g).

10. FINRA is subject to extensive oversight by the SEC. FINRA must obtain the SEC's approval for all new rule proposals, rule amendments, and rule repeals, and must generally obtain approval for interpretations of existing rules. *See* 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4(b)-(d). The SEC is required to ensure that FINRA's rules, and the results of any disciplinary action taken by FINRA against a member or associated member representative, are consistent with Chapter 2B of Title 15 of the United States Code, as well as the rules and regulations promulgated thereunder. *See* 15 U.S.C. §§ 78s(b)(2)(C)(i), (e)(1).

## JURISDICTION AND VENUE

11. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 in that there is diversity between the parties to this litigation and the amount in controversy is believed in good faith to exceed $75,000.

12. SCA is an Arizona corporation, headquartered in Arizona.

13. FINRA is a Delaware corporation, and, upon information and belief, has its principal place of business at 1735 K Street, NW in Washington D.C.

14. Venue is proper in this District under 28 U.S.C. § 1391 because the Defendant resides in this District and is subject to the Court's jurisdiction.

## GENERAL ALLEGATIONS

### Procedures Governing FINRA's Organization, Rulemaking and Disciplinary Authority

15. FINRA is the only registered SRO pursuant to Section 15A of the 34 Act. Virtually all firms engaged in the purchase and sale of securities *must* be members of FINRA; they must pay their dues to finance its operations and are subject to its oversight and rules. *See* 15 U.S.C. §§ 78o(a)-(b) (stating that it is unlawful for any broker or dealer to engage in transactions if not registered with the SEC and that registration with the SEC "shall not be effective until such broker or dealer has become a member of a registered securities association").

16. Section 15A(b) requires that FINRA rules ensure "fair representation" of its members in the administration of its affairs, and may not engage in or permit "unfair discrimination between customers, issuers, brokers or dealers." 15 USC § 78o-3(b)(4), (6). The statute further expressly provides that the rules of the association shall not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of this title."

78o(b)(9). These requirements are particularly critical given the compulsory nature of FINRA's membership.

17. Section 15A of the 34 Act also limits FINRA's reach to matters related to the 34 Act. Specifically, it provides that an SRO's rules must "not [be] designed . . . to regulate by virtue of any authority conferred by this chapter [2B of Title 15 of the United States Code] ***matters not related to the purposes of this chapter***." 15 U.S.C. § 78o-3(b)(6) (emphasis added).

18. The reference in Section 15A(b)(6) to "this chapter" is plainly a reference to Chapter 2B of Title 15 of the United States Code, which chapter contains ***only*** the 34 Act and does not include the 33 Act. In fact, the 33 Act is located instead in Chapter 2A of Title 15 of the United States Code.

19. The limitation imposed by the 34 Act is made more express by Section 19, which generally grants FINRA the authority to adopt rules that are "consistent with this chapter" or pursue disciplinary actions against members for violations of "this chapter," (referring to chapter 2B of Title 15), 15 U.S.C. §§ 78s(b),(e), (g), but expressly reserves to the SEC alone the authority to pursue violations of other securities laws, including the 33 Act. *See id.* § 78s(h) (authorizing "[t]he appropriate regulatory agency for . . . a registered securities association," defined in § 78c(a)(34)(E) as the SEC, to discipline "any person" for violations of "any provision of the Securities Act of 1933," and other laws).

20. The specific reference to the 33 Act in Section 19(h) and its omission from any other section of the 34 Act concerning SROs confirms that the SROs have never been authorized to interpret or enforce the 33 Act.

21. These limitations have been confirmed and discussed by individual officers of FINRA – confirming that FINRA's authority is circumscribed and does not extend to the 33 Act.

Marc Menchel, former Executive Vice President and General Counsel for FINRA from 2002 to 2012 testified that in his view, "Section 15[A] of the Securities Exchange Act" imposes "limiting language on FINRA's powers" and other provisions "relegate solely to the [SEC] supervision for compliance with the Securities Act." He added that he did not understand "how [FINRA Rule] 2010 can overcome a [C]ongressional mandate that the Securities Act will be supervised solely by the [SEC]." *Id.*

22. Those constraints expressly apply to FINRA's disciplinary actions. Section 15A provides that, with respect to the disciplinary authority of an SRO, the SRO must support any determination to discipline a member or associated member representative with a statement setting forth, among other things, the "specific provision of *this chapter [2B of Title 15 of the United States Code]"* and rules or regulations thereunder "which any such act or practice, or omissions to act, is deemed to violate." 15 U.S.C. § 78o-3(h)(1)(B) (emphasis added).

23. Section 19 carries that limitation through to the SEC's review of any SRO disciplinary action. It provides that, with respect to disciplinary actions and sanctions, the SRO's determination must be found by the SEC to have involved a "violation of such provisions of this chapter [2B of Title 15 of the United States Code], the rules or regulations thereunder, [or] the rules of the [SRO] . . . and that such provisions are and were applied in a manner, consistent with the purposes of this chapter." 15 U.S.C. § 78s(e)(1).

24. Section 19 of the Exchange Act likewise provides that an SRO's rules (or amendment, deletion, or interpretation of an existing rule) will only be approved by the SEC if the rule (or amendment, deletion, or interpretation) is "consistent with the requirements of this chapter [2B of Title 15 of the United States Code] and the rules and regulations issued under this chapter." 15 U.S.C. § 78s(b)(2)(C).

25. FINRA's By-Laws incorporate these provisions and restrictions by virtue of both Article VII and Article XI, which limit its authority to adopt rules to those that are consistent with applicable law, and commit it to adopt only rules consistent with the purpose of the Exchange Act, respectively. As stated in its by-laws, FINRA is obligated to adopt only rules that "carry out the purposes of . . . the [34] Act." FINRA By-Laws, Art. XI, Sec. 1.

26. FINRA By-Law Article VII, Section 1, restricts the Board of Governor's authority to adopt rules that are consistent with and subject to "applicable law." And the body to which the Board of Governors has delegated rule-making responsibility, FINRA Regulation, Inc., a wholly-owned subsidiary of FINRA, is itself restricted by its own by-laws to exercise its authority to undertake only "lawful acts as are permitted by law," FINRA Regulation, Inc. By-Laws, Article IV, Section 4.1.

27. As an SRO, FINRA is subject to substantial oversight by the SEC. As relevant here, FINRA is required to submit all proposed new rules, rule amendments, and rule deletions to the SEC for approval and in general to submit new interpretations of existing rules for SEC approval – which approval, in both cases, requires adherence to the notice and comment provisions of the Administrative Procedure Act. *See* 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4(b)-(d). FINRA has incorporated the SEC approval requirement in Article XI, Section 1 of its By-Laws by declaring that rules would not become effective unless and until approved by the SEC.

**FINRA's Agreement with and Obligation to Its Members**

28. FINRA member firms, including Scottsdale, enter into agreements with FINRA pursuant to which they become members of this SRO. FINRA describes the membership agreement as a "contractual relationship between the Applicant and FINRA" and has counterclaimed against firms for alleged breach of that agreement. *See* FINRA, General

Overview of the New Member Application Process, http://www.finra.org/sites/default/files/external_apps/p129282.html (last accessed Sep. 11, 2018).

29. FINRA has incorporated its By-Laws into the membership agreements entered into between FINRA and its members, expressly requiring compliance with those By-Laws. *See* FINRA Membership Agreement at F(1). Further, under Delaware law, a corporation's by-laws form part of a "binding broader contract" with members. *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013) (citing *Airgas, Inc. v. Air Prods. & Chems., Inc*., 8 A.3d 1182, 1188 (Del. 2010)).

30. FINRA has, by virtue of its By-Laws, limited the authority of its Board of Governors to adopting rules consistent with "applicable law." FINRA By-Laws, Art. VII, Sec. 1(a)(ii)-(iii) FINRA has obligated itself to adopt rules "to carry out the purposes of . . .the Act." FINRA By-Laws, Article XI, Sec. 1. The "Act" is defined as "the Securities Exchange Act of 1934, as amended." *Id.* Art. I(a).

31. FINRA's By-Laws incorporate the requirement that a registered SRO such as FINRA "assure fair representation of its members in the . . . administration of its affairs" and, through its rules, "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. § 78o-3(b)(4), (9).

32. FINRA's By-Laws also incorporate the requirement that it adopt rules and give effect to those rules only after they have been approved by the SEC. FINRA By-Laws, Art. XI, Sec. 1 ("[i]f any such rules or amendments thereto are approved by the [SEC] as provided in the Act, they shall become effective Rules of the Corporation").

**FINRA Has Skewed its Leadership and Pursued Discriminatory Policies and Actions**

33. FINRA has acted, contrary to its agreement and obligations reflected its governance documents, in a manner designed to elevate and benefit only those with a regulatory focus and only its largest firms, using the policies and practices of the organization to stifle competition, choke or eliminate the microcap and low-priced securities business, and thereby damage its own members and the issuers and customers who participate in that market.

**FINRA Does Not Provide Fair Representation to its Members**

34. In relation to the management of the organization, FINRA's structure has become increasingly disconnected from its members such that it is no longer a "self-regulatory organization." FINRA's Board of Governors includes the only member firm representatives who could have any meaningful impact on the administration of FINRA, and yet the members elect only seven of its 23 members. By definition, the policies and practices of FINRA are, therefore, determined by unelected individuals appointed by the FINRA Board from candidates nominated by its nominating committee. Further, of the seven seats that are elected by FINRA members, only three of those seats can be filled by "small firm" governors; three other seats are dedicated to representatives of large firms, i.e., those with more than 500 registered representatives.

35. As explained by now Securities & Exchange Commissioner Hester Peirce in her paper, "The Financial Industry Regulatory Authority: Not Self- Regulation After All,"

> The board structure, which is intentionally weighted away from the industry, is not consistent with self-regulation. An organization run by a board that is dominated by people who are not in the industry is not an SRO; it is a regulator with industry representation. Onnig H. Donaldson, professor of law at Tulane University Law School, has documented the trend away from an SRO staff with deep industry expertise and its replacement with a bureaucratized staff.

Id. at 18.

36. Commissioner Peirce observed that FINRA "has slowly but certainly evolved into what some describe as a "fifth branch of government," "likely to behave as if they are an extension of the Commission's own compliance and enforcement arms, with the added benefit that they are *subsidized directly by industry fees*." Id. at 21. Possible solutions to the current lack of self-regulation, according to Commissioner Peirce's Article, include acknowledging that FINRA acts like the SEC and "fold FINRA into the SEC." Alternatively, "*FINRA could be remade into an organization that is run by the industry it regulates*." Perhaps then, the Article suggests, "competing SROs might emerge to tailor regulation to a particular group of firms such as smaller broker-dealers." Id. at 28 (emphasis added).

**FINRA Has Improperly Issued and Used "Guidance" Against Members**

37. Despite its clear obligations, directly incorporated into FINRA's By-Laws and thus, its agreement with its members, FINRA has also pursued a course of action that targets small-member firms like Scottsdale and that seeks to drive those firms from the microcap and low-priced securities industry and, at least in the case of Scottsdale, drive it out of business entirely.

38. FINRA has done this by promulgating so-called "guidance" that contains FINRA's interpretation of rules and regulations of the SEC and the federal securities laws. Although this "guidance" is not issued pursuant to the procedures set forth in FINRA's By-Laws or required by the Exchange Act (e.g., by submission to the SEC for approval), FINRA has staked out the position that such guidance has the force of law and members are obligated to abide by it or face discipline.

39. For example, FINRA has issued guidance directly targeting transactions involving microcap and low-priced securities, identifying such transactions as "red flags" indicative of "suspicious activity." *See* FINRA, Reg. Notice 09-05 (Jan. 2009).

40. FINRA has then insisted that, because it has identified common characteristics of those transactions as "red flags," a firm is required to file suspicious activity reports on every transaction that possesses those characteristics.

41. FINRA has more recently wielded this guidance against its members. For example, FINRA sought to discipline and fine member-firm Sterne Agee on a theory that its entire anti-money laundering program was inadequate because it failed to identify and treat microcap transactions as suspicious activity. Fortunately, the Hearing Panel rejected FINRA's theory on this point.

42. Nonetheless, FINRA has since pursued actions against member firms based on its dim view of the microcap and low-priced securities market segment. Year after year FINRA has targeted members' activity in this segment as an enforcement priority. *See, e.g.*, FINRA, 2018 Regulatory and Examination Priorities Letter (Jan. 8, 2018).

43. Through its sweeping interpretation of its enforcement authority and its dissemination and use of purported "guidance," FINRA has sought to create law without even the requisite approval of the SEC much less any legislative action. It then uses its proclamations "for the purpose of coercing persons or entities outside the federal government into taking any action or refraining from taking any action beyond what is required by the terms of the applicable statute or regulation." Hamburger, Philip, *Is Administrative Law Unlawful?* (2014).

44. FINRA's tactic is improper. As a matter of law, agencies do not have the power to make law and are not permitted to simply promulgate guidance and then cite it as binding; an

agency has only the power conferred on it by Congress. *See La. Public Service Comm. v. FCC*, 476 U.S. 355, 374 (1986). Congress has plainly mandated that agencies are permitted to engage in "rulemaking," including the promulgation of any "substantive" or "legislative" directive, only in accordance with the comprehensive procedures set forth in the Administrative Procedure Act ("APA"). Absent compliance with the APA, an agency's publications do not have the force of law and are not entitled to the judicial "deference" that would apply to a statute or regulation.

45. The impropriety and dangers associated with an agency's creation and deployment of its own purported "guidance" was underscored recently by a Justice Department memorandum, *Prohibition on Improper Guidance Documents*, issued in November 2017. The Justice Department, in that memo, confirmed that, in the past, guidance documents had been issued without rulemaking and then used to "coerce" persons or entities into engaging in or refraining from conduct beyond that which is required by any statute or regulation. Pursuant to the Memorandum, the agency would cease promulgating "guidance" documents that purport to "impose new requirements" or "create binding standards." The Memorandum also directed that existing "guidance" be reviewed to identify that which should be repealed, replaced or modified.

46. Underscoring the prohibition against improper promulgation or use of guidance, Associate Attorney General Rachel Brand issued a subsequent memo, dated January 25, 2018, entitled *Limiting Use of Agency Guidance in Affirmative Civil Enforcement Cases*. That memo prohibited the Department from acting "to effectively convert agency guidance documents into binding rules" or "using noncompliance with guidance documents as a basis for proving violations of applicable law."

47. FINRA's dissemination and use of guidance runs contrary to these fundamental principles and the purposes and provisions of administrative procedure law.

48. FINRA's crusade against the microcap and low-priced securities market has directly impacted Scottsdale, which engages primarily in that industry. FINRA has targeted SCA for examinations, extensive document requests, and prosecutions, and sought to levy fines against it for its day-to-day business activities. FINRA has aggressively sought to use guidance to render microcap transactions increasingly burdensome if not impossible.

49. In staking out this position, FINRA has abdicated its obligation to ensure fair representation to those members who engage in the microcap and low-priced securities market. FINRA has cast those members, including SCA, as outsiders, who, despite operating in a ***fully legal*** segment of the securities market, are repeatedly charged as lawbreakers simply on the basis of FINRA's non-binding guidance.

50. Moreover, FINRA's obvious desire to regulate the microcap and low-priced securities market out of existence is strikingly anti-competitive and contrary to its obligation to ***not burden competition***. By forcing member firms to abandon or stay away from this market segment, issuers are isolated and unable to access the securities markets, while investors, particularly consumer and retail level investors, are unable to engage in the securities market at a level that they desire.

51. None of this squares with FINRA's By-Laws, wherein it has promised to act consistent with applicable law. Instead, it demonstrates FINRA's aggressive disregard for its own obligations, and a desire to punish its own members merely because they choose, legally, to serve a segment of the market that certain components of FINRA abhor.

**FINRA Has Engaged in Ultra Vires Actions Under the Guise of FINRA Rule 2010**

52. FINRA Rule 2010 provides that a member "in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." FINRA R. 2010.

53. In its notice to the SEC seeking approval for FINRA Rule 2010, FINRA stated simply that the rule is based in Section 15A(b)(6) of the 34 Act, which "requires that FINRA design rules to 'promote just and equitable principles of trade.'" FINRA, Proposed Rule Change, SR-2008-028 (June 13, 2008). The SEC approved the rule on or around September 25, 2008, adopting the statutory basis FINRA suggested. *See* SEC Rel. No. 34-58643, 73 Fed. Reg. 57174 (Sep. 25, 2008).

54. Despite its purported grounding of FINRA Rule 2010 in Section 15A of the 34 Act, in or around May 2015, FINRA propounded a contrary interpretation of FINRA Rule 2010 in the context of a disciplinary proceeding against SCA. In that proceeding, FINRA alleged that SCA violated FINRA Rule 2010 because it engaged in the sale of unregistered securities in violation of Section 5 of the 33 Act, 15 U.S.C. § 77e. In fact, FINRA did not allege any violation of any provision of the 34 Act or the rules and regulations thereunder.

55. FINRA's actions violate its obligations to its members under its by-laws, which only authorize its Board of Governors to exercise authority to adopt rules consistent with applicable law, which includes the 34 Act, *see* FINRA By-Laws, Art. VII, Sec. 1, and which commit FINRA to adopting rules to carry out the purposes of the 34 Act and to submit those rules to the SEC for approval as required by the 34 Act. *See* FINRA By-Laws, Art. XI, Sec. 1.

56. The 34 Act's requirements are therefore incorporated into the by-laws and serve as a critical limitation on the scope of the Board of Governors' power to adopt rules.

57. FINRA ignored the very limitations by which it agreed to abide. Section 15A(b)(6) – the same provision on which FINRA relied as the basis for FINRA Rule 2010 back in 2008 – expressly circumscribes the scope of SRO rules: they must "not [be] designed to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter." 15 U.S.C. § 78o-3(b)(6).

58. FINRA's interpretation of FINRA Rule 2010 contravenes that express limitation in Section 15A(b)(6) and thereby violates its own by-laws and agreement with its member. 15 U.S.C. § 78o-3(b)(6).

59. Further, FINRA has plainly abdicated its commitment to its members to obtain SEC approval as required by the 34 Act – the interpretation was *never* presented to the SEC for proper consideration and approval. The 34 Act, and the relevant rules thereunder, require that proposed rules, including interpretations of existing rules, must be submitted to the SEC for approval. Rule 240.19b-4(c) states that interpretations of existing rules are treated the same as proposed new rules or rule changes "unless . . . reasonably and fairly implied by an existing rule." 17 C.F.R. § 240.19b-4(c). But FINRA's interpretation is not "reasonably and fairly implied" by FINRA Rule 2010 as it would reach outside of the 34 Act and thus contravene the express limitation in Sections 15A(b)(6) and 19(b) that SRO rules may not regulate matters that are outside the 34 Act.

60. FINRA necessarily accepted this limitation on FINRA Rule 2010 when it specifically relied on Section 15A(b)(6) as the basis for the rule – a basis which the SEC then expressly adopted. *See* FINRA, Proposed Rule Change, SR-2008-028 (June 13, 2008); SEC Rel. No. 34-58643, 73 Fed. Reg. 57174 (Sep. 25, 2008).

61. As a result of FINRA's interpretation of FINRA Rule 2010 and its failure to submit that interpretation to the SEC for approval, FINRA has breached its agreement with its member firms, including its obligations set forth in its By-Laws.

**COUNT ONE**

**Breach of SCA/FINRA Contract**

62. Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 61 and incorporate those as if set forth fully herein.

63. SCA entered into a membership agreement with FINRA, which FINRA accepted and which formed a binding contract between SCA and FINRA.

64. That membership agreement incorporates the FINRA By-Laws and, in any case, a corporation's by-laws constitute a contractual agreement with its members.

65. The agreement between SCA and FINRA, including its By-Laws, require that FINRA provide fair representation to its members, prevent unfair discrimination in relation to its members, not impose any undue burden on competition, and conduct itself in accordance with applicable law.

66. FINRA's actions, described in more detail above, directly violated FINRA's agreement with SCA, including its By-Laws, because FINRA has not provided fair representation to industry members, has improperly issued and deployed "guidance" against its members, has improperly failed to represent and has in fact targeted the microcap sector of the market and its participants, including SCA, and imposed undue burdens on competition, has failed to abide by the requirement that it obtain review and approval of FINRA's rules and interpretations of those rules; and has ignored and exceeded its statutory authority by pursuing claims not arising under the 34 Act.

67. FINRA's actions in violation of its agreement with SCA, including its By-Laws, include actions directed against SCA (and other member firms) designed to relegate those firms to the outer-fringe of FINRA membership by virtue of their participation in the microcap and low-priced securities market.

68. FINRA's actions have also served to stifle and substantially burden competition within the securities market by targeting member firms engaged in the microcap and low-priced securities market segment and coercing them to abandon their business in that market segment. This has the detrimental and anti-competitive effect of putting member firms on the verge (or entirely out) of business, limiting issuers' access to the securities markets, and limiting investors' ability to engage in the securities markets.

69. SCA has been directly impacted and damaged by FINRA's continuing failure to comply with its obligations to its members under the FINRA By-Laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for an order and judgment:

1. Declaring FINRA's interpretation of FINRA Rule 2010 to be an *ultra vires* act in breach of the FINRA By-Laws and ordering FINRA to immediately comply with its obligations thereunder and owed to Plaintiff and all other FINRA members;

2. Determining that Defendant is in breach of its agreement with Plaintiff and awarding Plaintiff damages as a result of the harm caused to Plaintiff by virtue of its breach of the FINRA By-Laws in an amount to be determined at trial, but believed, in good faith, to be more than $75,000.00;

3. Awarding Plaintiff reasonable costs, including attorney's fees, incurred in bringing this action; and

4. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

THOMPSON HINE LLP

By: /s/ Joseph A. Smith

Joseph A. Smith
D.C. Bar No. 1010223
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
Phone: (202) 331-8800
Fax: (202) 331-8330
joe.smith@thompsonhine.com

*Counsel for Plaintiff*
*Scottsdale Capital Advisors Corporation*