# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:18-cv-2973 (CRC) |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, | |
| Defendant. | |

## DEFENDANT FINRA'S MOTION TO DISMISS

Defendant Financial Industry Regulatory Authority, Inc. (FINRA) respectfully moves this court for an order dismissing Plaintiff's Complaint in this matter for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). This Motion is supported by the accompanying Brief in Support of FINRA's Motion, and the exhibits attached thereto. A proposed order is attached.

DATED: February 11, 2019

**FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC**.

By:        /s/ Terri L. Reicher
              Terri L. Reicher

Timothy W. Mountz (D.C. Bar No. 1028867)
Terri L. Reicher (D.C. Bar No. 414685)
FINRA Office of General Counsel
1735 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 728-8210
Phone: (202) 728-8967
Fax: (202) 728-8294
Email: Timothy.Mountz@finra.org
Email: Terri.Reicher@finra.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:19-cv-2973 (CRC) |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, | |
| Defendant. | |

**BRIEF OF DEFENDANT
FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.
<u>IN SUPPORT OF MOTION TO DISMISS COMPLAINT</u>**

Timothy W. Mountz (D.C. Bar No. 1028867)
Terri L. Reicher (D.C. Bar No. 414685)
FINRA Office of General Counsel
1735 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 728-8210
Phone: (202) 728-8967
Fax: (202) 728-8294
Email: Timothy.Mountz@finra.org
Email: Terri.Reicher@finra.org

*Attorneys for Defendant*,
**FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 3

        A.      FINRA and Its Role in Securities Regulation ......................................... 3

                1.      FINRA Rules ................................................................................ 4

                2.      FINRA's Governance Structure ................................................... 4

                3.      FINRA's Regulatory and Disciplinary Authority ....................... 5

                4.      The Exchange Act Provides the Exclusive Process for Challenging FINRA
                        Rules or Disciplinary Proceeding Decisions ................................ 6

        B.      Scottsdale's Litigation Against FINRA and Its Pending Filings Before the SEC .. 7

III.    ARGUMENT ...................................................................................................... 8

        A.      Standards ................................................................................................. 8

        B.      The Exchange Act's Exclusive Review Process Divests This Court of Subject
                Matter Jurisdiction to Force FINRA to Change Its By-Laws, Governance
                Structure or Regulatory Practices ........................................................... 9

        C.      The Complaint Fails to State a Claim Under Rule 12(b)(6) .................. 13

                1.      There is No Private Right of Action Against FINRA for its Regulatory
                        Acts and Omissions ................................................................... 13

                2.      FINRA Is Absolutely Immune from Liability for its Regulatory Acts and
                        Omissions .................................................................................. 15

IV.     CONCLUSION ................................................................................................ 17

EXHIBITS ................................................................................................................... 19

Exhibit A:    Application for Review No. 3-18612, filed by Scottsdale Capital Advisors Corp., John J. Hurry, Timothy Diblasi, and D. Michael Cruz, of FINRA Complaint No. 2014041724601, dated July 23, 2018.

Exhibit B:    Petition for Rulemaking Regarding Administration of the Financial Industry Regulatory Association, dated December 19, 2018.

Exhibit C:    FINRA BrokerCheck Report for Scottsdale Capital Advisors Corp., dated January 29, 2019.

## <u>TABLE OF AUTHORITIES</u>
### (Including designations pursuant to LCvR7)

**Cases**                                                                          **Page(s)**

*Abhe & Svoboda, Inc. v. Chao*,
  508 F.3d 1052 (D.C. Cir. 2007) ................................................................................9

*Alton v. NASD*,
  1994 U.S. Dist. LEXIS 11312 (N.D. Cal. July 26, 1994) ........................................11

*American Benefits Group, Inc. v. NASD*,
  1999 U.S. Dist. LEXIS 12321 (S.D.N.Y. Aug. 10, 1999) .......................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................9

*Barbara v. New York Stock Exch., Inc.*,
  99 F.3d 49 (2d Cir. 1996) ...............................................................................10, 16

*Bell Atlantic Corp. v. Twombly*,
  540 U.S. 544 (2007) ..................................................................................................9

*Browne v. NASD*,
  2006 U.S. Dist. LEXIS 35507 (N.D. Tex. May 31, 2006) ......................................11

*Charles Schwab & Co., Inc. v. FINRA, Inc.*,
  861 F. Supp. 2d 1063 (N.D. Cal. 2012) .................................................................10

*City of Providence v. BATS Global Markets, Inc.*,
  878 F.3d 36 (2d Cir. 2017), *cert. denied*, 139 S. Ct. 341 (2018) ...........................15

*Cleantech Innovations, Inc. v. NASDAQ Stock Market, LLC*,
  2012 U.S. Dist. LEXIS 13707 (S.D.N.Y. Jan. 31, 2012) .......................................11

*Coleman v. NASD*,
  1999 U.S. Dist. LEXIS 7172 (S.D.N.Y. May 14, 1999) ........................................11

*Cort v. Ash*,
  422 U.S. 66 (1975) ..................................................................................................14

*D'Alessio v. New York Stock Exchange, Inc.*,
  258 F.3d 93 (2d Cir. 2001) .....................................................................................15

*Datek Sec. Corp. v. NASD*,
  875 F. Supp. 230 (S.D.N.Y. 1995) .........................................................................11

*Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.*,
    191 F.3d 198 (2d Cir. 1999)...............................................................................................14

*DL Capital Group LLC v. NASDAQ Stock Market, Inc.*,
    409 F.3d 93 (2d Cir. 2005)................................................................................................16

*D.L. Cromwell Inv., Inc. v. NASD Regulation, Inc.*,
    279 F.3d 155, 157 (2d Cir. 2002).......................................................................................5

*Domestic Sec., Inc. v. SEC*,
    333 F.3d 239, 242 (D.C. Cir. 2003) ...................................................................................3

*Empire Fin. Group, Inc. v. FINRA, Inc.*,
    2009 U.S. Dist. LEXIS 133643 (S.D. Fl. Jan. 15, 2009)..............................................7, 11

*Feins v. AMEX*,
    81 F.3d 1215 (2d Cir. 1996)............................................................................................14

*First Jersey Sec., Inc. v. Bergen*,
    605 F.2d 690 (3d Cir. 1979).............................................................................................11

*Hayden v. New York Stock Exch., Inc.*,
    4 F. Supp. 2d 335 (S.D.N.Y. 1998)..................................................................................10

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..........................................................................................................16

*J.W. Gant & Associates, Inc. v. NASD*,
    791 F. Supp. 1022 (D. Del. 1992).....................................................................................11

*Jarksey v. SEC*,
    803 F.3d 9 (D.C. Cir. 2015) ..........................................................................................2, 10

*Jones v. SEC*,
    115 F.3d 1173 (4th Cir. 1997) ...........................................................................................3

*Kurz v. Fidelity Mgmt. & Research Co.*,
    556 F.3d 639 (7th Cir. 2009) .............................................................................................4

*Lowe v. Nat'l Ass'n of Secs. Dealers, Inc. (In re Series 7 Broker Qualification*
    *Exam Scoring Litig.)*,
    548 F.3d 110 (D.C. Cir. 2008) ................................................................................. *passim*

*Marchiano v. NASD*,
    134 F. Supp. 2d 90 (D.D.C. 2001) ...............................................................................11, 13

*McGinn, Smith & Co., Inc. v. FINRA, Inc.*,
    786 F. Supp. 2d 139 (D.D.C. 2011) ..............................................................................11, 13

*McLaughlin Piven Vogel, Inc. v. NASD*,
   733 F. Supp. 694 (S.D.N.Y. 1990)......................................................................11

*Merrill Lynch, Pierce, Fenner & Smith v. NASD*,
   616 F.2d 1363 (5th Cir. 1980) ...........................................................................11

*Meyers v. NASD*,
   1996 U.S. Dist. LEXIS 6044 (E.D. Mich. March 29, 1996)..................................14

*Mister Discount Stockbrokers, Inc. v. SEC*,
   768 F.2d 875 (7th Cir. 1985) .............................................................................11

*MM&S Financial, Inc. v. NASD*,
   364 F.3d 908 (8th Cir. 2004) .............................................................................14

*NASD v. SEC*,
   431 F.3d 803 (D.C. Cir. 2005)..............................................................................6

*North v. Smarsh*,
   160 F. Supp. 3d 63 (D. D. C. 2015) ...................................................6, 11, 13, 15

*In re NYSE Specialists Securities Litigation*,
   503 F.3d 89 (2d Cir. 2007).................................................................................15

*In re Olick*,
   2000 U.S. Dist. LEXIS 4275 (E.D. Pa. April 4, 2000)..........................................14

*P'ship Exch. Sec. Co. v. NASD*,
   169 F.3d 606 (9th Cir. 1999) .............................................................................16

*Pinnacle Security Investment Associates, L.P. v. AMEX*,
   946 F. Supp. 290 (S.D.N.Y.1996).......................................................................14

*Pyramid Fin. Corp. v. FINRA, Inc.*,
   2010 U.S. Dist. LEXIS 90543 (N.D. Cal. Aug. 27, 2010)................................10, 11

*Scher v. NASD*,
   386 F. Supp. 2d 402 (S.D.N.Y. 2005),
   *aff'd*, 2007 U.S. App. LEXIS 4692 (2d Cir. 2007)...............................................16

*Scottsdale Capital Advisors Corp. v. FINRA*,
   844 F.3d 414 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1838 (2017).........1, 2, 10, 12

*Settles v. U.S. Parole Comm'n*,
   429 F.3d 1098 (D.C. Cir. 2005)............................................................................9

*Shahmirzadi v. Smith Barney*,
   636 F. Supp. 49 (D.D.C. 1985) ..........................................................................14

*Sparta Surgical Corp. v. NASD*,
   159 F.3d 1209 (9th Cir. 1998) ............................................................................16

*Speelman v. United States*,
   461 F. Supp. 2d 71 (D.D.C. 2006) ........................................................................9

*Spicer v. Chicago Board of Options Exchange, Inc.*,
   977 F.2d 255 (7th Cir. 1992) ..............................................................................14

*\*Standard Investment Chartered v. NASD*,
   2007 U.S. Dist. LEXIS 32566 (S.D.N.Y. May 2, 2007); *appeal dismissed as
   moot,* 560 F.3d 118 (2d Cir. 2009)................................................................11, 12

*Standard Investment Chartered v. NASD*,
   637 F.3d 112 (2d Cir. 2011)................................................................................15

*Swirsky v. NASD*,
   124 F.3d 59 (1st Cir. 1997)..................................................................................10

*Telecommunications Research and Action Center v. F.C.C.*,
   759 F.2d 70 (D.C. Cir. 1984) ..............................................................................13

*\*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)..........................................................................................9, 10

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979)......................................................................................14, 15

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979)..............................................................................................14

*Waco Financial v. NASD*,
   751 F.2d 386 (6th Cir. 1984) ..............................................................................11

**Statutes**

5 U.S.C. § 553(e) ...........................................................................................................6

15 U.S.C. § 77(e) ...........................................................................................................7

15 U.S.C. §77s ...............................................................................................................6

15 U.S.C. § 78a, *et seq.*...................................................................................... *passim*

*\*15 U.S.C. § 78o-3, et seq.* ............................................................................... *passim*

15 U.S.C. § 78o-3(b)(6) .................................................................................................4

15 U.S.C. § 78o-3(h)......................................................................................................5

*15 U.S.C. § 78s ...................................................................................................2, 5, 15

15 U.S.C. § 78s(b)(2)(C)...................................................................................................4

15 U.S.C. § 78s(b)(4) ........................................................................................................4

15 U.S.C. § 78s(c)..............................................................................................................6

15 U.S.C. 78s(e)(1) ...........................................................................................................7

*15 U.S.C. 78y(a)(1)..........................................................................................................7

15 U.S.C. § 78y(b) .............................................................................................................6

**Other Authorities**

Exchange Act Rel. 34-56145, 72 F.R. 42169 (August 1, 2007) ...................................4, 5

5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004) ........................9

Fed. R. Civ. P. 12(b)(1)..................................................................................................8, 13

Fed. R. Civ. P. 12(b)(6)..............................................................................................3, 9, 13

FINRA By-Laws, Article I, Secs. (t) and (tt)....................................................................5

FINRA By-Laws, Article VII, Sec. 4(a) ...........................................................................4

FINRA By-Laws, Article XVI, Sec. 1 ...............................................................................4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:18-cv-2973 (CRC) |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, | |
| Defendant. | |

**BRIEF OF DEFENDANT**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.**
**IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

Defendant Financial Industry Regulatory Authority, Inc. (FINRA) submits this Brief in Support of its Motion to Dismiss the Complaint.

## I.      INTRODUCTION

This lawsuit is filed by a securities firm against its regulator seeking to change FINRA's governance structure and regulatory jurisdiction, and claiming monetary damages based on FINRA's regulatory activities.  Couched as a single-count "breach of contract" claim, this lawsuit is the latest salvo in a multipronged attack by Scottsdale—the subject of an ongoing FINRA disciplinary action—to challenge FINRA's regulatory authority.  Some of the same claims made in the Complaint were recently made in a previous lawsuit that was filed by Scottsdale and dismissed for lack of subject matter jurisdiction. *Scottsdale Capital Advisors Corp. v. FINRA*, 844 F.3d 414 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1838 (2017) (*Scottsdale I*). In addition to repeating the "*ultra vires*" claims that Scottsdale made in that dismissed case, this Complaint also purports to challenge FINRA's governance structure and various aspects of FINRA's regulation of the

microcap securities markets—matters that have been approved, or are subject to oversight, by the Securities and Exchange Commission (SEC).

After Scottsdale's attempt in *Scottsdale I* to enjoin the FINRA disciplinary proceeding was dismissed, Scottsdale pursued its administrative remedies in the FINRA disciplinary proceeding by filing an Application for Review before the SEC. Scottsdale continues to argue in that pending proceeding, just as it did in *Scottsdale I* and again in this Complaint, that FINRA's disciplinary action is *ultra vires*.  Exhibit A, Application for Review.  And just two days after filing this lawsuit, Scottsdale's sister firm Alpine Securities (which is owned by the same entity and individual: Scottsdale Capital Advisor Holdings LLC, which in turn is owned by John Hurry, and represented by the same counsel) filed a separate Petition for Rulemaking at the SEC seeking the same relief sought in this Complaint regarding FINRA's governance structure and FINRA's use of "guidance" in the performance of its regulatory function.  Exhibit B, Petition for Rulemaking, and Exhibit C, BrokerCheck Report for Scottsdale Capital Advisors, p. 14.

Just as with the claims regarding FINRA's regulatory jurisdiction previously made in *Scottsdale I*, Scottsdale's Complaint must be dismissed under well-settled law in this and other Circuits. First, the Complaint must be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because the Securities Exchange Act of 1934 (15 U.S.C. § 78a, *et seq.*) (Exchange Act) provides the exclusive judicial review process for challenges to FINRA's governance and regulatory actions, and requires Scottsdale to seek relief first at the SEC, and then with the appropriate United States Court of Appeals pursuant to 15 U.S.C. § 78s. *Jarksey v. SEC*, 803 F.3d 9 (D.C. Cir. 2015); *Scottsdale Capital Advisors Corp. v. FINRA*, 844 F.3d 414 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1838 (2017). Scottsdale's claims that FINRA acted outside its authority in charging the firm with misconduct under FINRA Rules based on violations of the

Securities Act of 1933 are currently before the SEC in Scottsdale's Application for Review of the FINRA disciplinary decision, and pursuant to the Exchange Act, a United States Court of Appeals is the only court with jurisdiction to review the SEC's future decision in that proceeding. Similarly, with respect to Scottsdale's challenge seeking governance changes and challenging FINRA's use of guidance in the performance of its regulatory role, those matters are exclusively within the oversight domain of the SEC and are not properly brought in this court.

The Complaint should also be dismissed with prejudice for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) because as a matter of law there is no private right of action against FINRA for its regulatory acts and omissions, and because FINRA has complete immunity from suit for its regulatory actions, regardless of how Scottsdale's claims are couched. *Lowe v. Nat'l Ass'n of Secs. Dealers, Inc. (In re Series 7 Broker Qualification Exam Scoring Litig.)*, 548 F.3d 110 (D.C. Cir. 2008).

## II.   BACKGROUND

### A.   FINRA and Its Role in Securities Regulation

FINRA is a private not-for-profit Delaware corporation and a self-regulatory organization (SRO) registered with the SEC as a national securities association pursuant to the Maloney Act of 1938, 15 U.S.C. § 78o-3, *et seq.*, amending the Exchange Act. *See Jones v. SEC*, 115 F.3d 1173, 1179 (4th Cir. 1997). FINRA is part of the Exchange Act's interrelated and comprehensive mechanism for regulating the national securities markets.[1] *See Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 242 (D.C. Cir. 2003).

---

[1] FINRA was previously known as National Association of Securities Dealers, Inc. (NASD).  Effective July 30, 2007, FINRA changed its name when it acquired the regulatory and dispute resolution functions of NYSE Regulation, Inc. This brief will refer to FINRA, except when the NASD name is used in a legal citation.

### 1.    FINRA Rules

FINRA rules "are part of the apparatus of federal securities regulation." *Kurz v. Fidelity Mgmt. & Research Co.*, 556 F.3d 639, 641 (7th Cir. 2009).[2] As part of the process of SEC review and approval, all FINRA rules, including the rules made the subject of Scottsdale's Complaint, must be filed with the SEC, published in the *Federal Register*, and are not effective until approved by the SEC. 15 U.S.C. § 78s(b)(4). The SEC cannot approve a FINRA rule or amendment without finding that it is consistent with the Exchange Act. 15 U.S.C. § 78s(b)(2)(C). The SEC must find FINRA rules "are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6).

### 2.    FINRA's Governance Structure

In order for FINRA to be registered as a national securities association and SRO under the Exchange Act, the SEC is required to approve FINRA's By-Laws, which contain FINRA's governance structure. 15 U.S.C. §78s(b)(4). FINRA By-Laws may be amended only by a majority vote of the membership, followed by SEC approval. FINRA By-Laws, Article XVI, Sec. 1. FINRA's current governance structure was approved by the SEC in Exchange Act Rel. 34-56145, 72 F.R. 42169 (August 1, 2007).

The composition of FINRA's Board of Governors is set forth in Article VII, Sec. 4(a) of FINRA's By-Laws as: "(i) the Chief Executive Officer of the Corporation, (ii) a number of public

---

[2] FINRA Rules are published by the SEC in the *Federal Register* when changes are proposed or approved; the current version of all FINRA Rules is in the FINRA Manual and is publicly available at http://finra.complinet.com/.

governors[3] as determined by the Board, (iii) a Floor Member Governor, an Independent Dealer/Insurance Affiliate Governor and an Investment Company Affiliate Governor, and (iv) three Small Firm Governors, one Mid-Size Firm Governor and three Large Firm Governors." The same section provides the Board "shall consist of no fewer than 16 nor more than 25 Governors. The number of Public Governors shall exceed the number of Industry Governors."

In its 2007 approval order, the SEC noted that it had received both comments objecting that having a majority of Public Governors would "defeat the purpose of self-regulation," and comments complaining that the "new SRO Board structure would have too many industry representatives and not enough Public Governance." 72 F.R. at 42176. The SEC found "that the requirement that the number of Public Governors exceed the number of Industry Governors on the New SRO Board is consistent with the Exchange Act. Specifically, the Commission believes that this requirement represents a reasonable method to permit the New SRO Board to consider the needs of the entire SRO community, including large and small investors, issuers, and securities firms, while at the same time broadly assuring the independence of the regulatory function." *Id.* at 42184. Only the SEC has the authority to approve or require any change to FINRA's By-Laws regarding the composition of its Board of Governors.

### 3.  FINRA's Regulatory and Disciplinary Authority

Subject to SEC oversight, FINRA exercises regulatory and disciplinary authority over its members and is required to enforce compliance with securities laws and FINRA rules. *See, e.g.*, 15 U.S.C. §§ 78o-3((b)(6), (h), § 78s; *D.L. Cromwell Inv., Inc. v. NASD Regulation, Inc.*,  279 F.3d 155, 157 (2d Cir. 2002) (FINRA is charged with "conducting investigations and

---

[3] The terms "Industry Governor" and "Public Governor" are defined in Article I, §§ (t) and (tt), respectively. "Industry Governor" generally applies to someone who works for, controls or is otherwise affiliated with a broker or dealer, and "Public Governor" refers to someone unaffiliated with either a broker or dealer, or a self-regulatory organization.

commencing disciplinary proceedings against [FINRA] member firms and their associated member representatives relating to compliance with the federal securities laws and regulations").[4]

### 4. The Exchange Act Provides the Exclusive Process for Challenging FINRA Rules or Disciplinary Proceeding Decisions

The Exchange Act provides for a specific process of administrative and judicial review for challenges to both types of matters made the subject of Scottsdale's Complaint: (1) the promulgation of FINRA rules, and (2) final decisions in FINRA disciplinary proceedings. With respect to FINRA rules, the SEC requires all FINRA rules to be filed with the SEC, and then published in the *Federal Register*, where they are subject to public comment and response by FINRA. If the SEC approves the rule in question, a party may file a petition for review of the SEC's final order in the appropriate United States Court of Appeals pursuant to 15 U.S.C. § 78y(b). A party may also petition the SEC for review of any FINRA rule, as Scottsdale's counsel has done in this case. 5 U.S.C. § 553(e); 15 U.S.C. §77s, 78s(c); Exhibit B.

FINRA disciplinary actions are "adjudicated before a FINRA Hearing Panel," and the Panel's decisions "may be appealed to the [FINRA] National Adjudicatory Council (NAC), or they may be reviewed by the NAC on its own initiative." *NASD v. SEC*, 431 F.3d 803, 804 (D.C. Cir. 2005). The NAC can affirm, reverse or modify the Panel's decision. "Once a final disciplinary action is taken against a member, FINRA must notify the SEC of said action, which 'may then act *sua sponte*, or pursuant to a petition from the aggrieved member, to review NAC's decision *de novo*.'" *North v. Smarsh*, 160 F. Supp. 3d 63, 72 (D. D. C. 2015), *quoting NASD v. SEC*, *id*. The

---

[4] In addition to FINRA Rules, FINRA publishes notices and other publications, including rule interpretations and other guidance to assist firms in their compliance efforts.  Some types of guidance published by FINRA include Regulatory Notices, Regulatory and Compliance Alerts, Interpretive Letters, and various reports and studies published by FINRA. A list of FINRA publications and notices can be found at www.finra.org/industry/guidance.

SEC has the authority to affirm, modify, remand or set aside the FINRA sanction. 15 U.S.C. 78s(e)(1). Final decisions of the SEC are subject to judicial review only in the United States Court of Appeals in which the respondent resides or has its principal place of business, or for the District of Columbia. 15 U.S.C. §78y(a)(1).

**B.** **Scottsdale's Litigation Against FINRA and Its Pending Filings Before the SEC**

Scottsdale is a FINRA member firm located in Arizona. Complaint at ¶ 7. As a FINRA member firm, Scottsdale agreed to comply with all FINRA rules and procedures, including being subject to the FINRA disciplinary process. *Empire Fin. Group, Inc. v. FINRA, Inc.*, 2009 U.S. Dist. LEXIS 133643 at *2 (S.D. Fl. Jan. 15, 2009). *See also*, Exhibit C, FINRA BrokerCheck Report for Scottsdale Capital Advisors, dated January 29, 2019.

FINRA has disciplined Scottsdale several times for activities involving low-priced securities or penny stocks, including a 2011 settlement with Scottsdale in which Scottsdale agreed to a censure and a fine of $125,000. Exhibit C, p. 23.

The FINRA disciplinary proceeding that Scottsdale unsuccessfully sought to enjoin in *Scottsdale I* resulted in a decision against Scottsdale and its principals finding, *inter alia*, that the firm engaged in the sales of unregistered, non-exempt penny stock securities in violation of FINRA rules and Section 5 of the Securities Act of 1933 (15 U.S.C. § 77(e)) (the same violation that Scottsdale alleges in the Complaint to be outside of FINRA's regulatory authority to charge). The case was decided by a FINRA Hearing Panel, and the 111-page Hearing Panel Decision in Complaint No. 20140417224601, dated June 20, 2017, is available at http://www.finra.org/sites/default/files/OHO_Scottsdale_2014041724601_062017.pdf.

Scottsdale was fined $1,500,000, plus costs, and the individual respondents were also sanctioned. *Id*. Scottsdale appealed the decision to FINRA's National Adjudicatory Council, which

affirmed the decision on July 20, 2018. The 112-page NAC Decision in Complaint No. 2014041724601 dated July 20, 2018, is available at

http://www.finra.org/sites/default/files/NAC_2014041724601_Scottsdale_072018.pdf.

On July 23, 2018, Scottsdale exercised its right to SEC administrative review of FINRA's final action in the NAC proceeding by filing an Application for Review with the SEC (No. 3-18612). Exhibit A, Application for Review. Scottsdale's Application for Review makes the same claim that it advances in the instant Complaint: that FINRA's enforcement proceeding is *ultra vires*. Exhibit A, p. 9 of Motion to Stay Sanctions, n. 29; *see* Complaint at ¶¶ 17-27; 52-61.

In addition to the claims made in *Scottsdale I*, in this Complaint Scottsdale also alleges that the composition of FINRA's Board of Governors does not fairly represent its members as required by FINRA's By-Laws and the Exchange Act. Complaint at ¶¶ 33, 34. The Complaint also alleges FINRA improperly uses "Guidance" in its regulatory activities regarding member firms. Complaint, ¶¶ 39-51 ("FINRA Has Improperly Issued and Used 'Guidance' Against Members.") Only two days after filing the Complaint, Scottsdale's sister firm (represented by the same counsel) filed at the SEC a separate Petition for Rulemaking pursuant to the Exchange Act seeking the same relief as requested in the Complaint—to transform FINRA's Board from a majority of public governors to a majority from the securities industry, and seeking a ruling prohibiting FINRA's "Improper Issuance and Use of Guidance." Exhibit B.

## III.    ARGUMENT

### A.    Standards

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, Scottsdale bears the burden to show the Court has jurisdiction to hear its claims. A court reviewing a motion to dismiss under Rule 12(b)(1) "need not accept factual inferences drawn

by plaintiffs if those inferences are not supported by facts in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006). A court may consider matters outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

In *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544 (2007), the Supreme Court held that to survive a motion to dismiss based on Fed. R. Civ. P. 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 569.  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)). Although courts are to accept the complaint's factual allegations as true and view the complaint in the light most favorable to the plaintiff, a court need not accept as true legal conclusions set forth in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). As discussed below, Scottsdale's Complaint fails to state a claim as a matter of law.

**B.      The Exchange Act's Exclusive Review Process Divests This Court of Subject Matter Jurisdiction to Force FINRA to Change Its By-Laws, Governance Structure or Regulatory Practices**

The Exchange Act's exclusive review process requires all challenges to FINRA's rulemaking and regulatory activities to be made first to FINRA, then to the SEC, and from the SEC to the appropriate United States Court of Appeals, not a federal district court.

The governing case in this area is *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), in which the Supreme Court held that a similar statutory process of administrative and judicial review in the Federal Mine Safety and Health Act divested federal district courts of subject matter

jurisdiction. Every court that has applied *Thunder Basin* to the Exchange Act has held that the Exchange Act's administrative review process of SRO regulation divests district courts of subject matter jurisdiction, as did the administrative review process in *Thunder Basin*. *See Scottsdale I, supra; Charles Schwab & Co., Inc. v. FINRA, Inc.*, 861 F. Supp. 2d 1063 (N.D. Cal. 2012); *Pyramid Fin. Corp. v. FINRA, Inc.*, 2010 U.S. Dist. LEXIS 90543 (N.D. Cal. Aug. 27, 2010); *Hayden v. New York Stock Exch., Inc.*, 4 F. Supp. 2d 335 (S.D.N.Y. 1998); *see also Jarkesy v. SEC*, 803 F.3d 9, 12 (D.C. Cir. 2015) ("Congress intended exclusivity when it established the [Exchange Act's] statutory scheme").

The court in *Charles Schwab, supra*, compared the Exchange Act's administrative review process followed by judicial review in a United States Court of Appeals, to the process in *Thunder Basin:*

> The Exchange Act's administrative review process is very similar to the administrative process at issue in *Thunder Basin*. Like the Mine [Safety and Health] Act, the Exchange Act allocates initial review to an administrative body, establishes a detailed structure for review that leads to review by an independent commission, and ultimately provides for judicial review by the court of appeals.

861 F. Supp. 2d at 1072. As a result, the *Schwab* court held that the Exchange Act "precluded district court jurisdiction prior to exhaustion of administrative remedies." *Id*. at 1070. In *Hayden, supra*, the court reached the same conclusion: "This Court finds *Thunder Basin* to be indistinguishable from the case at bar." 4 F. Supp. 2d at 338.

Federal courts have uniformly determined that the Exchange Act's exclusive review requirements apply to FINRA and other SRO disciplinary proceedings, thereby divesting district courts of subject matter jurisdiction to consider challenges filed in district court outside of the statutorily–mandated review process. The cases are legion, including cases in this District. *Scottsdale I, supra; Swirsky v. NASD*, 124 F.3d 59, 62 (1st Cir. 1997); *Barbara v. New York Stock*

*Exch., Inc.*, 99 F.3d 49 (2d Cir. 1996); *Mister Discount Stockbrokers, Inc. v. SEC*, 768 F.2d 875 (7th Cir. 1985); *Waco Financial v. NASD*, 751 F.2d 386 (6th Cir. 1984); *Merrill Lynch, Pierce, Fenner & Smith v. NASD*, 616 F.2d 1363, 1368-71 (5th Cir. 1980); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 700 (3d Cir. 1979); *North v. Smarsh*, 160 F. Supp. 3d 63 (D.D.C. 2015); *Cleantech Innovations, Inc. v. NASDAQ Stock Market, LLC*, 2012 U.S. Dist. LEXIS 13707 (S.D.N.Y. Jan. 31, 2012); *McGinn, Smith & Co., Inc. v. FINRA, Inc.*, 786 F. Supp. 2d 139 (D.D.C. 2011); *Pyramid Fin. Corp. v. FINRA, Inc.*, 2010 U.S. Dist. LEXIS 90543 (N.D. Cal. Aug. 27, 2010); *Empire Fin. Group, Inc. v. FINRA, Inc.*, 2009 U.S. Dist. LEXIS 133643 (S. D. Fl. Jan. 15, 2009); *Browne v. NASD*, 2006 U.S. Dist. LEXIS 35507 (N.D. Tex. May 31, 2006); *Marchiano v. NASD*, 134 F. Supp. 2d 90 (D.D.C. 2001); *Coleman v. NASD*, 1999 U.S. Dist. LEXIS 7172 (S.D.N.Y. May 14, 1999); *Datek Sec. Corp. v. NASD*, 875 F. Supp. 230 (S.D.N.Y. 1995); *Alton v. NASD*, 1994 U.S. Dist. LEXIS 11312 (N.D. Cal. July 26, 1994); *J.W. Gant & Associates, Inc. v. NASD*, 791 F. Supp. 1022 (D. Del. 1992); *McLaughlin Piven Vogel, Inc. v. NASD*, 733 F. Supp. 694 (S.D.N.Y. 1990).

The exclusive review scheme has been applied with equal force to challenges to FINRA rulemaking. "Congress has broadly defined an SRO's rules as including an organization's 'constitution, articles of incorporation [and] bylaws.'" *Standard Investment Chartered v. NASD*, 2007 U.S. Dist. LEXIS 32566 at * 11 (S.D.N.Y. May 2, 2007) (*Standard I*); *appeal dismissed as moot*, 560 F3d 118 (2d Cir. 2009). While the case law is "most fully developed in the context of SRO disciplinary proceedings," (*Standard I*, *id*. at 14), courts have also dismissed challenges to FINRA rulemaking for lack of subject matter jurisdiction. *See, e.g*., *Standard I, id.* (holding district court lacks subject matter jurisdiction to entertain challenge to NASD governance structure for failure to exhaust administrative remedies at SEC pursuant to Exchange Act); *American Benefits Group, Inc. v. NASD*, 1999 U.S. Dist. LEXIS 12321 (S.D.N.Y. Aug. 10, 1999) (court lacks subject

matter jurisdiction to entertain challenge to FINRA rule requiring issuers quoted on the OTC Bulletin Board to file reports with SEC).

The Exchange Act's exclusive review process provides Scottsdale with its exclusive SEC remedy, which Scottsdale is pursuing on both the regulatory and disciplinary fronts. Courts have already decided the subject matter jurisdiction bar adversely to Scottsdale in both of the precise situations raised in this Complaint. With respect to the governance claim, in *Standard I*, *supra*, NASD member firms had already voted to approve the changes in NASD By-Laws to create the governance structure in effect now, and as NASD prepared to seek the necessary SEC approval, the plaintiff sought to enjoin the entire process, citing alleged violations of Delaware law. Notwithstanding Standard's attempt to couch the complaint as a state law claim, the court in *Standard I* recognized that NASD's governance was subject to SEC review and approval, and that the federal district court lacked subject matter jurisdiction to entertain a challenge to the governance process.

The exclusive review process applies with equal force to Scottsdale's challenges to FINRA's regulatory practices, including Scottsdale's argument that FINRA is acting outside of its regulatory authority under the Exchange Act. Scottsdale already tried to obtain judicial intervention into its disciplinary case based on this position, and lost. *Scottsdale I*, *supra*. Scottsdale's Petition for Rulemaking seeks SEC review of FINRA's alleged improper regulatory practices, and Scottsdale has presented its argument that FINRA is acting outside of its regulatory authority as part of Scottsdale's appeal of the adverse disciplinary decision in the Application for Review before the SEC. Exhibit B, p. 9 of Motion to Stay Sanctions, n. 29.

The exclusive review process mandated in the Exchange Act is consistent with Congress' determination that the SEC, as the agency with the expertise to regulate the national securities

markets and enforce the federal securities laws, is best able to regulate FINRA's governance structure and regulatory practices.  The Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).[5]

### C.      The Complaint Fails to State a Claim Under Rule 12(b)(6)

Scottsdale's Complaint is subject to dismissal for the additional reason that it fails to state a claim upon which relief can be granted. First, because the Complaint alleges that FINRA is operating in violation of the Exchange Act and its own Rules (Complaint at ¶¶ 1-5, 33-51, 52-61), the Complaint must be dismissed for lack of a private right of action.  Second, the Complaint seeks damages for Scottsdale's alleged losses due to FINRA's regulation of Scottsdale and the microcap securities market (Complaint at ¶11; Prayer for Relief, p. 19, no. 2), and FINRA is immune from such claims as a matter of law.

### 1.      There is No Private Right of Action Against FINRA for its Regulatory Acts and Omissions

It is well-established that neither the Exchange Act nor any other statute provides for a private cause of action against an SRO like FINRA for acts or omissions in connection with its duties as a securities regulator.  To  the contrary, many courts, including the Court of Appeals for the D.C. Circuit, have uniformly held that no private right of action exists against an SRO for its regulatory activities. *See In re Series 7,* 548 F.3d at 114 ("By specifically adopting an appeals

---

[5] The district court also lacks jurisdiction under the rule in *Telecommunications Research and Action Center v. F.C.C.*, 759 F.2d 70, 75 (D.C. Cir. 1984) (TRAC), which divests a federal district court of subject matter jurisdiction to "review or enjoin FINRA disciplinary actions if (1) the relevant statute 'commits review to the Court of Appeals', and (2) 'the action 'seeks relief that might affect the Circuit Court's future jurisdiction.'" *North v. Smarsh*, 160 F. Supp. 2d 63, 83 (D.D.C. 2015), *quoting Marchiano v. NASD*, 134 F. Supp. 2d 90, 93 (D.D.C. 2001). See also, *McGinn Smith v. FINRA*, 786 F. Supp. 2d 139 (D.D.C. 2011).  Each of these decisions holds that the Exchange Act's vesting of exclusive jurisdiction in the Court of Appeals divests the district court of subject matter jurisdiction under *TRAC*. Given the critical role of SEC review and approval of FINRA By-Laws and disciplinary decisions, both of which Scottsdale has pending before the Commission, it is not in the interest of justice to bypass the SEC and transfer this action directly to the appropriate Court of Appeals under TRAC.

process which does not provide monetary relief, Congress has displaced claims for relief based on state common law"). *See also Spicer v. Chicago Board of Options Exchange, Inc.*, 977 F.2d 255, 260 (7th Cir. 1992) (declining to imply a private right of action "against an [SRO] for violating or failing to enforce its own rules"); *MM&S Financial, Inc. v. NASD*, 364 F.3d 908, 911-12 (8th Cir. 2004) ("the Exchange Act does not create a private right of action against the NASD defendants for violating their own rules" and a party's attempt to bypass the absence of a private right of action by asserting a claim under state contract law is "fruitless"); *Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 208 (2d Cir. 1999) ("there is no private right of action available under the Securities Exchange Act . . . to challenge an exchange's failure to follow its own rules"); *In re Olick*, 2000 U.S. Dist. LEXIS 4275, *11 (E.D. Pa. April 4, 2000) (a party "may not maintain a private cause of action against the NASD under the Exchange Act, or at common law, for regulatory actions taken by the NASD"); *Meyers v. NASD*, 1996 U.S. Dist. LEXIS 6044, *13 (E.D. Mich. March 29, 1996) (finding that "a majority of courts have held that there is no private cause of action against the NASD for a violation of its own rules") (citations omitted); *Feins v. AMEX*, 81 F.3d 1215 (2d Cir. 1996); *Pinnacle Security Investment Associates, L.P. v. AMEX*, 946 F. Supp. 290, 293-94 (S.D.N.Y.1996).

In finding there is no private cause of action against SROs under the Exchange Act or for violations of rules enacted thereunder, courts have applied the analysis laid down by the United States Supreme Court for determining whether an implied right of action exists where the applicable statute does not expressly provide a private right of action. *See Shahmirzadi v. Smith Barney*, 636 F. Supp. 49, 51-52 (D.D.C. 1985). That test, which the Supreme Court developed in a trilogy of cases, *Cort v. Ash*, 422 U.S. 66 (1975), *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979), is "one of

statutory construction." *Touche Ross*, 442 U.S. at 568. Under the comprehensive regulatory scheme for the securities industry established by Congress in the Exchange Act, FINRA's performance of its responsibilities is subject to the ongoing oversight of the SEC and there is no implied private right of action in the statute. *See, e.g.*, 15 U.S.C. § 78o-3, *et seq.*, § 78s.

In this case, Scottsdale asserts throughout the Complaint that FINRA has violated the Exchange Act, its By-Laws, and other FINRA rules in its regulation of Scottsdale and other firms "engaged in the microcap and low-priced securities business." *E.g.,* Complaint ¶ 5. But there is no private right of action against FINRA for its regulatory activities, including FINRA's decisions to bring disciplinary proceedings, its prosecution of those disciplinary cases, the legal authorities that FINRA relies on, and FINRA's issuance of publications in its role as a securities regulator. Because there is no private right of action against FINRA, Scottsdale's Complaint against FINRA must be dismissed.

## 2. FINRA Is Absolutely Immune from Liability for its Regulatory Acts and Omissions

No court has imposed damages on FINRA for pursuing disciplinary cases against its member firms or registered representatives. This is because when FINRA "acts under the aegis of the Exchange Act's delegated authority, it is absolutely immune from suit for the improper performance of regulatory, adjudicatory, or prosecutorial duties delegated by the SEC." *In re Series 7, supra*, 548 F.3d at 114; *see also City of Providence v. BATS Global Markets, Inc.*, 878 F.3d 36, 46 (2d Cir. 2017), *cert. denied*, 139 S. Ct. 341 (2018); *Standard Investment Chartered v. NASD,* 637 F.3d 112 (2d Cir. 2011) *(Standard II); In re NYSE Specialists Securities Litigation,* 503 F.3d 89 (2d Cir. 2007); *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) (holding that an SRO is "immune from liability for claims arising out of the discharge of its duties under the Exchange Act"); *North v. Smarsh*, 160 F. Supp. 3d 63, 87-

88 (D.D.C. 2015); *DL Capital Group LLC v. NASDAQ Stock Market, Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (holding that when an SRO engaged in conduct consistent with the powers delegated to it pursuant to the  Exchange Act and the regulations and rules promulgated thereunder, SRO is immune from suit); *P'ship Exch. Sec. Co. v. NASD*, 169 F.3d 606, 608 (9th Cir. 1999) (holding that the NASD was protected by absolute immunity for its actions taken "under the authority delegated to it by the  Exchange Act"); *Sparta Surgical Corp.  v. NASD*, 159 F.3d 1209, 1215 (9th Cir. 1998) ("when  Congress elected  'cooperative regulation'  as the  primary  means of regulating  the  over-the-counter market,  the consequence was that self-regulatory organizations had to enjoy freedom  from civil liability when they acted in their regulatory capacity"); *Barbara v. NYSE*, 99 F.3d 49, 59 (2d Cir. 1996) ("[A]llowing suits against the Exchange arising out of the Exchange's  disciplinary functions would clearly 'stand as an obstacle to the accomplishment and execution of  the full purposes and objectives of Congress,' namely, to encourage forceful self-regulation of the   securities  industry") *quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Scher v. NASD*, 386 F. Supp. 2d 402, 406 (S.D.N.Y. 2005) (dismissing  complaint against NASD and related entities because action barred by absolute immunity granted to NASD "for conduct falling within the scope of the [NASD's] regulatory and oversight  functions"), *aff'd*, 2007 U.S. App. LEXIS 4692 (2d Cir. 2007).

In *In re Series 7*, plaintiffs brought tort claims against FINRA for mistakes made in connection with administering a securities licensing exam. Granting FINRA's motion to dismiss, the Court found that the "comprehensive structure set up by Congress is suggestive. . .  of an intent to  create  immunity  for  such  duties.  .  .  The  elaboration  of  duties,  allowance  of delegation and oversight by the SEC, and multi-layered system of review show Congress's desire to protect SROs from liability for common law suits." 548 F.3d at 115. The *In re Series 7* Court

further reasoned that "Courts have consistently barred suits which seek monetary relief for actions taken by agency regulators – or those acting in their place – in performance of their regulatory, adjudicatory, or prosecutorial duties." *Id.*

Scottsdale is seeking an award of damages purportedly resulting from FINRA's regulatory activities:

> FINRA's crusade against the microcap and low-priced securities market has directly impacted Scottsdale, which engages primarily in that industry. FINRA has targeted [Scottsdale] for examinations, extensive document requests, and prosecutions, and sought to levy fines against it for its day-to-day business activities.

Complaint, ¶ 48.  Scottsdale requests that it be awarded unspecified but substantial "damages as a result of the harm caused to [Scottsdale] by virtue of [FINRA's] breach of the FINRA By-Laws in an amount to be determined at trial…." Complaint, p. 19; *see also* ¶ 11. These are precisely the types of claims to which SRO immunity is intended to apply.  This action seeking damages against FINRA is barred by FINRA's regulatory immunity, and Scottsdale's Complaint should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, FINRA moves the Court to grant its Motion to Dismiss, and for such other and further relief to which it may be entitled.

DATED:  February 11, 2019

By:      /s/ Terri L. Reicher
         Terri L. Reicher

         Timothy W. Mountz (D.C. Bar No. 1028867)
         Terri L. Reicher (D.C. Bar No. 414685)
         FINRA Office of General Counsel
         1735 K Street, N.W.
         Washington, D.C. 20006
         Phone: (202) 728-8210
         Phone: (202) 728-8967
         Fax: (202) 728-8294
         Email: Timothy.Mountz@finra.org
         Email: Terri.Reicher@finra.org


         *Attorneys for Defendant*,
         **FINANCIAL INDUSTRY REGULATORY
         AUTHORITY, INC.**

## EXHIBITS

# EXHIBIT A

RECEIVED

JUL 2 4 2018

OFFICE OF THE SECRETARY

3-18612

**UNITED STATES OF AMERICA**
**BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

SCOTTSDALE CAPITAL ADVISORS CORP., JOHN J.
HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL
CRUZ'S APPLICATION FOR REVIEW
NAC Decision (July 20, 2018)
FINRA Hearing Panel Decision (June 20, 2017)          **HARD COPY**
Complaint No. 2014041724601

## APPLICATION FOR REVIEW

Pursuant to Section 19(d)(2) of the Securities Exchange Act of 1934, and Rule 420 of the

Commission's Rules of Practice, Scottsdale Capital Advisors Corp. ("SCA"), John J. Hurry,

Timothy B. DiBlasi, and D. Michael Cruz (collectively, the "Petitioners")[1] submit this Application

for Review of the July 20, 2018 decision of FINRA's National Adjudicatory Council (the "NAC")

in FINRA Complaint No. 2014041724601 (the "Decision").

The Decision's findings were incorrect because the NAC misapplied the law, relied on

improper authority, and based its conclusions on unreliable or otherwise improperly admitted

evidence or speculation. Without limiting the generality of the foregoing, the issues on which

Petitioners request review include the following:

a) SCA and Mr. Hurry liquidated unregistered and nonexempt microcap securities, in
   violation of Section 5 of the Securities Act and FINRA Rule 2010;

b) SCA did not perform a reasonable searching inquiry when determining whether to approve
   the sale of restricted securities;

c) SCA's due diligence was cursory and incomplete, and thus unreasonable;

---

[1] Petitioners, who may be served through the undersigned, are located at 7170 E. McDonald Dr.,
Suite 6, Scottsdale, AZ, 85253, (480) 603-4900.

1

d) SCA was unable to establish that the selling customers were non-affiliates of the issuers, that they met the requisite one-year holding period for the resale of restricted securities, or that the underlying instruments were, in fact, securities;

e) SCA was unable to demonstrate that the issuers of the relevant deposits and liquidations were not shell companies;

f) SCA cannot rely on Securities Act Rule 144 because it failed to establish that its due diligence was not part of a plan or scheme to evade the registration requirements of the Act;

g) Mr. Hurry's creation, management, and control of Cayman Securities Clearing and Trading SEZC Ltd. ("CSCT") was unethical and in violation of FINRA Rule 2010;

h) SCA and Mr. DiBlasi maintained deficient and inadequate written supervisory procedures ("WSPs") related to Section 5, in violation of FINRA Rule 2010 and NASD Rule 3010;

i) SCA and Mr. Cruz failed to supervise the firm's microcap liquidation business, in violation of FINRA Rule 2010 and NASD Rule 3010; and

j) FINRA's reliance on Mr. Ruzicka's ex parte investigative testimony and the NAC's refusal to admit new evidence concerning Mr. Ruzicka's reliability and credibility.

Even if the Commission were to uphold any of the findings of liability, the sanctions should be reversed or substantially reduced because they are not in line with FINRA's sanctions guidelines and are punitive, not remedial.

Dated: July 23, 2018

Respectfully Submitted,

Kevin J. Harnisch
Michael J. Edney
Ryan E. Meltzer
Vijay N. Rao
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-4520 – telephone
(202) 662-4643 – facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile and via first class mail, return receipt requested, on the following:

> The Office of the Secretary
> U.S. Securities and Exchange Commission
> 100 F Street NE
> Mailstop 1090-10915
> Washington, D.C. 20549
> (703) 813-9793 – facsimile
> (202) 772-9324 – facsimile (alternate)
>
> Attn: Jante C. Turner
> Office of General Counsel
> FINRA
> 1735 K. Street, NW
> Washington, D.C. 20006
> (202) 728-8264 – facsimile

Kevin J. Harnisch

Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-4520 – telephone
(202) 662-4643 – facsimile
kevin.harnisch@nortonrosefulbright.com

**United States of America**
**Before The United States Securities and Exchange Commission**

SCOTTSDALE CAPITAL ADVISORS CORP., JOHN J.
HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL
CRUZ'S APPLICATION FOR REVIEW
NAC Decision (July 20, 2018)
FINRA Hearing Panel Decision (June 20, 2017)
Complaint No. 2014041724601

**<u>NOTICE OF APPEARANCE ON BEHALF OF SCOTTSDALE CAPITAL ADVISORS
CORP., JOHN J. HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL CRUZ</u>**

Please take notice that, pursuant to Rule 102(b) and (d) of the Commission's Rules of

Practice, Kevin J. Harnisch, an attorney at Norton Rose Fulbright US LLP who may be contacted

at the address in the signature block below, hereby enters an appearance on behalf of Scottsdale

Capital Advisors Corp., John J. Hurry, Timothy B. DiBlasi, and D. Michael Cruz (collectively,

the "Petitioners"), all of whom are located at 7170 E. McDonald Dr., Suite 6, Scottsdale, AZ,

85253, with a telephone number of (480) 603-4900, in the Petitioners' Application for Review of

the above captioned proceedings.

Respectfully Submitted,

Kevin J. Harnisch

Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-4520    telephone
(202) 662-4643    facsimile
kevin.harnisch@nortonrosefulbright.com

Date: July 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile and via first class mail, return receipt requested, on the following:


The Office of the Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Mailstop 1090-10915
Washington, D.C. 20549
(703) 813-9793 – facsimile
(202) 772-9324 – facsimile (alternate)

Attn: Jante C. Turner
Office of General Counsel
FINRA
1735 K. Street, NW
Washington, D.C. 20006
(202) 728-8264 – facsimile


Kevin J. Harnisch

Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-4520 – telephone
(202) 662-4643 – facsimile
kevin.harnisch@nortonrosefulbright.com

**UNITED STATES OF AMERICA**
**BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

SCOTTSDALE CAPITAL ADVISORS CORP., JOHN J.
HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL
CRUZ'S APPLICATION FOR REVIEW
NAC Decision (July 20, 2018)
FINRA Hearing Panel Decision (June 20, 2017)
Complaint No. 2014041724601

**NOTICE OF APPEARANCE ON BEHALF OF SCOTTSDALE CAPITAL ADVISORS
CORP., JOHN J. HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL CRUZ**

Please take notice that, pursuant to Rule 102(b) and (d) of the Commission's Rules of

Practice, Michael J. Edney, an attorney at Norton Rose Fulbright US LLP who may be contacted

at the address in the signature block below, hereby enters an appearance on behalf of Scottsdale

Capital Advisors Corp., John J. Hurry, Timothy B. DiBlasi, and D. Michael Cruz (collectively,

the "Petitioners"), all of whom are located at 7170 E. McDonald Dr., Suite 6, Scottsdale, AZ,

85253, with a telephone number of (480) 603-4900, in the Petitioners' Application for Review of

the above captioned proceedings.

Respectfully Submitted,

Michael J. Edney
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-0410 – telephone
(202) 662-4643 – facsimile
michael.edney@nortonrosefulbright.com

Date: July 23, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile and via first class mail, return receipt requested, on the following:


The Office of the Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Mailstop 1090-10915
Washington, D.C. 20549
(703) 813-9793    facsimile
(202) 772-9324    facsimile (alternate)

Attn: Jante C. Turner
Office of General Counsel
FINRA
1735 K. Street, NW
Washington, D.C. 20006
(202) 728-8264    facsimile


Michael J. Edney
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-0410 – telephone
(202) 662-4643    facsimile
michael.edney@nortonrosefulbright.com

**UNITED STATES OF AMERICA**
**BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

SCOTTSDALE CAPITAL ADVISORS CORP., JOHN J.
HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL
CRUZ'S APPLICATION FOR REVIEW
NAC Decision (July 20, 2018)
FINRA Hearing Panel Decision (June 20, 2017)
Complaint No. 2014041724601

**<u>NOTICE OF APPEARANCE ON BEHALF OF SCOTTSDALE CAPITAL ADVISORS
CORP., JOHN J. HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL CRUZ</u>**

  Please take notice that, pursuant to Rule 102(b) and (d) of the Commission's Rules of

Practice, Ryan E. Meltzer, an attorney at Norton Rose Fulbright US LLP who may be contacted

at the address in the signature block below, hereby enters an appearance on behalf of Scottsdale

Capital Advisors Corp., John J. Hurry, Timothy B. DiBlasi, and D. Michael Cruz (collectively,

the "Petitioners"), all of whom are located at 7170 E. McDonald Dr., Suite 6, Scottsdale, AZ,

85253, with a telephone number of (480) 603-4900, in the Petitioners' Application for Review of

the above captioned proceedings.

Respectfully Submitted,

Ryan E. Meltzer
Norton Rose Fulbright US LLP
98 San Jacinto Blvd, Suite 1100
Austin, TX 78701-4255
(512) 536-5234 – telephone
(512) 536-4598 – facsimile
ryan.meltzer@nortonrosefulbright.com

Date: July 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile and via first class mail, return receipt requested, on the following:

> The Office of the Secretary
> U.S. Securities and Exchange Commission
> 100 F Street NE
> Mailstop 1090-10915
> Washington, D.C. 20549
> (703) 813-9793 – facsimile
> (202) 772-9324 – facsimile (alternate)
>
> Attn: Jante C. Turner
> Office of General Counsel
> FINRA
> 1735 K. Street, NW
> Washington, D.C. 20006
> (202) 728-8264 – facsimile

Ryan E. Meltzer
Norton Rose Fulbright US LLP
98 San Jacinto Blvd, Suite 1100
Austin, TX 78701-4255
(512) 536-5234 – telephone
(512) 536-4598 – facsimile
ryan.meltzer@nortonrosefulbright.com

**UNITED STATES OF AMERICA**
**BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

SCOTTSDALE CAPITAL ADVISORS CORP., JOHN J.
HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL
CRUZ'S APPLICATION FOR REVIEW
NAC Decision (July 20, 2018)
FINRA Hearing Panel Decision (June 20, 2017)
Complaint No. 2014041724601

**<u>NOTICE OF APPEARANCE ON BEHALF OF SCOTTSDALE CAPITAL ADVISORS
CORP., JOHN J. HURRY, TIMOTHY B. DIBLASI, AND D. MICHAEL CRUZ</u>**

Please take notice that, pursuant to Rule 102(b) and (d) of the Commission's Rules of

Practice, Vijay N. Rao, an attorney at Norton Rose Fulbright US LLP who may be contacted at

the address in the signature block below, hereby enters an appearance on behalf of Scottsdale

Capital Advisors Corp., John J. Hurry, Timothy B. DiBlasi, and D. Michael Cruz (collectively,

the "Petitioners"), all of whom are located at 7170 E. McDonald Dr., Suite 6, Scottsdale, AZ,

85253, with a telephone number of (480) 603-4900, in the Petitioners' Application for Review of

the above captioned proceedings.


Respectfully Submitted,

Vijay N. Rao
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-0211 – telephone
(202) 662-4643 – facsimile
vijay.rao@nortonrosefulbright.com


Date: July 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile

and via first class mail, return receipt requested, on the following:

> The Office of the Secretary
> U.S. Securities and Exchange Commission
> 100 F Street NE
> Mailstop 1090-10915
> Washington, D.C. 20549
> (703) 813-9793 – facsimile
> (202) 772-9324 – facsimile (alternate)
>
> Attn: Jante C. Turner
> Office of General Counsel
> FINRA
> 1735 K. Street, NW
> Washington, D.C. 20006
> (202) 728-8264 – facsimile

Vijay N. Rao
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-0211 – telephone
(202) 662-4643 – facsimile
vijay.rao@nortonrosefulbright.com

UNITED STATES OF AMERICA
BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of the Application of

JOHN J. HURRY
(CRD No. 2146449),

For a Motion to Stay Sanctions Imposed by
FINRA

## MOTION TO STAY SANCTIONS AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

NORTON ROSE FULBRIGHT US LLP

Kevin J. Harnisch
Michael J. Edney
Vijay N. Rao
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501

Ryan E. Meltzer
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701-4255

*Attorneys for Petitioners*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

    I.    The Microcap Securities Market and Section 5 of the Securities Act ................... 3

    II.   Overview of SCA .............................................................................................. 4

    III.  Alpine Securities Corporation ........................................................................... 5

    IV.  Cayman Securities Clearing and Trading SEZC Ltd ......................................... 6

    V.   Allegations of Sales of Unregistered Stock in Three Issuers by CSCT
        Customers ........................................................................................................ 8

DISCUSSION ............................................................................................................. 8

    I.    No Evidence Links Mr. Hurry to the Relevant Transactions ............................... 8

    II.   Mr. Hurry's Creation and Control of CSCT Was Lawful and Does Not
        Give Rise to Rule 2010 Liability ....................................................................... 14

    III.  The Sanctions Are Patently Excessive ............................................................... 16

    IV.  Mr. Hurry Will Suffer Irreparable Harm Absent a Stay ..................................... 17

    V.   No Person Will Suffer Substantial Harm as a Result of a Stay, and a Stay
        Is in the  Public Interest ..................................................................................... 18

CONCLUSION .......................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
    138 S. Ct. 1061 (2018) ................................................................................................. 9

*Davis v. Rondina,*
    741 F. Supp. 1115 (S.D.N.Y. 1990) ......................................................................... 17

*Geiger v. SEC,*
    363 F.3d 481 (D.C. Cir. 2004) ................................................................................. 13

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.,*
    441 F. Supp. 2d 552 (S.D.N.Y. 2006) ..................................................................... 17

*Kokesh v. SEC,*
    137 S. Ct. 1635 (2017) ............................................................................................. 16

*Saad v. SEC,*
    873 F.3d 297 (D.C. Cir. 2017) ................................................................................. 16

*SEC v. Alexander,*
    115 F. Supp. 3d 1071 (N.D. Cal. 2015) .................................................................. 13

*SEC v. Alpha Telecom, Inc.,*
    187 F. Supp. 2d 1250 (D. Or. 2002) ....................................................................... 13

*SEC v. Calvo,*
    378 F.3d 1211 (11th Cir. 2004) ............................................................................... 13

*SEC v. Cavanagh,*
    1 F. Supp. 2d 337 (S.D.N.Y. 1998) ........................................................................ 13

*SEC v. CMKM Diamonds, Inc.,*
    729 F.3d 1248 (9th Cir. 2013) ....................................................................... 9, 10, 12

*SEC v. e-Smart Techs., Inc.,*
    74 F. Supp. 3d 306 (D.D.C. 2014) .......................................................................... 13

*SEC v. Friendly Power Co.,*
    49 F. Supp. 2d 1363 (S.D. Fla. 1999) ..................................................................... 13

*SEC v. Gillespie,*
    349 F. App'x 129 (9th Cir. 2009) ............................................................................ 13

*SEC v. Greenstone Holdings, Inc.,*
    954 F. Supp. 2d 211 (S.D.N.Y. 2013) ..................................................................... 13

*SEC v. Jones,*
    300 F. Supp. 3d 312 (D. Mass. 2018) ..................................................................... 12

*SEC v. Softpoint, Inc.,*
    958 F. Supp. 846 (S.D.N.Y. 1997) ................................................................13, 14

*SEC v. Universal Express, Inc.,*
    475 F. Supp. 2d 412 (S.D.N.Y. 2007).................................................................13

*Street v. Vitti,*
    685 F. Supp. 379 (S.D.N.Y. 1988) ....................................................................18

*Wisdom Import Sales Co. v. Labatt Brewing Co.,*
    339 F.3d 101 (2d Cir. 2003)...............................................................................17

*Wonsover v. SEC,*
    205 F.3d 408 (D.C. Cir. 2000) .............................................................................4

**Administrative Decisions**

*Ahmed Gadelkareem,*
    SEC Release No. 80586, 2017 WL 1735943 (May 3, 2017)................................18

*Arthur W. Lewis,*
    SEC Release No. 75511, 2015 WL 4481236 (July 23, 2015) ..............................13

*Christopher A. Parris,*
    SEC Release No. 77500, 2016 WL 1298225 (April 4, 2016)................................18

*John A. Carley,*
    SEC Release No. 57246, 2008 WL 268598 (Jan. 31, 2008)................................13

*Kenny A. Akindemowo,*
    SEC Release No. 78352, 2016 WL 3877888 (July 18, 2016) ..............................18

*Meyers Assocs., L.P.,*
    SEC Release No. 77994, 2016 WL 3124674 (June 3, 2016)................................18

*Michael Earl McCune,*
    SEC Release No. 77921, 2016 WL 2997935 (May 25, 2016)............................2, 19

*Owen v. Kane,*
    SEC Release No. 23827, 1986 WL 626043 (Nov. 20, 1986) ..............................13

*Scattered Corp.,*
    52 S.E.C. 1314 (Apr. 28, 1997) ...........................................................2, 16, 17, 19

*William Scholander,*
    SEC Release No. 74437, 2015 WL 904234 (Mar. 4, 2015) ................................18

**Rules and Statutes**

15 U.S.C. § 78o-3 .....................................................................................................9

15 U.S.C. § 78s..........................................................................................................9

21 C.F.R. § 230.144 ...........................................................................................4, 5, 7

## INTRODUCTION

Pursuant to Rule of Practice 401, Petitioner John J. Hurry—a twenty-seven-year veteran of the securities industry with a previously pristine disciplinary history—hereby moves to stay the effectiveness of the bar imposed by FINRA's National Adjudicatory Council (the "NAC"), which affirmed a FINRA Hearing Panel decision, pending the Commission's review of this matter.[1] FINRA's Department of Enforcement ("Enforcement") charged Mr. Hurry with violating Section 5 of the Securities Act of 1933 in connection with the deposit and liquidation of microcap securities for three issuers through Scottsdale Capital Advisors ("SCA"), a broker-dealer that Mr. Hurry co founded. By reason of Mr. Hurry's alleged participation in the Section 5 violations, Enforcement contended that Mr. Hurry had violated FINRA Rule 2010, which requires the observance of "high standards of commercial honor and just and equitable principles of trade." FINRA R. 2010.

The standards for imposing individual liability in Section 5 cases are stringent and there is no evidence linking Mr. Hurry to the transactions at issue. Instead of acknowledging Enforcement's failure of proof, the NAC invented a new, post hoc theory of liability premised on perfectly legal conduct and patently faulty logic. Specifically, the NAC barred Mr. Hurry because he established a broker-dealer in the Cayman Islands—Cayman Securities Clearing and Trading SEZC Ltd. ("CSCT")—that unquestionably provided various tax advantages in connection with securities transactions by foreign financial institutions. Although this had absolutely no impact on how SCA processed microcap deposits and did not diminish any of the records that SCA maintained, the NAC summarily concluded that Mr. Hurry's only purpose for creating CSCT was

---

[1] Under FINRA's rules, all sanctions "other than a bar or an expulsion" are automatically stayed pending the Commission's review. FINRA R. 9370. Accordingly, this motion addresses only the bar against Mr. Hurry. A more fulsome brief addressing the bases for reversal of the findings and sanctions against all Respondents, including additional bases for reversal with respect to Mr. Hurry, will be filed in accordance with the briefing schedule that the Commission establishes.

to insulate SCA from regulatory scrutiny, and used this uncharged theory as grounds for a permanent industry bar. The likelihood of Mr. Hurry prevailing against such an illogical theory that Enforcement did not even include in the Complaint is high. And for the reasons described herein, the collateral consequences of not staying the bar pending the Commission's review would be severe and irreversible. Thus, the Commission should grant this motion to stay.

The Commission weighs four factors in deciding whether to grant a stay: (1) "whether there is a strong likelihood that the moving party will succeed on the merits of the appeal"; (2) "whether the moving party will suffer irreparable harm without a stay"; (3) "whether any person will suffer substantial harm as a result of a stay"; and (4) "whether a stay is likely to serve the public interest." *Michael Earl McCune*, SEC Release No. 77921, 2016 WL 2997935, at *1 (May 25, 2016). The factors are "not accorded equal weight": "a stay may be granted where there is a high probability of irreparable harm, but a lower probability of success on the merits, or vice versa." *Id.*; *see also Scattered Corp.*, 52 S.E.C. 1314, 1315 (Apr. 28, 1997) (the petitioner need only show "a substantial case on the merits" if the other three factors "strongly favor a stay"). Here, all four factors strongly support a stay.

Aside from the legal infirmity of barring somebody for uncharged theories of liability tied to wholly legal conduct, the permanent bar, if not stayed, will cause irreparable injury to Mr. Hurry and to the many employees of SCA and a clearing firm, Alpine Securities Corp. ("Alpine"), which are owned by Mr. Hurry's family trusts.[2] Given the strong likelihood that Mr. Hurry will prevail on appeal, coupled with the irreparable injury that will flow from the immediate imposition of a bar, the Commission should stay the effectiveness of that bar pending the Commission's review.

---

[2] SCA's and Alpine's holding companies are owned by a series of family trusts for which Mr. Hurry, his wife Justine Hurry, and their family are beneficiaries. Through the trusts, Mr. and Mrs. Hurry are management trustees.

To avoid any concern that a stay would somehow not be in the public interest, Mr. Hurry will agree to remain uninvolved in evaluating whether potential sales of unregistered stock are eligible for an exemption from registration and/or to refrain from involvement in the management of any SEC-registered broker-dealers during the pendency of the Commission's review.

## BACKGROUND

### I.     The Microcap Securities Market and Section 5 of the Securities Act

SCA is one of the leading broker-dealers in the microcap securities market. The microcap market provides liquidity for small and upstart issuers that lack the resources to obtain listings on the more well-known exchanges. It is no secret that FINRA dislikes the microcap market. In fact, prior to bringing this case, Enforcement unsuccessfully pursued disciplinary charges against Mr. Hurry and SCA, and Enforcement's questionable conduct in that investigation is now the subject of an ongoing civil lawsuit that Mr. Hurry filed against FINRA.[3]  This background provides important context for the decisions below, in which FINRA blatantly disregarded controlling legal principles to assess individual liability on Mr. Hurry.

In this matter, Enforcement charged Mr. Hurry with violating Section 5 of the Securities Act, which Enforcement argued triggered a violation of FINRA Rule 2010, the organization's general ethical rule.[4]  Section 5 prohibits the sale of unregistered securities absent an exemption from registration. The Hearing Panel held that Mr. Hurry personally violated Section 5 despite the complete absence of evidence indicating that Mr. Hurry had any involvement in the

---

[3] *See* Second Amended Complaint ¶¶ 1–7, 56–257, *Hurry v. FINRA*, No. 2:14-cv-02490 (D. Ariz. Aug. 28, 2015), ECF No. 71 (attached hereto as Exhibit 1).

[4] Complaint ¶¶ 143–57, *Dep't of Enforcement v. Scottsdale Capital Advisors Corp.*, Disciplinary Proceeding No. 2014041724601 (May 15, 2015) (FINRA 00032–35).

transactions.[5]  In apparent recognition of this evidentiary failure, the NAC has shifted course to an

uncharged theory of liability and has held that Mr. Hurry violated FINRA Rule 2010 because of

his creation and management of a perfectly lawful and tax-efficient entity, CSCT.[6]  The

Commission cannot countenance FINRA's attempt to invent after-the-fact theories of liability to

salvage the fatal evidentiary infirmities in Enforcement's case.

## II.    Overview of SCA

SCA is a broker-dealer that processes physical and electronic deposits of listed and non-

listed securities, including Pink Sheets, OTCBB, and Rule 144 restricted stock.[7]  SCA customers

often deposit unregistered stock and then seek to sell it.  SCA executes those sales only if, after

performing due diligence on the stock deposit, its staff—and, in particular, its dedicated Rule 144

review team—concludes that the stock qualifies for an exemption from registration, such as the

---

[5] Extended Hearing Panel Decision at 87, *Dep't of Enforcement v. Scottsdale Capital Advisors Corp.*, Disciplinary Proceeding No. 2014041724601 (FINRA OHO March 31, 2017) ("Panel Decision") (FINRA 00032–35).  On June 20, 2017, FINRA's Office of General Counsel granted the Hearing Officer's unilateral request for a remand of the Panel Decision to correct an assertedly non-substantive "factual error."  On June 22, 2017, the Panel issued an amended decision that corrected a material error yet continued to find Respondents liable.  *See generally* Amended Extended Hearing Panel Decision, *Dep't of Enforcement v. Scottsdale Capital Advisors Corp.*, Disciplinary Proceeding No. 2014041724601 (FINRA OHO June 22, 2017) (the "Amended Decision").  References to the Panel Decision are to both the Panel Decision and the Amended Decision, except where noted otherwise.

[6] NAC Decision at 83, *Dep't of Enforcement v. Scottsdale Capital Advisors Corp.*, Disciplinary Proceeding No. 2014041724601 (FINRA NAC July 20, 2018) ("NAC Decision").

[7] Rule 144 is a safe harbor that applies to sales of unregistered stock provided that a broker-dealer satisfies the following objective criteria: (1) the seller has held the securities for at least one year, including permitted "tacking"; (2) the seller is not an "affiliate" of the issuer; and (3) the issuer is not a shell company. 17 C.F.R. § 230.144(b)(1).  In addition, there must be adequate current public information about the issuer. *Id.* § 230.144(b)(1), (c).  If Rule 144 does not apply, a broker-dealer that sells unregistered securities is still protected from liability under Section 4(a)(4) of the Securities Act, known as the broker's exemption, provided that the broker-dealer conducted reasonable diligence as to the applicability of an exemption. *See Wonsover v. SEC*, 205 F.3d 408, 413 n.11 (D.C. Cir. 2000).

Rule 144 safe harbor.[8]  Mr. Hurry had no role in that review and approval process.[9]  In fact, Mr.

Hurry withdrew from management and the day-to-day operations of SCA in 2012, long before the

relevant time period in this case (December 2013 to June 2014).[10]

## III.    Alpine Securities Corporation

In 2012, Mr. Hurry indirectly acquired Alpine, a registered broker-dealer and clearing firm,

through a holding company that is owned by his family trusts.[11]  Alpine provides clearing services

for its customers, including SCA.[12]  Beginning in 2013, in order to reduce complications and risks

with respect to tax withholding, Alpine made the business decision to stop providing clearing

services for transactions on behalf of foreign financial firms unless those transactions were routed

through a foreign broker-dealer that was an IRS-approved Qualified Intermediary ("QI").[13]  If

transactions come through a QI, the tax withholding obligations lie with the QI rather than the

clearing firm.[14]  The tax withholding obligations related to transactions for foreign financial firms

---

[8] *See* FINRA Hr'g Tr. ("Tr.") 1953:11–25, 1954:11–13, 22–24 (Day 8) (DiBlasi) (FINRA 004295, 004296); Tr. 2251:17–2252:4, 2313:11–22 (Day 10) (D'Mura) (FINRA 004594–95, 004656).

[9] *See* Tr. 149:12–15 (Day 1) (Cruz) (FINRA 002487); Tr. 573:6–574:14 (Day 3) (Cruz) (FINRA 002912–13); Tr. 1548:22–25 (Day 7) (Hurry) (FINRA 003889); Tr. 1822:23–1823:5 (Day 8) (Diekmann) (FINRA 004164–65); Tr. 2304:16–25, 2318:18–22 (Day 10) (D'Mura) (FINRA 004647, 004661); CX-178 at 76:16–21, 85:11–18, 85:24–86:15 (FINRA 006242, 006251–52).

[10] Tr. 1551:6–21 (Day 7) (Hurry) (FINRA 003892).

[11] *See* Tr. 1307:8–16 (Day 6) (Hurry) (FINRA 003648).

[12] *See, e.g.*, Tr. 382:11–15 (Day 2) (Cruz) (FINRA 002720).

[13] Tr. 305:23–306:5, 316:1–2 (Day 2) (Cruz) (FINRA 002643–44, 002654); Tr. 563:1–9 (Day 3) (Cruz) (FINRA 002902); Tr. 861:17–20 (Day 4) (Diekmann) (FINRA 003155); Tr. 1117:3–10 (Day 5) (Noiman) (FINRA 003457); Tr. 1642:21–1644:18 (Day 7) (Hurry) (FINRA 003983–85); Tr. 2346:2–23 (Day 10) (Frankel) (FINRA 004689).

[14] "A qualified intermediary (QI) is any foreign intermediary (or foreign branch of a U.S. intermediary) that has entered into a qualified intermediary withholding agreement with the IRS. . . . [T]he QI assumes primary withholding responsibility and primary Form 1099 reporting and

are complicated and the potential repercussions can be significant, so Alpine's decision regarding

the use of QIs was logical.[15]  The risks Alpine sought to minimize by using a QI are real and not

theoretical.  Indeed, the Commission fined Oppenheimer & Co. $10 million for violating Section

17(a) of the Exchange Act and Rule 17a-3 by "fail[ing] to properly withhold and remit taxes [owed

by its customers] to the IRS" and, in turn, "fail[ing] to record this liability and resulting expenses,

which caused its books and records to become inaccurate."[16]

## IV.    Cayman Securities Clearing and Trading SEZC Ltd.

Recognizing the potential growth opportunities for QIs, Mr. Hurry established CSCT in

the Cayman Islands.[17]  Locating in the Cayman Islands provided tax deferral advantages, and

registering for business in the Caymans' so-called "special economic zone" provided quicker

issuance of work permits.[18]

Mr. Hurry hired Gregory Ruzicka, an attorney who had previously represented Mr. Hurry

in a variety of legal matters, to manage the firm, a process that included obtaining IRS approval to

act as a QI and retaining KPMG to fulfill the mandatory QI audit process.[19]  Although Mr. Ruzicka

---

backup withholding responsibility for a payment." *Miscellaneous Qualified Intermediary Information*, IRS.gov, https://www.irs.gov/businesses/international-businesses/miscellaneous-qualified-intermediary-information (last updated Aug. 4, 2016); *see also* Tr. 1553:5–9 (Day 7) (Hurry) (FINRA 003894).

[15] *See* Tr. 1554:12–1557:6 (Day 7) (Hurry) (FINRA 003895–98).

[16] Order Instituting Administrative and Cease-and-Desist Proceedings at 2, *Oppenheimer & Co. Inc.*, SEC Release No. 74141 (Jan. 27, 2015).

[17] Tr. 1552:7–1557:6, 1561:21–1565:16 (Day 7) (Hurry) (FINRA 003893–98, 003902–06).

[18] *Id.*

[19] Tr. 1553:2–19, 1574:19–1575:7 (Day 7) (Hurry) (FINRA 003894, 003915–16); *see also* RX-33. Although Mr. Ruzicka was an entrepreneurial lawyer who had previously run his own law firm, Enforcement and the Decisions presume Mr. Hurry acted nefariously by hiring Mr. Ruzicka

was not practicing law at the time Mr. Hurry hired him as his law firm had dissolved, he had two master's degrees, one of which was in United States tax, and he held himself out as having extensive investment knowledge.[20]  He also spent months studying Rule 144 before starting at CSCT.[21]  And once CSCT began receiving stock deposits from customers, Craig D'Mura, who was regarded as one of the best reviewers on SCA's specialized Rule 144 review team, joined CSCT to assist in the stock deposit review process.[22]

Importantly, although Messrs. Ruzicka and D'Mura performed an initial review of proposed stock deposits for compliance with Rule 144, they were not the final decision-makers as to whether the stocks would be sold in the United States.  Instead, if they were satisfied based upon their review, Messrs. Ruzicka and D'Mura then forwarded the stock deposits to SCA for its own independent review.[23]  SCA, not CSCT, made the final decision as to whether it believed an unregistered security fell within the Rule 144 safe harbor.[24]

---

because Mr. Ruzicka was out of work after experiencing personal issues when Mr. Hurry hired him.  *See, e.g.*, Panel Decision at 21, 24–25, 65, 88; NAC Decision at 79  81, 83.

[20] Tr. 1575:8  11, 1575:20  1576:6 (Day 7) (Hurry) (FINRA 003916  17); *see* CX-29 at 15 (FINRA 005659).

[21] CX-29 at 15 (FINRA 005659); RX-59 at 1 (FINRA 009403); Tr. 1575:16  1577:11 (Day 7) (Hurry) (FINRA 003916  18).

[22] Tr. 1599:4  1601:9, 1603:25–1604:8 (Day 7) (Hurry) (FINRA 003940–45); *see* RX-73 at 1 (FINRA 009405).

[23] Messrs. Ruzicka and D'Mura were adamant that they only forwarded deposits to SCA that they thought met the requirements of Rule 144.  *See* Tr. 2311:18  21, 2325:15  2326:4 (Day 10) (D'Mura) (FINRA 004654, 004668  69); CX-178 at 81  83, 92  93 (FINRA 006247–49, 006258  59).

[24] *See, e.g.*, CX-178 at 91 (FINRA 006257).

## V.    Allegations of Sales of Unregistered Stock in Three Issuers by CSCT Customers

Enforcement alleged that two foreign financial institutions ("FFIs")—Unicorn International Securities ("Unicorn") and Montage Securities ("Montage")—deposited at CSCT unregistered shares of three issuers on behalf of the FFIs' own customers, and CSCT, in turn, sold those stocks through SCA.[25]   Enforcement contended that those sales violated Section 5.[26] Enforcement alleged that Mr. Hurry personally violated Section 5 "[b]y being a necessary participant and substantial factor in the foregoing sales of unregistered securities."[27] That was the sole charge against Mr. Hurry.[28]

### DISCUSSION

Although Enforcement's sole charge against Mr. Hurry was that he was a necessary participant and substantial factor in the alleged Section 5 violations, the NAC devised its own theory for imposing liability on Mr. Hurry because the evidence did not support the charged conduct. The serious flaws in that approach are numerous and will likely lead to reversal. Thus, the Commission should stay the effectiveness of the bar in order to prevent the significant and irreparable harm that otherwise would result.

## I.    No Evidence Links Mr. Hurry to the Relevant Transactions

The high threshold for imposing individual liability under Section 5 requires affirmative evidence that the individual directly and substantially participated in key aspects of the allegedly

---

[25] FINRA Complaint ¶¶ 45–56, 143–57 (FINRA 000015–18, 000032–35).

[26] *Id.* ¶¶ 156–57 (FINRA 000035).

[27] *Id.* ¶ 157 (FINRA 000035).

[28] *See id.* ¶¶ 143–57 (FINRA 000032–35).

unlawful sales.[29]   Enforcement clearly recognized that legal requirement as it included in the

Complaint that Mr. Hurry was "a necessary participant and substantial factor" in the transactions.[30]

The mere fact that a person owns or controls a broker-dealer or other entity involved in the sales

process is not enough to sustain individual liability.  Indeed, the Ninth Circuit, to which Mr. Hurry

has the right of appeal, has made this point abundantly clear.

        As the Ninth Circuit has explained, before Section 5 liability can attach, the regulator must

prove that the respondent's "role in the transaction [was] a significant one." *SEC v. CMKM

Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013).  "Defendants play a significant role when

they are both a 'necessary participant' and 'substantial factor' in the sales transaction." *Id.*  This

standard is demanding by design: "[I]t is particularly important that the necessary participant and

substantial factor test be carefully applied to each case so as not to subject defendants with a de

---

[29] Importantly, FINRA does not have the statutory authority to bring enforcement actions premised on Section 5, as Sections 15A and 19 of the Exchange Act expressly and unambiguously (1) limit FINRA's disciplinary powers to violations of the Exchange Act and (2) designate the SEC the exclusive regulatory body authorized to enforce the Securities Act.  *See* 15 U.S.C. §§ 78o-3(b)(2), (h)(i), 78s(g)(1) (empowering FINRA to discipline member firms only for violations of "this chapter," "the rules and regulations thereunder," and the organization's own rules); *id.* § 78s(h)(3) (authorizing the SEC alone to discipline "any person" for violating "any provision of the Securities Act of 1933").  This point has been addressed in prior briefing related to the hearing and will be addressed in the appellate briefs in this matter.  *See, e.g.*, Respondent's Opening Brief at 74-75, *Dep't of Enforcement v. Scottsdale Capital Advisors Corp.*, Disciplinary Proceeding No. 2014041724601 (July 19, 2017) ("NAC Opening Brief").  For now, it suffices to observe that the Supreme Court held just this term that the plain text of the federal securities laws trumps any purported congressional intent.  *See Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1073 (2018) (holding that SLUSA did not divest state courts of concurrent jurisdiction over class actions alleging only violations of the Securities Act, notwithstanding an apparent congressional purpose of combatting legal gamesmanship, and explaining: "This Court has long rejected the notion that '*whatever* furthers the statute's primary objective must be the law.'  Even if Congress could or should have done more, still it 'wrote the statute it wrote—meaning, a statute going so far and no further.").  This strongly suggests that FINRA's atextual claim of authority over the Securities Act—a topic to which the NAC dedicated a single paragraph—will not survive judicial review.  *See* NAC Decision at 91.

[30] FINRA Complaint ¶¶ 152, 157 (FINRA 000090, 000091).

minimis or insubstantial role in a securities scheme to strict liability." *Id.* at 1257. As a result, "[a] participant's title, standing alone, cannot determine liability under Section 5, because the mere fact that a defendant is labeled as an issuer, a broker, a transfer agent, a CEO, a purchaser, or an attorney, does not adequately explain what role the defendant actually played in the scheme at issue." *Id.* at 1258.

Both the Hearing Panel and the NAC, however, simply ignored the requirement that Enforcement prove that Mr. Hurry had significant direct participation in the violative transactions. For example, the Hearing Panel based its conclusion on a subjective view that Mr. Hurry was a "master puppeteer" because he established CSCT and the Hearing Panel believed that he introduced a number of FFIs to CSCT.[31] But those conclusions do not equate to direct and substantial personal involvement in the specific transactions at issue. As explained in *CMKM Diamonds*, a person's ownership of an entity involved in the sales process is not an appropriate basis for imposing Section 5 liability. *See* 729 F.3d at 1258.

There is not a shred of evidence—neither testimony nor exhibits—indicating that Mr. Hurry had any role in the stock deposits for the three issuers. All witnesses who testified about CSCT's and SCA's stock deposit review practices—including Enforcement's own witnesses, Gregory Ruzicka[32] and Craig D'Mura—confirmed that Mr. Ruzicka, not Mr. Hurry, ran the daily

---

[31] Hearing Panel Decision at 88. Those FFIs made dozens of other deposits at CSCT, none of which Enforcement claimed violated Section 5. *See* RX-40 at 2 (FINRA 009256).

[32] Mr. Ruzicka did not testify at the hearing. Instead, the Hearing Officer admitted into evidence the full transcript of Mr. Ruzicka's on-the-record testimony ("OTR") despite his manifest disdain for Mr. Hurry and his admission that he had lied to Enforcement in a prior interview. *See* Respondents' Opening NAC Br. 61–66; Respondents' Reply NAC Br. 21–22. And the NAC not only credited that testimony, but also refused to consider new evidence that Mr. Ruzicka has been deemed incompetent to stand trial in California for a slew of charges consistent with a progressively deteriorating mental state. NAC Decision at 91–94. This is another basis for reversal that will be addressed in subsequent briefing in this appeal.

operations of CSCT.[33] And those same witnesses all confirmed that Mr. Hurry neither asked them about any particular stock deposit requests—let alone the three stock deposits at issue—nor urged them to reconsider any rejections.[34] This is especially notable because Mr. Ruzicka estimated that he rejected approximately 80% of the deposits he reviewed, including roughly 50% of Unicorn's deposits and 70% of Montage's deposits.[35] For deposits that passed through Mr. Ruzicka's and Mr. D'Mura's review, SCA then rejected an additional 46%.[36] Despite all of these rejections, there is absolutely no suggestion that Mr. Hurry ever complained or asked the reviewers at CSCT or SCA to do anything differently.

Had Mr. Hurry wanted to facilitate the sale of unregistered stock without an exemption, as Enforcement implied, one would expect him to have taken steps to remove any impediments to the sales process—most notably, the high deposit-rejection rate at CSCT and SCA. But that did not happen. Instead, Mr. Hurry was completely passive with respect to the approval and sales processes. In fact, as Enforcement conceded before the NAC, there are no emails or records of telephone communications between Mr. Hurry and others during the time that the subject deposits

---

[33] Tr. 575:23–576:9 (Day 3) (Cruz) (FINRA 002914–15); Tr. 759:23–25 (Day 4) (Diekmann) (FINRA 003098); Tr. 2271:5–2273:7 (Day 10) (D'Mura) (FINRA 004614–16); CX-178 at 38:18–19, 55:7–10, 56:6–9 (FINRA 006204, 006221–22).

[34] Tr. 149:12–15 (Day 1) (Cruz) (FINRA 002487); Tr. 573:6–574:14 (Day 3) (Cruz) (FINRA 002912–13); Tr. 1822:23–1823:5 (Day 8) (Diekmann) (FINRA 004164–65); Tr. 2304:16–25, 2318:18–22 (Day 10) (D'Mura) (FINRA 004647, 004661); CX-178 at 76:16–21, 85:11–18, 85:24–86:15 (FINRA 006242, 006251–52).

[35] CX-178 at 92–93 (FINRA 006258–59).

[36] See RX-40 at 2 (FINRA 009256).

were being evaluated.[37]  That is irreconcilable with an argument that Mr. Hurry personally and actively took significant and substantial steps to violate Section 5.

Presumably recognizing its inability to reconcile the evidence with the necessary and substantial participation test, the Hearing Panel made up its own test and rationale for imposing Section 5 liability on Mr. Hurry.[38]  In doing so, the Hearing Panel explicitly ignored the charges in the complaint to find Mr. Hurry liable.[39]

The Hearing Panel's approach, however, amounted to imposing Section 5 liability on Mr. Hurry solely because he established SCA and CSCT.  But the courts have expressly rejected that type of overly simplistic reasoning as counter to the requirement that there be proof of direct and substantial participation in the underlying transactions before Section 5 liability can attach.  It is precisely for that reason that the Ninth Circuit in *CMKM Diamonds* reversed summary judgment in favor of the Commission on its claim that a transfer agent was liable for the sale of securities in violation of Section 5.  *See* 729 F.3d at 1258–59.  Even though the unlawful sales could not have occurred without the approval of the transfer agent, the transfer agent could not be held personally liable without evidence of more direct and substantive involvement than merely effectuating the transfer of the stock from the seller to the buyer.  *Id.* at 1259.  More recent decisions have followed *CMKM Diamonds* and have cut off Section 5 liability absent evidence of both "substantial" and "necessary" participation in securities sales.  *See, e.g., SEC v. Jones*, 300 F. Supp. 3d 312, 316–17 (D. Mass. 2018) (investor's receipt of commissions on securities purchased by other investors, communications with other investors, and coordination with mastermind of alleged scheme to allay

---

[37] NAC Oral Argument Tr. 160:12–23.

[38] Amended Panel Decision at 86-90.

[39] Complaint at ¶ 157.

concerns of other investors, even taken together and viewed in the light most favorable to the Commission, did not give rise to participatory liability under Section 5).

A review of Section 5 case law demonstrates that individual liability uniformly turns on proof that the defendant has either sold the unregistered securities himself or has taken concrete steps necessary to effectuate those sales (e.g., negotiating transactions, controlling the issuer, issuing opinion letters, or directing the issuance of shares).[40]  Given the non-existence of such evidence with respect to Mr. Hurry, the Hearing Panel's decision was legally unsustainable.

Upon recognizing the infirmity of the Hearing Panel's decision, the NAC should have reversed the decision.  The NAC, however, chose to ignore the actual charges in the Complaint,

---

[40] *See, e.g., SEC v. Gillespie*, 349 F. App'x 129, 131 (9th Cir. 2009) (mem.) (controlled issuer and directed consultant to sell stock and remit proceeds); *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (negotiated and signed transactional documents and opened brokerage account); *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (found buyer, negotiated terms, facilitated sale, and fraudulently obtained attorney opinion letter); *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1084 (N.D. Cal. 2015) (solicited buyers and negotiated sales); *SEC v. e-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 328 (D.D.C. 2014) (organized and directed scheme and signed transactional documents); *SEC v. Greenstone Holdings, Inc.*, 954 F. Supp. 2d 211, 213–14 (S.D.N.Y. 2013) (authorized and directed issuance of shares or drafted false attorney opinion letters); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 425, 430, 437 (S.D.N.Y. 2007) (directed issuance of shares, offered and sold shares, or exercised trading authority over sellers' accounts); *SEC v. Alpha Telecom, Inc.*, 187 F. Supp. 2d 1250, 1254–56 (D. Or. 2002) (owned and controlled issuer and had role in day-to-day operations); *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1366, 1372 (S.D. Fla. 1999) (directed and participated in operations and "conceived of and planned the scheme" by which ownership interests were sold); *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998) (sold shares or negotiated and executed sales); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 860 (S.D.N.Y. 1997) (prepared marketing agreements, arranged for broker-dealers to sell stock, and acted as intermediary between broker-dealers and issuers); *Arthur W. Lewis*, SEC Release No. 75511, 2015 WL 4481236, at *2, *6 (July 23, 2015) (approved subordinate's sales and advocated for change of firm policies to permit sales); *John A. Carley*, SEC Release No. 57246, 2008 WL 268598, at *10–11 (Jan. 31, 2008) (maintained accounts, executed trades, and directed transfer agent); *Owen V. Kane*, SEC Release No. 23827, 1986 WL 626043, at *3 (Nov. 20, 1986) (laid the groundwork for broker's purchase of shares, opened and serviced account, and entered sale orders).

which formed the basis for the presentation of Mr. Hurry's defense at the hearing, abandoned the

Section 5 analysis, and created its own illogical theory of liability.[41]

## II.     Mr. Hurry's Creation and Control of CSCT Was Lawful and Does Not Give Rise to Rule 2010 Liability

The NAC barred Mr. Hurry because it decided that his creation and control of CSCT was

for the sole purpose of insulating SCA from regulatory scrutiny.[42]   The NAC pointed to Mr.

Hurry's ownership of CSCT, SCA, and Alpine and the resulting "vertical[] integrat[ion]" of those

businesses, along with Mr. Ruzicka's alleged lack of directly relevant experience, as evidence of

a scheme to evade the regulatory protections of the federal securities laws.[43]   Glaringly, however,

the NAC is unable to point to any actual or even alleged wrongdoing by CSCT.   Nothing about

the structure or operation of CSCT is unlawful.   And the record is clear that CSCT was established

to provide legitimate tax efficiencies.

Contrary to the implications of the NAC's faulty reasoning, CSCT had absolutely no ability

to approve the sale of microcap stocks in U.S. markets—that authority remained with SCA.   Nor

did it reduce in any way the due diligence that SCA performed in deciding whether to approve a

deposit of microcap securities.   The questions SCA asked and the information it gathered remained

unchanged.   Its recordkeeping remained unchanged.   Therefore, the information available to

regulators remained unchanged.

---

[41] *See* NAC Decision at 83.

[42] *Id.*

[43] *Id.*; *see also id.* at 1, 15, 16, 76.

Thus, counter to the NAC's unsupported statement that Mr. Hurry established CSCT so that SCA could "evade regulatory scrutiny,"[44] none of the work related to approving a deposit for sale in the U.S. was somehow transferred from SCA to CSCT. SCA still performed the very same due diligence. It gathered the same documents. It asked the same follow-up questions. The creation of CSCT did not shift any diligence outside of the U.S. or beyond the reach of U.S. regulators, as the NAC claims. Indeed, there is no evidence in the record or findings in the Hearing Panel or NAC decisions that the use of CSCT resulted in SCA not having information that it otherwise would have had. The only change brought about by the creation of CSCT—indeed, the entire reason for CSCT's creation—was the easing of tax withholding complications and tax deferral. In sum, the notion that Mr. Hurry created CSCT in order help SCA evade regulatory scrutiny is contrary to the facts and to common sense.

The NAC's argumentative shift is nothing more than a back-door attempt to hold Mr. Hurry liable for the Section 5 violations that FINRA speculates occurred without confronting the stringent test of necessary and substantial participation required for a finding of individual Section 5 liability. The theory upon which Enforcement charged Mr. Hurry and which was the basis for Mr. Hurry's defense was that Mr. Hurry personally violated Section 5, resulting in a Rule 2010 violation.[45] The NAC, realizing that any Rule 2010 violation predicated on individual Section 5 liability would not survive legal scrutiny in light of the evidentiary record, has turned to an uncharged and standardless basis for imposing liability that amounts to little more than a dislike of Mr. Hurry's activities. An individual cannot be charged with a Rule 2010 violation, and

---

[44] *Id.* at 83.

[45] Complaint at ¶ 157.

subsequently barred from the securities industry and deprived of his livelihood, simply because FINRA does not *like* what he does.

Before barring somebody, the theory of liability must be charged in the complaint such that the respondent can present all available defenses. Similarly, in order to justify liability there must be evidence supporting findings of actual, unethical conduct. Those necessary predicates do not exist here. Accordingly, Mr. Hurry's likelihood of success on appeal is high.

### III. The Sanctions Are Patently Excessive

FINRA's sanctions are excessive and unmoored from any guiding legal principles. The NAC's Decision imposed FINRA's equivalent of the death penalty against Mr. Hurry because his actions in creating CSCT were "purposeful" and "egregious".[46, 47] However, the NAC's sanctions cannot be reconciled with the fact that *nothing about Mr. Hurry's creation, control, or management of CSCT was improper*. The NAC is unable to point to even a single instance of wrongdoing by Mr. Hurry, and instead relies on its "estimation" that Mr. Hurry behaved unlawfully.[48] Such speculation cannot support the draconian sanctions issued in this matter.

In sum, FINRA's factual and legal errors make out, at the very least, a "substantial case" for reversal. *See Scattered Corp.*, 52 S.E.C. at 1318–19.

---

[46] NAC Decision at 102.

[47] FINRA sanctions must be remedial, not punitive. Recent Supreme Court precedent calls into question whether a permanent bar can be considered remedial, which changes the SEC's analysis of whether such a bar is "excessive or oppressive." *See, e.g., Saad v. SEC*, 873 F.3d 297, 304–07 (D.C. Cir. 2017) (Kavanaugh, J. concurring) (discussing the impact of *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), on whether FINRA bars are punitive or remedial). The Commission should grant Mr. Hurry's motion to stay so that the issue of whether FINRA is even permitted to issue a bar under the circumstances of this case can be more fully considered.

[48] NAC Decision at 83.

## IV.   Mr. Hurry Will Suffer Irreparable Harm Absent a Stay

Mr. Hurry undoubtedly will be irreparably harmed in the absence of a stay. Unlike most cases involving stays of industry bars, the basis here is not the hardship of finding another job or source of income pending the Commission's decision. Unless a stay is granted, Mr. Hurry will be forced to divest his control interests in the entities within the SCA and Alpine ownership structures. Selling SCA and Alpine is not practical given the lack of any public or ready market as well as the numerous tax implications and other considerations. Moreover, any such sale would be at very distressed prices given the circumstances. In addition, the inability of SCA and Alpine to access capital from Mr. Hurry could threaten or significantly limit ongoing operations, which could negatively impact numerous employees of those firms. There is no practical way to undo those consequences should Mr. Hurry ultimately prevail on appeal. Those types of damages are not reversible, and therefore the harm is irreparable.

A stay is merited when the petitioner would otherwise lose the benefit of a successful appeal. *See Scattered Corp.*, 52 S.E.C. at 1320 (staying a firm's expulsion, an executive's bar, and their respective fines "pending the resolution of this case on the merits" because "[t]he benefit of any possible reduction of [the] bar and fines . . . would be lost, absent a stay at this juncture"). Courts have held, in the analogous context of motions for injunctive relief, that the dilution or divestiture of a control interest in a business constitutes irreparable harm. *See, e.g.*, *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (affirming injunction because "the denial of a controlling ownership interest in a corporation may constitute irreparable harm"); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 441 F. Supp. 2d 552, 563-64 (S.D.N.Y. 2006) (noting that "[i]rreparable injury has been found . . . in 'the dilution of a party's stake in, or party's loss of control of, a business'" and granting injunction because "the loss of control itself— even if temporary—may constitute irreparable harm"); *Davis v. Rondina*, 741 F. Supp. 1115, 1125

(S.D.N.Y. 1990) (granting injunction because "loss of the opportunity to continue to manage the company which [plaintiff] has helped to build" constituted irreparable harm); *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (awarding injunction where plaintiffs would lose their shares in close corporation and "their voice in management").

These previously recognized reasons for granting a stay apply here. Without a stay, many of the benefits of a successful appeal will be forever lost.

**V.    No Person Will Suffer Substantial Harm as a Result of a Stay, and a Stay Is in the Public Interest**

Finally, the balance of the equities and the public interest favor a stay. To find a stay to be against the public interest, the Commission generally looks for direct evidence that the petitioners violated substantive securities laws or engaged in patently offensive and egregious behavior in violation of FINRA rules.[49] There is no claim, let alone any evidence, that Mr. Hurry took affirmative steps to sell or approve the sale of the stock at issue in this case. Instead, the theory of liability is predicated on Mr. Hurry's control interest in CSCT, not on any actions he took with respect to the discrete stock deposits in the three companies at issue. Given Mr. Hurry's previously unblemished record (not a single reportable customer complaint ever in Mr. Hurry's career or any personal regulatory issues prior to this) and the nature of the NAC's reasoning, which do not

---

[49] *See, e.g., Ahmed Gadelkareem*, SEC Release No. 80586, 2017 WL 1735943, at *1 (May 3, 2017) (petitioner "embark[ed] on a campaign of abusive, harassing, and threatening communications directed at employees of his former member firm," which included making false allegations fraud to the former firm's customers and impersonating an NYPD officer); *Kenny A. Akindemowo*, SEC Release No. 78352, 2016 WL 3877888, at *3 (July 18, 2016) (petitioner converted investor funds for personal use); *Meyers Assocs., L.P.*, SEC Release No. 77994, 2016 WL 3124674, at *4–5 (June 3, 2016) (petitioner willfully aided firm's failure to respond to state regulator's document request and had a significant prior disciplinary history); *Christopher A. Parris*, SEC Release No. 77500, 2016 WL 1298225, at *3 (April 4, 2016) (petitioner refused to produce documents pursuant to FINRA Rule 8210); *William Scholander*, SEC Release No. 74437, 2015 WL 904234, at *7–8 (Mar. 4, 2015) (petitioners sold customers securities of a company with which they previously did business, without disclosing the prior relationship).

involve any alleged customer losses, there is no reason to believe that "any person will suffer substantial harm as a result of a stay." *McCune*, 2016 WL 2997935, at *1 (May 25, 2016); *see also Scattered Corp.*, 52 S.E.C. at 1319 (no harm to others where unrefuted evidence showed that petitioners "d[id] not trade directly with the investing public").

Mr. Hurry is not involved in the day-to-day operations of SCA or Alpine.  Indeed, Mr. Hurry would be amenable to the Commission conditioning a stay on his commitment to remain uninvolved in the stock deposit review process or from otherwise managing the affairs of those entities or of any other SEC registered broker-dealer during the pendency of the Commission's review of this matter.  *See Scattered Corp.*, 52 S.E.C. at 1320–21 (granting motion to stay effectiveness of bar subject to conditions restricting involvement in certain types of trading).  Such explicit limitations in the Commission's order would foreclose any concern that any person would be at risk of harm or the public interest would be adversely affected by the stay.

## **CONCLUSION**

For the foregoing reasons, the Commission should stay the bar against Mr. Hurry until the Commission has rendered a final decision on the merits.

Dated: July 23, 2018

Respectfully Submitted,

Kevin J. Harnisch
Michael J. Edney
Ryan E. Meltzer
Vijay N. Rao
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001-4501
(202) 662-4520    telephone
(202) 662-4643 – facsimile

## **ATTORNEY CERTIFICATION**

Pursuant to Rule 154(c) of the Commission's Rules of Practice, I hereby certify that

foregoing document contains 6,419 words, exclusive of the tables of contents and authorities.

Kevin J. Harnisch

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2018, I caused the foregoing to be served by facsimile and via first class mail, return receipt requested, on the following:

The Office of the Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Mailstop 1090-10915
Washington, D.C. 20549
(703) 813-9793 – facsimile
(202) 772-9324 – facsimile (alternate)

Attn: Jante C. Turner
Office of General Counsel
FINRA
1735 K. Street, NW
Washington, D.C. 20006
(202) 728-8264 – facsimile

Kevin J. Harnisch

UNITED STATES OF AMERICA
BEFORE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of the Application of

JOHN J. HURRY
(CRD No. 2146449),

For a Motion to Stay Sanctions Imposed by
FINRA

**MOTION TO STAY SANCTIONS AND INCORPORATED MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT**

**EXHIBIT 1**

1  Robert A. Mandel, SBN 022936
   Taylor C. Young, SBN 020743
2  Peter A. Silverman, SBN 020679
3  **MANDEL YOUNG PLC**
   3001 E. Camelback Rd., Ste. 140
4  Phoenix, Arizona 85016
5  Tel (602) 424-8480
   Fax (602) 734-5431
6  taylor@mandelyoung.com
7  rob@mandelyoung.com
   peter@mandelyoung.com
8  courtorders@mandelyoung.com
9  *Attorneys for Plaintiffs*

10              **IN THE UNITED STATES DISTRICT COURT**

11                **FOR THE DISTRICT OF ARIZONA**

12
     John J. Hurry and Justine Hurry, as husband     Case No. CV-14-02490-PHX-ROS
13   and wife; Investment Services Corporation,
     an Arizona corporation; Hurry Family
14   Revocable Trust d/t/d October 18, 2011
     amended November 26, 2012, a Nevada
15   trust; Investment Services Partners LLC, an
16   Arizona limited liability company;              **SECOND AMENDED COMPLAINT**
     Scottsdale Capital Advisors Partners LLC an
17   Arizona limited liability company; SCAP I
18   LLC, an Arizona limited liability company;
     SCAP II LLC, an Arizona limited liability
19   company; SCAP III LLC, an Arizona
20   limited liability company; SCAP 4 LLC, an       **JURY TRIAL DEMANDED**
     Arizona limited liability company; SCAP 6
21   LLC, a Nevada limited liability company;
22   SCAP 7 LLC, a Nevada limited liability
     company; SCAP 8 LLC, an Arizona limited
23   liability company; SCAP 9 LLC, a Nevada
24   limited liability company; SCAP 10 LLC, a
     Nevada limited liability company; BRICFM
25   LLC d/b/a Corner of Paradise Ice Cream
26   Store, a California limited liability company;
     CJ3 LLC, a Montana limited liability
27   company; Association of Securities Dealers
28

1  LLC, a Delaware limited liability company;
2  SCAP 5 LLC, an Arizona limited liability
   company; Investment Services Capital LLC,
3  a Nevada limited liability company;
   Investment Services Holdings Corp., a
4  Nevada corporation; NEWCONMGT LLC,
5  a Nevada limited liability company; ISC
   LLC, an Alaska limited liability company;
6  ISHC LLC, a Montana limited liability
7  company; NEWMGT LLC, a Nevada
   limited liability company; SCAINTL LLC, a
8  Nevada limited liability company; FLJH
9  LLC, a Nevada limited liability company;
   ASD Holding Company LLC, a Delaware
10 limited liability company; Hurry
11 Foundation, a Nevada non-profit 501(c)(3)
   organization.
12
13                              *Plaintiffs,*
14 v.
15 Financial Industry Regulatory Authority,
   Inc., a Delaware corporation, Scott M.
16 Andersen, a natural person, John and/or Jane
17 Does 1-10.
18                             *Defendants.*
19
20
21              **NATURE OF THE ACTION**
22
23         1.      This action stems from deliberate, retaliatory, and extra-regulatory conduct by the
24 Financial Industry Regulatory Authority, Inc. ("FINRA"), a self-regulatory organization ("SRO")
25 acting under authority of the U.S. Securities and Exchange Commission ("SEC"); Scott M.
26 Andersen ("Andersen"), FINRA's former regional deputy counsel; and several other FINRA staff
27 members whose identities are currently unknown. (Andersen and unknown Does are collectively
28

-2-

referred to as the "Individual Defendants." Individual Defendants and FINRA are collectively referred to as "Defendants").

2.       John and Justine Hurry (the "Hurrys") are successful entrepreneurs who own or operate several businesses in Arizona, Montana, Nevada, Utah, and California. Two of these businesses, non-parties Scottsdale Capital Advisors Corporation ("SCA"), and Alpine Securities Corporation ("Alpine"), are registered broker-dealers and members of FINRA. (Alpine and SCA are collectively referred to as the "Member Firms.") SCA and Alpine are among the largest and most dominant firms in the clearing microcap securities market in the United States. Though legal, the microcap securities market, often referred to as the over-the-counter ("OTC") market, is disfavored as a "high risk" industry by FINRA and the SEC. The Hurrys' other businesses include commercial and residential real estate ventures, retail operations, and prospective ventures in aerospace, defense, technology, professional services, and innovative consumer goods.

3.       John Hurry's role in the securities industry extends beyond any ownership interest he has in the Member Firms. In his capacity as an experienced industry leader and as one of a growing chorus of critics with regard to overreach and abuse by FINRA, John Hurry has sought to improve the industry through the creation of a new self-regulated organization, the "Association of Securities Dealers LLC" or "ASD," a potential competitor to FINRA. ASD's purpose includes the laudatory goals of removing barriers to and preserving a free and open market and a national market system, while adhering to securities laws.

4.       In November of 2012, FINRA and Andersen improperly gained entry to the Hurrys' office at Investment Services Corporation ("ISC"), a non-member company, and coerced access to the computers and hard-drives the Hurrys use for their non-securities related business and

personal pursuits ("ISC computers"). Defendants unlawfully accessed and copied the sensitive, private, confidential, attorney-client privileged, attorney work product, and proprietary computer data, including trade secrets, contained in the ISC computers.

5. FINRA regularly and explicitly relies upon the potential for a lifetime ban to coerce compliance from its members and associated persons. When FINRA and Andersen were sued for unlawfully accessing and copying the non-member computer data, Defendants coerced the Hurrys into dropping the lawsuit under threat of disciplinary action against the Hurrys and/or those associated with the Member Firms.

6. Dropping the lawsuit did not mollify the Defendants. Instead, Defendants pursued an unlawful course of conduct designed to prevent the Hurrys from expanding in the over-the-counter sector, shrink their sphere of influence in the securities industry, and, ultimately, drive them out of business altogether. Through an orchestrated campaign of harassment, defamatory statements, press leaks, and capricious interference with the Hurrys' business relationships, Defendants have caused and continue to cause unwarranted reputational damage to the Hurrys and the numerous closely held businesses in which the Hurrys have a direct or indirect interest.

7. FINRA's executive leadership has shown nothing but callous disregard to entreaties to investigate and stop these reputational injuries. FINRA knows or should know that such reputational injuries inevitably interfere with the target's ability to stay in business by, among other things, causing a loss of essential banking relationships. On information and belief, this is the precise consequence Defendants have pursued through direct and indirect means utilizing tactics consistent with those relied on by the federal government in its Operation Choke Point, a highly controversial and unlawful program to drive companies and individuals engaged in legal

-4-

activities out of business through extra-regulatory means. Under the program, government officials have pressured banks and other financial institutions to cut off accounts for targeted businesses engaged in "high risk" activities. Disfavored industries include gun stores, casinos, tobacco distributers, short-term lenders, among other legal businesses. Government officials have painted the targeted businesses as "high risk," inflicted reputational harm, and engaged in behind-the-scenes, extra-regulatory strong-arm tactics. Officials have created fear among members of the financial industry—reportedly telling banks they would face increased audits and scrutiny if they maintained relationships with customers in disfavored industries. Reportedly, the operation was led by Department of Justice officials working in partnership with officials from other agencies including the Treasury and the SEC. As alleged in this Second Amended Complaint, FINRA has engaged in extra-regulatory activity targeted at the Hurrys and their businesses using the Operation Choke Point model:

   a. FINRA and the SEC view the legal microcap securities market with disfavor and as high risk;

   b. FINRA and the Individual Defendants have targeted the Hurrys, as major players in the market, to limit their influence and force them out of the sector.

   c. The campaign by FINRA and the Individual Defendants has included the infliction of reputational harm and the intentional destruction of the Hurrys' business and financial relationships;

   d. The misconduct by FINRA and the Individual Defendants bears no legitimate relationship to their regulatory functions and authority.

With no other recourse, the Hurrys and several of their businesses now seek relief in this Court.

-5-

**PARTIES**

8.    Plaintiff John J. Hurry is a natural person and resident of Douglas County, State of Nevada.

9.    Plaintiff Justine Hurry is a natural person and resident of Douglas County, State of Nevada.

10.    Plaintiff ISC is an Arizona corporation with its principal place of business in Scottsdale, Arizona.

11.    Plaintiff Hurry Family Revocable Trust d/t/d October 18, 2011, amended November 26, 2012, ("Hurry Family Trust") is a Nevada trust. John Hurry and Justine Hurry are trustees of the Hurry Family Trust.

12.    Plaintiff Investment Services Partners LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

13.    Plaintiff Scottsdale Capital Advisors Partners LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

14.    Plaintiff SCAP I LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

15.    Plaintiff SCAP II LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

16.    Plaintiff SCAP III LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Newport Beach, California.

-6-

17.     Plaintiff SCAP 4 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.

18.     Plaintiff SCAP 6 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

19.     Plaintiff SCAP 7 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

20.     Plaintiff SCAP 8 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

21.     Plaintiff SCAP 9 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Salt Lake City, Utah.

22.     Plaintiff SCAP 10 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

23.     Plaintiff BRICFM LLC, d/b/a Corner of Paradise Ice Cream Store, is a limited liability company organized and existing under the laws of the State of California with its principal place of business in Newport, California.

24.     Plaintiff CJ3 LLC is a limited liability company organized and existing under the laws of the State of Montana with its principal place of business in Montana.

25.     Plaintiff Association of Securities Dealers LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Scottsdale, Arizona.

26.     Plaintiff SCAP 5 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.

-7-

27.    Plaintiff Investment Services Capital LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

28.    Plaintiff Investment Services Holdings Corp is a Nevada corporation with its principal place of business in Nevada.

29.    Plaintiff NEWCONMGT LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

30.    Plaintiff ISC LLC is a limited liability company organized and existing under the laws of the State of Alaska with its principal place of business in Alaska.

31.    Plaintiff ISHC LLC is a limited liability company organized and existing under the laws of the State of Montana with its principal place of business in Montana.

32.    Plaintiff NEWMGT LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

33.    Plaintiff SCAINTL LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

34.    Plaintiff FLJH LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Florida.

35.    Plaintiff ASD Holding Company LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Scottsdale, Arizona.

36.    Plaintiff Hurry Foundation is a non-profit organization (501(c)(3)) organized and existing under the laws of the State of Nevada, with its principal place of operation in Nevada.

-8-

37.     Collectively, the plaintiffs in paragraphs 10 through 36 are the "Business Plaintiffs." Collectively, the Business Plaintiffs and the Hurrys are referred to as Plaintiffs.

38.     The Hurrys, jointly or separately, have direct or indirect ownership interest in each of the Business Plaintiffs.

39.     FINRA is a private, not-for-profit corporation organized and existing under the laws of the State of Delaware that operates from Washington D.C. and New York City with regional offices throughout the United States.

40.     FINRA is an SRO registered with the SEC as a national securities association. FINRA has regulatory power, delegated from Congress through the SEC in the Securities Exchange Act of 1934 (the "Exchange Act"), over broker-dealer firms registered under section 15 of the Exchange Act and their registered associated persons.

41.     Andersen is a natural person who, on information and belief, is domiciled in the State of California. He was a FINRA employee holding the title "Deputy Regional Chief Counsel" until on or about April 6, 2015, when Andersen's employment abruptly ceased with FINRA.

42.     Plaintiffs do not know the true names of John and/or Jane Does 1 through 10, inclusive, and therefore sue them by those fictitious names.

43.     John and/or Jane Does 1-10 are employees or agents of FINRA who unlawfully accessed, inspected, copied, or seized three password protected computers belonging to ISC, and the several hard drives within them, and/or unlawfully reviewed, copied, retained, or disseminated information copied from the ISC computers that is beyond FINRA's jurisdiction, and/or acted in concert with Andersen to coerce and retaliate against the Hurrys for bringing their lawsuit and/or engaging in constitutionally protected activity.

44.    Defendants' conduct was and remains deceptive, coercive, invasive, unauthorized, extra-jurisdictional, and unlawful. The Individual Defendants' failure to hue to the limits of FINRA Procedural Rules and their conspiratorial abuses of authority demonstrate that FINRA had and has inadequate control over the Individual Defendants. Plaintiffs sue the Individual Defendants in their personal capacities to secure complete relief.

45.    Plaintiffs seek injunctive relief and damages holding FINRA, Andersen, and all persons or entities acting in concert with them liable for causing irreparable harm to Plaintiffs together with their respective families, their employees past and present, and the several other persons and entities upon whose privacy, privilege, and proprietary rights and obligations Defendants have willfully intruded and interfered by engaging and continuing to engage in the unlawful conduct alleged.

46.    Plaintiffs reserve the right to amend this Complaint to assert, *inter alia*, additional or different claims against FINRA, Andersen, or other members of FINRA staff, including, without limitation, additional or different remedies, or additional or different parties, as its investigation proceeds.

## JURISDICTION AND VENUE

47.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiffs' CFAA, *Bivens*, and Civil Rights claims arise under the Constitution, laws, or treaties of the United States, and under 28 U.S.C. § 1367, as Plaintiffs' state law claims are so related to the federal claims they form part of the same case or controversy under Article III of the United States Constitution.

48.     The Court has general personal jurisdiction over FINRA and the Individual Defendants as they conduct business in the State of Arizona on a substantial or continuous and systematic basis, and, therefore, are constructively present in the State of Arizona.

49.     The Court also or alternatively has specific ("long-arm") jurisdiction over FINRA and the Individual Defendants, as (a) they purposefully availed themselves of the privilege of conducting business in Arizona, (b) Plaintiffs' claims arise out of or relate to their contacts with Arizona, and (c) the exercise of jurisdiction over them is reasonable.

50.     Venue is proper in this judicial district under 28 U.S.C. §§ 1392(b)(1) and (b)(2), as FINRA and the Individual Defendants "reside" in the State of Arizona within the meaning of that statute, and a substantial part of the events or omissions giving rise to Plaintiffs' claims against FINRA and the Individual Defendants occurred, or a substantial part of the property that is the subject of this action is situated, in the State of Arizona.

## ALLEGATIONS OF FACT

### *FINRA's and the Individual Defendants' activities are closely coordinated with the SEC*

51.     Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

52.     At all times pertinent to this Complaint, FINRA, Andersen, and the unidentified FINRA agents were acting under color of federal law.

53.     Upon information and belief, at all times pertinent to this Complaint, FINRA's and the Individual Defendants' examination and other activities related to the Hurrys and the

businesses associated with the Hurrys have been closely and directly coordinated with the SEC and/or other federal authorities.

54.     According to at least one press account, the SEC and FINRA are working together in a purported investigation of the broker-dealers associated with the Hurrys.

55.     Moreover, the inquiries from the SEC and FINRA to the Hurrys and businesses associated with the Hurrys overlap temporally and substantively in a manner that demonstrates joint activity by the regulators. As one example, described fully below, subpoenas from the SEC have closely followed record requests from FINRA substantially mirroring the type and scope of records to be produced.

### FINRA and the Individual Defendants Coerce Access to the ISC Office and Seize, Access, and Copy the ISC Computers

56.     Scottsdale Partners is one of the Hurrys' several real estate businesses, which owns two adjacent building complexes in Scottsdale, Arizona—one at 7110 East McDonald Drive ("Kiva Professional Plaza"), and the other at 7170 East McDonald Drive ("Scottsdale Professional Plaza"). Scottsdale Partners is not involved in broker-dealer activities, is not a FINRA "member" or "associated person" under FINRA's Bylaws or FINRA's Procedures, and is not subject to FINRA's regulatory jurisdiction.

57.     Scottsdale Partners leases offices in the plazas to numerous business tenants unrelated to the Hurrys or their several companies, including a dental practice, a Chinese medicine herbalist, an accounting practice, a physical therapy practice, a pain management clinic, a financial advisory practice, and a sleep disorders institute (collectively, the "Non-Hurry Business Tenants").

58.     In November of 2012, the offices and common areas in Suite 6 of the Scottsdale Professional Plaza, which share a common reception area, were reserved for and divided among the Hurrys' several businesses.

59.     Scottsdale Partners leases several of the offices in Suite 6 to Non-Party Scottsdale Capital Advisors Corporation ("SCA"), an Arizona corporation operating as a securities broker-dealer that John and Justine founded in 2001.

60.     SCA is a FINRA "member" and is subject to FINRA regulations.

61.     In November of 2012, Scottsdale Partners also provided offices in Suite 6 to employees of Scottsdale Partners who perform building maintenance services for the two plazas.

62.     Scottsdale Partners also leases office space at the Scottsdale Professional Plaza to ISC. Presently, ISC's offices are located exclusively in Suite 4 of the Scottsdale Professional Plaza (the "ISC Office Suite"). In November 2012, ISC's offices were located in space it leased from Scottsdale Partners in Suite 6—specifically, the northwest corner office of Suite 6 (the "ISC Corner Office"). ("ISC Office" refers to both the ISC Corner Office and the ISC Office Suite unless context otherwise demands.) At all times relevant to this Complaint, FINRA was on notice of the location of the ISC Office.

63.     ISC is neither a FINRA "member" nor a FINRA "associated person" under FINRA's By-laws and Enforcement Department Procedures Manual ("FINRA's Procedures").

64.     Scottsdale Partners conducts business out of the ISC Office. At all times relevant to this Complaint, the plaza's several tenants remit their rent payments and provide landlord notices to Scottsdale Partners at the ISC Office.

-13-

65.     In November 2012, ISC owned and maintained the ISC Computers—three password protected computers and the several hard drives within them—located in the ISC Office.

66.     The ISC Computers were connected to the internet and used in interstate commerce and communications.

67.     When working onsite at the Scottsdale Professional Plaza, the Hurrys use the ISC Computers in the ISC Office primarily to attend to the management and operations of ISC, Scottsdale Partners, their other non-member real estate businesses, and new and potential business ventures that arise for them from time to time.

68.     When working onsite at the Scottsdale Professional Plaza, Hurrys also use the ISC Computers in the ISC Office for all or most of their charitable endeavors and the personal affairs of their immediate and extended family, including, but not limited to, financial, legal, tax, medical, educational, and numerous other personal matters, as described in greater detail below.

69.     When working from one of their homes or otherwise away from Scottsdale Professional Plaza, the Hurrys access the ISC Computers remotely for the same purposes listed in paragraphs 67 - 68.

70.     A single gigabyte of electronic data is the equivalent of approximately 894,784 pages of plaintext or 4,473 200-page books.

71.     In November 2012, the ISC Computers contained hundreds of gigabytes of electronic data that (1) were not SCA's "books and records" (nor the books and records of any other FINRA member) or (2) were unrelated to SCA, including at least the following categories of sensitive, private, confidential, privileged, and proprietary information that ISC is duty bound to protect from disclosure (collectively, the "Extra-Jurisdictional Materials"):

-14-

a.      confidential and legally protected employment files, medical records, and health information of ISC's and Scottsdale Partners' employees and their family members including, but not limited to, John Davidson, John Lumpkin, John Hurry, Justine Hurry, and various employees of Corner of Paradise in Newport, California;

b.      proprietary, confidential, and sensitive business, employee, and customer information for numerous non-member entities, which has competitive value because it is not generally known or ascertainable by competitors who could use it to their economic advantage, including, but not limited to, information pertaining to the Non-Hurry Business Tenants, and to the Hurrys' past, present, and future non-regulated businesses and entrepreneurial commercial ventures, such as counterparty information, customer lists, client lists, accounts, business financial information, payroll information, contracts, settlement agreements, non-disclosure agreements, trade secrets, production methods, formulas, plans, and other intellectual property;

c.      private and confidential communications regarding sensitive family and business matters related to the Hurry family and extended family, including the health records of John and Justine and their four children, the health, military and financial records of Justine's elderly father, for whom Justine holds a power-of-attorney, the account numbers and details of the Hurry's personal bank accounts and accounts at other financial institutions, and a variety of other private personal data, including photos;

d.      privileged attorney-client communications between John or Justine both in their personal and/or official capacities, on the one hand, and their legal advisors, on the other, with related attorney work product;

e.      confidential school records related to the Hurrys' children;

-15-

f.    personal estate and financial planning information for the Hurrys, including their trust documents, living wills, and the location and disposition of various personal financial assets of the couple; and

g.    business tax returns for various non-member entities and other financial information, including bank account numbers, passwords, and general ledgers.

72.    On the morning of November 12, 2012, staff members representing FINRA's Departments of Member Regulation and Enforcement commenced FINRA Matter No. 20120327319 with a surprise onsite examination of SCA at its headquarters in Suite 6 of the Scottsdale Professional Plaza. Staff members represented at least five FINRA offices (Dallas, Denver, Los Angeles, New York City, and Rockville) and included Andersen, Christina L. Stanland ("Stanland"), FINRA's principal regional counsel, Steven C. Bender, Rebecca Kramer, Cia M. Fiske, Stacie A. Jungling, Christopher Leigh, Nicholas Moor, and Cindy Ponikvar.

73.    FINRA's arrival at Suite 6 bore hallmarks of a government raid. Andersen and his examination team arrived unannounced first thing in the morning. They deliberately intimidated the receptionist and FINRA staff fanned out throughout the offices, bullying SCA personnel and interrupting and interfering with the performance of their job duties.

74.    Andersen and his examination team commandeered SCA's conference room and set up an office of their own within it for four consecutive days, operating around the clock, during which time they interfered with the business operations in Suite 6.

75.    FINRA staff also roamed the outside common areas and parking lot of Scottsdale Professional Plaza, disturbing and causing Non-Hurry Business Tenants enough concern to

-16-

inquire of SCA personnel and FINRA staff whether the FINRA individuals were law enforcement or government agents.

76.     FINRA did not disclose to SCA or the Hurrys at the time of the onsite examination its cause for examining SCA in FINRA Matter No. 20120327319.

77.     In the period between the commencement of the onsite examination of SCA on November 12, 2012, and the date of this Second Amended Complaint, FINRA has not charged SCA or any SCA personnel with wrongdoing in FINRA Matter No. 20120327319.

78.     Andersen, FINRA's Deputy Regional Chief Counsel, led the team of FINRA staff members that conducted FINRA's onsite examination of SCA in FINRA Matter No. 20120327319.

79.     When they arrived at SCA's headquarters, Andersen or a member of his team presented SCA's chief compliance officer with a Procedural Rule 8210 Request (the "8210 Request") and related correspondence addressed to John solely in his purported capacity as "president" of SCA.

80.     FINRA issued no separate FINRA Rule 8210 request to John, Justine, or any other "associated person" of SCA in his or her personal capacity relating to FINRA Matter No. 20120327319.

81.     Both Justine and John were under considerable emotional strain at the time of the onsite examination. Justine had recently been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. She was scheduled to ▮▮▮▮▮▮ on January 17, 2013, to remove it. Nobody knew or could have known whether or not ▮▮▮▮▮▮▮▮▮. John, Justine, and their four children ▮▮▮ ▮▮▮▮

-17-

82.     Because Justine's ████████████ was to be followed by at least ten weeks of convalescence, John was preparing to single-handedly undertake ████████████ Justine, their four children, and their several companies and business ventures when FINRA commenced the onsite examination of SCA.

83.     Neither John nor Justine was at SCA's headquarters in Suite 6, or at the ISC Office during FINRA's onsite examination of SCA.

84.     FINRA demanded of SCA in the 8210 Request "immediate access to inspect and copy . . . information in the possession, custody, or control of [SCA] and its subsidiaries, affiliates, predecessor corporations, principals, employees, and any other affiliated persons."

85.     FINRA warned SCA in the 8210 Request that "your failure to provide access to the firm's books and records requested . . . may result in a disciplinary action .... Sanctions that could be imposed include fines, expulsion and a permanent bar from the industry."

86.     Among other items, FINRA demanded in the 8210 Request that SCA produce "[f]orensic images of *the hard drives* of select firm employees *identified onsite* by FINRA staff" (emphasis added), advised SCA that "[u]nder FINRA Rule 8210, you are obligated to respond to this request fully, promptly, and without qualification," and warned SCA that "[a]ny failure on your part to satisfy these obligations could expose you to sanctions, including a permanent bar from the securities industry."

87.     Andersen also provided SCA's representatives with a letter dated November 12, 2012, (the "Privilege Letter") wherein he expressed that SCA could provide FINRA with a detailed "privilege log" identifying each electronic record collected by FINRA that SCA claims is "privileged" (the latter term undefined, but subsequently clarified to embrace private and

-18-

proprietary information unrelated to SCA) and FINRA would "agree to consider those claims and, *without reviewing the document*, to *delete or otherwise segregate* those documents for which your privilege claim seems reasonable." (Emphasis added).

88.    Andersen asserted in words or substance to SCA representatives on the afternoon of November 12, 2012, that FINRA has jurisdiction over the ISC Computers and the power to compel unfettered access to those devices in their entirety. ISC is not a FINRA member firm. There is nothing in FINRA Rule 8210 that authorizes FINRA to demand or seize ISC's computers and hard drives. Interpreting Rule 8210 as providing such authority exceeds the jurisdictional bounds set forth for SRO's in the Securities and Exchange Act of 1934 and violates the Hurrys' and Business Plaintiffs constitutional right to due process.

89.    Andersen made the foregoing assertion even though SCA was the only recipient of FINRA's 8210 Request, which applies only to the books and records of SCA and despite the fact that FINRA has no regulatory jurisdiction over ISC.

90.    Andersen demanded in words or substance on the afternoon of November 12, 2012, that SCA unlock the ISC Office so FINRA staff under his command could enter ISC's premises, seize the ISC Computers, access the ISC Computers, and create "mirror images" of the ISC Computers in their entirety.

91.    Andersen's demand for access to the ISC Computers in their entirety was improper for numerous reasons, including that the ISC Computers were not on SCA's premises but instead on ISC's premises, that the ISC Computers do not belong to SCA, and that the ISC Computers are used predominantly for purposes unrelated to SCA and laden with sensitive, private,

-19-

confidential, attorney-client privileged, work product, and/or proprietary information not comprising books and records related to SCA, *i.e.*, the Extra-Jurisdictional Materials.

92.    At the time of his demands, Andersen was informed that, to the extent the ISC Computers contain any SCA-related material, that material likely comprises emails to or from John or Justine at their respective SCA-email addresses, which are preserved in a third-party, SEC-approved, cloud-based, verifiable and auditable, electronic data repository maintained by Smarsh, Inc., which could readily provide a true and correct copy of every non-privileged email to or from John or Justine at their respective SCA-email addresses without prejudicing the privacy, privilege, and proprietary rights of ISC and the other individuals and entities about whom Extra-Jurisdictional Material exists on the ISC Computers.

93.    Andersen afforded no serious consideration during the onsite examination to any representations or alternative proposals regarding the handling of the ISC Computers.

### *FINRA and the Individual Defendants Access the ISC Computers through Coercion and Deceit*

94.    Andersen told SCA representatives on November 12, 2012, that FINRA would issue "Wells Notices" to several SCA personnel "within the next 15 minutes" if SCA continued to resist his demand to unlock the ISC Office and allow the FINRA examination team to enter the premises, seize the ISC Computers, access the ISC Computers, and create "mirror images" of the ISC Computers in their entirety.

95.    To be "Wells'd" is a reportable event on a registered person's Form U4 and carries a significant stigma in the securities industry.

-20-

96.     The stigma associated with "being Wells'd" can be immediate and devastating to the respondent's career, reputation, and livelihood.

97.     The mere issuance of a Wells Notice to a securities professional with regulatory compliance duties can make it extraordinarily difficult for the respondent to find another job in the securities industry, even if the respondent ultimately is found not to have engaged in the alleged misconduct.

98.     It was outside the bounds of FINRA's authority for Andersen to threaten to serve a Wells Notice on SCA staff members in the next fifteen minutes if they did not unlock the door to a non-member firm's office. Andersen's threat to issue Wells Notices to SCA's personnel, with the instant attendant stigma and risk that those personnel would face a permanent bar from working in the securities industry, was intended to coerce SCA representatives to unlock the ISC Office and allow the FINRA examination team to access the ISC Computers and, ultimately, had just that effect.                                                                                      .

99.     With Andersen's threat of imminent Wells Notices for SCA personnel, John and Justine were presented with a classic Morton's fork, *i.e.*, as SCA's founders and indirect owners they could abate the immediate peril to the careers, reputations, and livelihoods of SCA employees or, as the founders and indirect owners of ISC, they could continue to shield ISC's Computers from intrusion and protect the entities and individuals, including themselves, whose private, privileged, and proprietary information is contained in the ISC Computers. They could not do both.

100.    Under the circumstances, Andersen's "Wells Notice" ultimatum reasonably caused enormous duress for John and Justine, compounding ███████████████ with which they

-21-

were burdened because of ███████████████████████ and ████████████
████████████████████████████████████████ .

101.   Ultimately, FINRA staff under Andersen's command accessed the ISC Office, seized the ISC Computers, accessed the ISC Computers, and copied the ISC Computers in their entirety.  FINRA had no right to coerce and demand that SCA grant it access to a non-FINRA member firm's office and the computers and hard drives therein, and FINRA further had no right to access ISC's devices and make mirror images of them.

102.   Andersen, in undertaking and directing other FINRA staff to undertake the tasks of seizing, accessing and copying the ISC Computers in their entirety, failed to hue to the limits of FINRA Rule 8210.

103.   Andersen, in undertaking and directing other FINRA staff to undertake the tasks of seizing, accessing and copying the ISC Computers in their entirety, violated those provisions of FINRA's procedures that define the nature and scope of FINRA's jurisdiction and that prevail on FINRA staff to respect FINRA's jurisdictional boundaries when conducting examinations.

104.   FINRA, in seizing, accessing and copying the ISC Computers in their entirety, deprived ISC of the full use of those devices for at least five days.

105.   FINRA forced SCA to retain the costly services of a forensic data specialist to monitor and log all material events pertaining to the time-consuming electronic data extraction process to assess the safe handling of the devices and integrity of the data within.

106.   Neither John, Justine, nor any agent or representative of SCA or ISC ever authorized FINRA to review any of the Extra-Jurisdictional Materials.  Regulatory counsel for SCA objected to the seizing and copying of the ISC Computers and demanded that FINRA not review any of

-22-

the electronic information it copied from the ISC Computers using any procedure that failed to protect the Extra-Jurisdictional Materials from review or dissemination.

107.   FINRA, in seizing, accessing, and copying the ISC Computers in their entirety, knowingly and willfully arrogated to itself, at Andersen's direction, and over strenuous objections, the hundreds of gigabytes of Extra-Jurisdictional Material believed to exist on those devices.

### FINRA and the Individual Defendants Refuse to Protect the Extra-Jurisdictional Materials from Review and Dissemination

108.   Continuing to ignore the fact that the ISC Computers belonged to ISC, FINRA, Andersen, and Stanland initially required that SCA provide a "privilege log" of all electronic information on the ISC Computers—copies of which FINRA now had in its possession.

109.   It is impractical, ineffective, and punitive for FINRA to require a small broker-dealer's attorneys to parse as much as two terabytes of electronic data, the equivalent of nearly 1.8 billion pages of plaintext, from a non-member's computers to identify and log every piece of digital information that is privileged, irrelevant, or both, when such privileged and/or irrelevant digital information is anticipated to constitute the majority of that electronic data. Indeed, the Hurrys expended hundreds of thousands of dollars just to collect and track the seized and copied drives.

110.   Despite the representation in the Privilege Letter that FINRA would consider "privilege" claims *"without reviewing the document"* and would *"delete or otherwise segregate"* those documents—Andersen responded to SCA's regulatory counsel's written request that the Extra-Jurisdictional Materials be returned by stating that FINRA could not agree to return or destroy any such data because the data purportedly cannot be disaggregated and also stated that,

-23-

if Andersen disagreed with SCA's claim of "privilege" on any document, a FINRA staff member would review that document and decide whether, in the FINRA staff member's view, the "privilege" claim is warranted.

111.   Upon information and belief, FINRA commonly uses a method to identify potentially attorney-client privileged documents where a search is run for materials containing the names of attorneys provided by the member, those materials are then segregated and copies provided to the member's attorney for preparation of a privilege log on those documents.

112.   As John and Justine prepared ███████████, it became evident that the "privilege log" approach was unworkable.

113.   FINRA agreed to allow SCA to submit a list of "search terms" beyond attorney names which, if used in electronic searches of FINRA's mirror image copies of the ISC Computers, would yield Extra-Jurisdictional Material.

114.   Under this method, FINRA would run searches of FINRA's mirror image copies of the ISC Computers using the off-limits search terms, provide SCA with some unspecified way to identify the specific electronic data those search terms identified, require SCA to perform a "privilege" review of that enormous universe of electronic data, and require SCA to provide FINRA with a "privilege" log identifying the basis of each of its "privilege" objections to each item of digitized information in that universe.

115.   The "search terms" method and associated review protocol is unworkable to protect the Extra-Jurisdictional Material from review, dissemination, or disclosure.

116.    To craft a list of search terms that would provide a reasonable measure of assurance that all of the Extra-Jurisdictional Material is excluded from FINRA's review is unduly burdensome and entirely impractical, if not impossible.

117.    The review protocol wherein a FINRA staff member determines the validity of privilege claims impinges on regulatory counsels' legal and ethical responsibilities to identify and shield attorney-client privileged data and work product from disclosure.

118.    The more sensible, practical, and efficient approach to dealing with the ISC Computers is for FINRA to place its copies of the ISC Computers in the custody of a mutually-acceptable, neutral, third-party forensic computer specialist to extract any SCA books and records relevant to the undisclosed purpose of FINRA's examination of SCA without prejudicing the privacy, privilege, and proprietary rights of those individuals and non-member entities about whom Extra-Jurisdictional Material exists on the ISC Computers.

119.    SCA, in reaction to further demands and threats by FINRA, and in good faith, provided FINRA with a list of search terms that SCA surmised would shield—at least initially—significant privileged and Extra-Jurisdictional Material.

120.    FINRA rejected the vast majority of the search terms that SCA proposed to yield potentially privileged documents, including such terms as "attorney," "lawyer," "counsel," "counselor," "confidential," "immunity," "litigation," "memorandum," "analysis," "evaluation," "advice," "court," "arbitration," "lawsuit," "action," "case," "precedent," "claim," "defense," "object," "objection," "motion," "complaint," "pleading," "discovery," "civil procedure," "judge," "arbitrator," "adversary," "opposing counsel," "confidentiality agreement," "NDA," "release," and "non-disclosure agreement."

121.   FINRA also rejected the vast majority of the search terms that SCA proposed to yield Extra-Jurisdictional Material, including the terms in the preceding paragraph, the names of the Hurrys' non-member entities, and such terms as "University of San Francisco," "Stanford Medical," "Phoenix Childrens Hospital," "Veteran's Association," "Accountant," "Apartment," "Beneficiary," "Bicycle," "Bookkeeper," "Building," "Brain," "Brother," "Charity," "Charitable," "Child," "Children," "Church," "Dad," "Doctor," "Enjoin," "Executor," "Father," "Grade," "Grandma," "Grandmother," "Grandpa," "Grandfather," "Guardian," "Healthcare," "Home," "Ice cream," "Ill," "Illness," "Infection," "IRA," "IRS," "Landlord," "Lease," "Military," "Mom," "Mortgage," "Mother," "Philanthropy," "Revocable Trust," "Retirement," "School," "Script," "Sick," "Sister," "Social Security," "SSN," "Surgery," "Teacher," "Tenant," "Title," "Treatment," "Trip," "Trustee," "Vacation," and "Veteran's Administration."

122.   The search terms that FINRA rejected were likely to identify Extra-Jurisdictional Material. Highlighting just one example, the search term "ice cream" was intended to exclude electronic data pertaining to Plaintiff Corner of Paradise, the Hurrys' non-member ice cream shop in Newport Beach, California.

123.   Neither FINRA, Andersen, nor Stanland had or has any intention of shielding the Extra-Jurisdictional Materials from review by FINRA staff.

124.   Neither FINRA nor Andersen had or has any intention of not distributing or sharing, or not causing or allowing the Extra-Jurisdictional Materials to be distributed or shared, with government agencies. FINRA's mere act of searching the copies of the ISC Computers could permanently impair significant constitutional protections, including Fourth Amendment protections, to which the Hurrys and Business Plaintiffs are otherwise entitled.

-26-

125.   Neither the Hurrys nor the Business Plaintiffs had or have any desire or intention of interfering with FINRA's legitimate examination of its members. To the contrary, the Hurrys and the Business Plaintiffs have cooperated with several requests by FINRA.

126.   ISC even offered to search for and produce from ISC's computers and hard drives any non-privileged SCA books and records related to the undisclosed purpose of FINRA's examination of SCA, a process that should satisfy any legitimate objective of FINRA's SCA examination without prejudicing the privacy, privilege, and proprietary interests of ISC and other individuals and non-member entities.

127.   ISC also offered to share with FINRA the expense of having the ISC Computers placed in the custody of a mutually-acceptable, third-party, neutral forensic computer specialist so any non-privileged SCA books and records related to the undisclosed purpose of FINRA's examination of SCA can be isolated for production. The latter proposal likewise would satisfy any legitimate objective of FINRA's examination of SCA without prejudicing the privacy, privilege, and proprietary interests of individuals and non-member entities

128.   FINRA rejected the aforementioned proposals.

129.   As a direct and proximate result of FINRA's and the Individual Defendants' actions, the Plaintiffs have been and continue to be irreparably injured in that FINRA coercively, deceitfully, and in violation of its jurisdictional boundaries and federal and state law (a) seized the ISC Computers on ISC's premises, (b) accessed the ISC Computers, (c) copied the ISC Computers in their entirety, and (d) refused thereafter to return or destroy the Extra-Jurisdictional Material they copied from the ISC Computers.

130.   FINRA, Andersen, Stanland, and the Individual Defendants have no independent basis or authority to retain the Extra-Jurisdictional Materials.

131.   As a direct and proximate result of FINRA's, Andersen's, Stanland's, and the Individual Defendants' actions, Plaintiffs have been and continue to be irreparably injured by the imposition of a punitive, unduly burdensome, vexatious, ineffective, and impracticable electronic data review process whereby FINRA ultimately reserves the "right" unilaterally to decide whether to review Extra-Jurisdictional Materials.

132.   As a direct and proximate result of Defendants' actions, the Plaintiffs have been and continue to be irreparably injured by FINRA's intent to review, retain, and disclose to government agencies the Extra-Jurisdictional Materials, in blatant violation of privacy, privilege, and proprietary rights of the Hurrys, ISC, and the individuals and entities about whom electronic data exists on FINRA's copy of the ISC Computers.

### *ISC and the Hurrys Demand Destruction, Return, or Escrow of the Copies of the ISC Computers*

133.   On February 27, 2013, the Hurrys and ISC demanded that FINRA destroy, return, or deposit with a mutually-acceptable third party computer forensic specialist, any copies of the ISC Computers in FINRA's possession for purposes of preservation and security.

134.   On March 1, 2013, FINRA assured ISC and the Hurrys that FINRA had not "accessed the Hurrys' hard drives, and will not do so until there is an agreement on the data that may be accessed." This was consistent with numerous prior communications made to SCA's counsel where FINRA assured them that no review of computer material would take place absent agreement and a mutually acceptable process for resolving disputes.

-28-

*ISC Seeks Court Intervention to Protect the Confidential Data
from Disclosure, Review, and Dissemination*

135.   On March 8, 2013, ISC filed suit in the U.S. District Court for the District of Arizona against FINRA and Andersen, alleging that Andersen's invasion of the ISC Office and seizure and copying of the ISC Computers violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, among other claims.

136.   Hopeful that FINRA would be amenable to settling the dispute on mutually agreeable terms, the Hurrys refrained from serving the complaint but sent copies both to FINRA and to Andersen.

137.   In the months that followed, neither FINRA nor Andersen proposed any method for examining any non-privileged books and records of SCA that might be on the ISC Computers without violating the privacy and proprietary interests of non-members.

138.   Instead, on information and belief, FINRA, Andersen, and the Individual Defendants devised a plan to harass and then strong-arm the Hurrys and ISC into dropping their lawsuit against FINRA and Andersen.

*Defendants Engage in a Pattern of Harassment Meant to
Intimidate, Coerce, and Harm the Hurrys and Business Plaintiffs*

139.   In the months that followed the seizure and copying of the ISC Computers, Defendants engaged in a pattern of escalating harassment of the Hurrys and the businesses associated with the Hurrys designed to intimidate, annoy, coerce, and harm the Hurrys and Business Plaintiffs.

140.   On or about December 20, 2012, Alpine filed a standard form application with FINRA for permission to provide retail margin account services on a self-clearing basis and to

remove the restriction upon the firm that it would have no one other than John Hurry dually registered and/or associated with SCA.

141.    FINRA informed Alpine that it should withdraw the application because it would never be approved.

142.    Then FINRA demanded that Alpine provide John Hurry's personal bank records for FINRA's review and examination as part of the application, allegedly due to a line of credit between Alpine and John Hurry. On information and belief, the request for personal bank records was nothing more than a pretext to harass the Hurrys' and further invade their privacy.

143.    In response to the request for bank records, John Hurry produced a "Depository Validation" from JP Morgan Chase Bank verifying that the Hurrys' trust account maintained a minimum of $3,000,000 in collected funds.

144.    Based upon the Depository Validation and other information in FINRA's possession regarding the Hurrys' financial resources, FINRA knew or should have known that John Hurry had sufficient liquidity to provide contingent funding to Alpine should the firm need to draw on the line of credit.

145.    Nonetheless, on or about May 3, 2013, FINRA issued a denial of Alpine's application to provide retail margin account services on a self-clearing basis.

146.    This denial letter was arbitrary and a pretext to harass the Hurrys, impair their businesses and livelihood without due process of law, pressure them into waiving constitutional privacy protections, coerce them to drop their lawsuit against FINRA and Andersen, reduce their influence in the OTC sector, and, ultimately, drive them out of business.

-30-

147.   Even when FINRA ultimately approved Alpine to provide retail margin account services on a self-clearing basis, it did so with a margin that was arbitrarily restrictive and largely ineffective for the firm's intended business purposes.

148.   During this same period, the Nevada Secretary of State's Securities Division issued 24 subpoenas seeking numerous records from businesses associated with the Hurrys. On information and belief, there was no active or pending investigation by the Nevada authorities nor was there lawful cause to seek the records. Rather, on information and belief, the subpoenas were issued at the prompting of Andersen and/or one of the Individual Defendants. The Securities Division eventually withdrew the subpoenas.

149.   Andersen also participated directly in the harassment. On or about June 19, 2013, FINRA and Andersen conducted the first in a series of on-the-record ("OTR") interviews with employees and officers of the Hurrys' companies.

150.   Neither the interview of June 19, 2013, nor any of the OTR interviews that followed was conducted strictly in furtherance of legitimate examination goals; the interviews were, rather, designed to harass and cause reputational damage to the Hurrys and their businesses.

151.   In the course of the OTR interviews, Andersen and Individual Defendants framed their questions to insinuate to the interviewees that John Hurry had been engaging in money laundering activities or unlawful activities. These false insinuations that John Hurry is or was engaged in money laundering, that he or his employees were paid in cash, and that customers were permitted to pay in cash, were all deliberate attempts to cause reputational damage to the Hurrys and those businesses associated with them.

152.   As a direct and proximate result of these false insinuations that John Hurry is or was involved in unlawful activity, at least one senior level officer resigned from a business associated with the Hurrys. At least one other senior employee has resigned from a Business Plaintiff as a result of FINRA's and the Individual Defendants' harassing and disparaging conduct.

### *FINRA, Andersen, Stanland, and the Individual Defendants Threaten and Coerce the Hurrys into Abandoning the Lawsuit against FINRA and Andersen*

153.   On June 25, 2013, Andersen resurrected his threat to "analyz[e]"—without any reasonable method to protect the privacy and propriety interests of non-parties—the information, documents, and data contained on the Hurry's hard drives" "beginning *this* Friday [June 28, 2013] at noon EDT [9:00 a.m. MST]."

154.   Andersen issued this threat despite that FINRA and ISC had not yet agreed on a mutually acceptable process for resolving disputes regarding Extra-Jurisdictional Material and the ISC Computers.

155.   Among the new assertions that Andersen made in his letter was the false assertion that the seizure of the ISC Computers was part of an investigation of John Hurry's outside business activities. This was nothing more than an after-the-fact attempt to justify Andersen's unlawful invasion of the ISC Office and confiscation of the ISC Computers.

156.   FINRA's Procedural Rule 8210 Request of November 12, 2012, was addressed to John Hurry only in his capacity as president of SCA, not in his personal capacity or in his capacity as an owner or manager of any outside business.

-32-

157.    Despite seeking disclosure of vast quantities of SCA books and records, FINRA had made no demand whatsoever in its Procedural Rule 8210 Request of November 2012 for disclosure of records related to the Hurrys' outside business activities.

158.    SCA employees were not questioned during the OTRs begun in June 2013 regarding the Hurrys' outside business activities.

159.    On June 26, 2013, in response to Andersen's renewed threat to harm ISC and the Hurrys by reviewing and analyzing Extra-Jurisdictional Materials, ISC expressed in writing to FINRA's outside litigation counsel that it had "no desire to impede FINRA's legitimate examination of a member firm" and that "[w]ithout conceding the presence of any such materials on the ISC Computers, ISC has never objected, and does not object today, to FINRA reviewing non-privileged SCA books, records, and accounts to the extent ISC and its counsel find them on the ISC Computers."

160.    Despite this renewed invitation to negotiate a resolution that would preserve the privacy and proprietary interests of non-members while acknowledging FINRA's right to investigate SCA, FINRA refused to discuss any method for examining non-privileged books and records of SCA that might be on the ISC Computers.

161.    On June 27, 2013, through its outside counsel, FINRA doubled-down on the Andersen threat and accused the Hurrys of attempting to "delay and obstruct FINRA's proper regulatory review" by causing ISC to commence its first lawsuit regarding the Extra-Jurisdictional Materials.

162.    FINRA and the Individual Defendants knew or should have known that its accusations of an improper motive were false and pretextual.

-33-

163.   FINRA, Andersen, and FINRA's outside counsel made their accusations regarding the Hurrys' purported improper motive in order to intimidate the Hurrys and coerce them not to serve their complaint and to abandon their lawsuit.

164.   The Hurrys reasonably understood FINRA's accusations as a threat to bring disciplinary action against them if they allowed ISC to persist in vindicating its rights and the rights of others with data on the ISC Computers.

165.   The same day that FINRA falsely accused the Hurrys of attempting to "delay and obstruct FINRA's proper regulatory review" of John Hurry's outside business activities, the SEC issued a subpoena to John Hurry seeking production of electronic and other records.

166.   Faced with that prospect of having to defend themselves against contrived obstruction charges in an 8210 proceeding and potentially losing their livelihood as a result, and already feeling the effects of harassment from the multiple quarters, the Hurrys were left with no reasonable alternative but to cause ISC to stand down. This did not mean, however, that the Hurrys, ISC, the Business Plaintiffs, or anyone else with information on the ISC Computers consented to FINRA's access, examination, or retention of the Extra-Jurisdictional materials in FINRA's possession.

167.   As of the filing of this Complaint, Defendants still unreasonably retain the Extra-Judicial Material, which was secured in excess of their jurisdiction, and is being held by Defendants without independent basis or authority to do so.

-34-

*Defendants Embark on a Campaign to Discredit, Intimidate, and*
*Harm the Hurrys While Avoiding Further Scrutiny and the*
*Requirement of Due Process*

168.   On information and belief, when it was clear that ISC was not going to serve its lawsuit, Defendants embarked on a campaign to discredit the Hurrys, intimidate them from pursuing their federal lawsuit, and force them out of the OTC sector, while avoiding the scrutiny and due process attendant to formal regulatory action.

169.   On or about September 19, 2013, FINRA conducted an OTR of John Hurry.

170.   During the Hurry OTR, John Hurry was asked to disclose the name of the financial institution in which he conducted his personal banking. He responded in substance that his primary personal banking relationship was with Chase, where his trust accounts were established.

171.   On or about October 7 and October 18, 2013, FINRA propounded Rule 8210 requests seeking personal and business records from the Hurrys and their non-regulated businesses, including bank records, phone records, and flight records.

172.   FINRA's demands for records were unnecessarily overbroad and sought records not reasonably related to any issue in FINRA's examination. FINRA's staff had no evidence or grounds to believe that the records they sought contained any information relevant to the subject of FINRA's examination. The 8210 requests were intended to harass the Hurrys, injure and impair Hurrys' businesses, pressure the Hurrys to waive their constitutional privacy protections, retaliate against the Hurrys for bringing their lawsuit against FINRA and Andersen, and prevent the Hurrys from reinitiating their lawsuit against FINRA, Andersen, or others.

173.   The overbroad and overreaching 8210 requests were also part of a scheme to harass the Hurrys into abandoning the OTC sector, part of their lawful business activities, without due process of law.

174.   Faced with the threat of further charges of obstruction, the Hurrys provided FINRA with hundreds of pages of personal bank records, personal phone records, and flight records. FINRA's request was unduly burdensome, extremely costly and time consuming.  Nevertheless, the Hurrys fully cooperated.  The records were redacted to remove personal information pursuant to an agreement with FINRA, marked confidential, and provided to FINRA over the Hurrys' express objections.

175.   On or about February 4, 2014, a short time after the Hurrys provided their records in redacted form as per their agreement with FINRA, the SEC issued a subpoena to Pinnacle Aviation for the very same flight records as well as for communications between the Hurrys and the company that manages the airplane. The timing and substance of the subpoena from the SEC establish close coordination between FINRA and the SEC, including on matters that do not concern FINRA's regulatory functions.  The subpoena invaded the Hurrys' business and privacy interests by exposing information redacted by the Hurrys when responding to FINRA's 8210 request and revealing private and sensitive communications to regulators.

### Defendants Leak Non-Public, Confidential, and Misleading Information to the Deal Pipeline

176.   On information and belief, in furtherance of their scheme to discredit, harass, and injure the Hurrys, Andersen, or the other Individual Defendants, conspired to leak non-public, confidential, and false and misleading information to a reporter for the Deal Pipeline, a financial

-36-

news and information service whose readership includes a range of financial institutions and other key audiences in the financial services market.  Defendants leaked the information for the specific purpose and with the design of causing its publication.

177.   On or about September 17, 2013, Bill Meagher ("Meagher") of the Deal Pipeline wrote the first of several articles using the information leaked by FINRA.  Citing "internal documents" Meagher obtained from FINRA, Meagher described "a series of reports Finra sent to the SEC in 2012 and 2013."

178.   The "internal documents" to which Meagher alluded were obtained from FINRA's Office of Fraud Detection and Market Intelligence ("OFDI").

179.   The "internal documents" to which Meagher alluded made reference to "trading records obtained from U.S.-based broker[] Scottsdale Capital Advisors," among others.

180.   Meagher's article disclosed non-public information including the name of an individual who opened a trading account with SCA, when the account had been opened, on whose behalf it was opened, and the volume of trading in the account. Meagher identified no source for these disclosures in his article apart from FINRA.

181.   On information and belief, Andersen, and FINRA staff members from OFDI, were present for all testimony taken as part of FINRA Matter No. 20120327319.

182.   On December 3, 2013, the Deal Pipeline's Meagher contacted SCA's outside regulatory counsel, seeking responses from SCA, Alpine, and/or the Hurrys to several questions regarding FINRA's investigation into trading in a company called Biozoom, among other matters. Meagher's inquiries reflected a knowledge of non-public and confidential information, the leaking of which can be attributed plausibly only to FINRA.

-37-

183.   Meagher requested comments from SCA's outside regulatory counsel regarding a former SCA employee, Tim Scarpino—specifically, comments regarding the termination of his employment with SCA, which was known to FINRA investigators but had not been publicly reported by SCA.

184.   Meagher also requested comments from SCA's outside regulatory counsel regarding John Hurry's plans to buy Wilson Davis, a transaction which was known to FINRA, but had not been publicly reported.

185.   Meagher's questions demonstrated that, at minimum, he had knowledge of FINRA's ongoing examination of SCA, and the questions posed by FINRA staff members to SCA and its employees. His questions reflected a distinct "prosecutorial" perspective consistent with the tenor of FINRA's examination. His questions made reference to a full spectrum of details reflecting FINRA Matter No. 20120327319 and what FINRA had learned regarding SCA's business, internal practices, customers, customer transactions, securities deposits, wire activities, and trading activity. Other than SCA's in-house and outside regulatory counsel, only Andersen and the other Individual Defendants who were present at the OTRs would have had knowledge of the details reflected in Meagher's questions.

186.   Neither SCA's outside regulatory counsel nor anyone else associated with SCA, Alpine, or the Hurrys responded to Meagher's inquiries.   Any calls from Meagher were referred to the president and chief counsel of SCA without discussing the matters with Meagher.   The president and chief counsel of SCA was unable to identify anyone at SCA or Alpine who provided the leaks to Meagher.

187.   On December 3, 2013, SCA's outside regulatory counsel emailed Andersen expressing that "SCA is extremely concerned that confidential information has been leaked that may be damaging to the firm or its employees" and asking that Andersen "advise as to whether [FINRA] Staff is aware of this information being provided to the reporter."

188.   Andersen never responded to the December 3, 2013, inquiry by SCA's outside regulatory counsel.

189.   On or about December 4, 2013, Brad Bennett, FINRA's head of enforcement, left a voice mail for SCA's outside regulatory counsel.

190.   Despite that the September 17, 2013, Deal Pipeline article demonstrated that Meagher was provided internal documents from FINRA, Bennett was dismissive of the concerns and suggested that the press leaks "could have come from someone at Scottsdale [Capital Advisors]."

191.   Bennett expressed in his December 4 voicemail that he was "confident on our side that we didn't leak" and declined to respond further, stating that "no one on staff can have anything more to say about it."

192.   On December 6, 2013, just days after the inquiries from Meagher, the Deal Pipeline ran an article by Meagher entitled, "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says." As his source, Meagher referenced in his December 6 article only "a person familiar with those investigations."

193.   The information disclosed in Meagher's December 6 article was non-public and confidential.

-39-

194.   Meagher's December 6 article demonstrated knowledge of FINRA's ongoing examination of SCA, Alpine, and the questions FINRA staff members had posed to those companies and their employees. His article reflected a distinct "prosecutorial" perspective consistent with the tenor of FINRA's examination.

195.   According to Meagher's December 6 article, FINRA is "work[ing] with the SEC" on investigations involving SCA, Alpine, and the Hurrys."

196.   Meagher also reported in his December 6, 2013, article that "John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Wilson Davis."

197.   On information and belief, no one associated with the parties to the Wilson Davis purchase informed Meagher or anyone else in the media that John Hurry or any entity associated with the Hurrys was acquiring Wilson Davis. The article made clear that the Deal Pipeline did not receive comments from anyone who was approached by Meagher at SCA.

198.   Meagher falsely and misleadingly stated in his December 6, 2013, article that the FBI was investigating SCA and Alpine falsely implying that the firms or their principals are targets of criminal or securities' investigations.

199.   On information and belief, SCA is and was not the target of any federal law enforcement investigation and neither are Alpine nor the Hurrys.

200.   Meagher falsely reported in his December 6 article that Biozoom shareholders were allowed to trade in violation of SCA policies and were provided special perks. Meagher also falsely implied in his December 6 article that SCA had disregarded "red flags" regarding the Biozoom trades and that SCA had failed to follow up.

-40-

201.   On information and belief, if FINRA conducted any investigation regarding the press leaks following the inquiry from SCA's outside regulatory counsel to Andersen and the subsequent voice message from Bennett, the investigation was incomplete and inadequate.

202.   On information and belief, if FINRA took any action to curb or prevent press leaks or inappropriate disclosure of confidential or non-public information regarding the Hurrys, their businesses, or their customers following the inquiry from SCA's regulatory counsel to Andersen and the subsequent voice message from Bennett, the action was incomplete and inadequate.

203.   On January 9, 2014, SCA's chief in-house counsel, wrote the FINRA Office of the Ombudsman and Robert L.D. Colby, FINRA's Chief Legal Officer, regarding the information leak to Meagher and the Deal Pipeline. The January 9 letter notified FINRA that SCA and its customers have been embarrassed and harmed by the reports and sought a "full investigation" of the matter by FINRA and the SEC. He also requested an assurance that "FINRA is appropriately safeguarding confidential information obtained during its investigations."

204.   On information and belief, if FINRA conducted any investigation regarding the press leaks following SCA's January 9, 2014, letter, the investigation was incomplete and inadequate.

205.   On information and belief, if FINRA took any action to curb or prevent press leaks or inappropriate disclosure of confidential or non-public information regarding the Hurrys, their businesses, or their customers following the January 9, 2014, letter, the action was incomplete and inadequate.

206.   On February 18, 2014, outside counsel for John Hurry spoke with Deb Tarasevich (Assistant Director of Enforcement) and Jennie Krasner (Senior Counsel) of the SEC. Counsel

-41-

expressed concerns regarding the leaks and the reputational harm they were causing the Hurrys and their businesses.

207.    Tarasevich stated that no one at the SEC was speaking to the press about any investigations or examinations involving the Hurrys.

208.    On March 20, 2014, the Deal Pipeline published a Bill Meagher article entitled "SEC requests default judgment in $34M Biozoom pump-and-dump case." The article mentions information that would only be known to FINRA, SEC, and SCA, including that a FINRA audit of SCA was scheduled for the end of March and that FINRA had made a regulatory request for the personal notes of SCA employees.

209.    The March 20, 2014, article repeats the false and misleading statement that the FBI is investigating SCA and Alpine and repeats the false and misleading implication that the firms or their principals are the targets of criminal or securities' investigations. The March 20, 2014, article further falsely implies that SCA and/or the Hurrys were involved in a "pump-and-dump" scheme with Biozoom.

210.    As the disclosures of non-public and confidential information to Meagher was attributable to FINRA, on March 21, 2014, SCA's in-house counsel again emailed Colby detailing SCA's concerns about the March 20, 2014, article in the Deal Pipeline. He explained that breach of confidentiality associated with FINRA's examination and "the distorted factual portrayal of these disclosures has interfered with current and prospective business relationships of SCA." He demanded that the disclosure of confidential or non-public matters stop immediately.

211.    On March 21, 2014, Colby confirmed to SCA that "FINRA's policies prohibit disclosing our audit schedule and regulatory requests to firms." Colby represented that FINRA's

"Ombudsman's office is actively reviewing whether our staff disclosed any information inconsistent with our policies."

212.    As of the filing of this Second Amended Complaint, FINRA has not communicated the result of any Ombudsman's office review to SCA or the Hurrys.

213.    On information and belief, FINRA did not conduct a thorough and adequate investigation regarding the press leaks and inappropriate disclosures following SCA's March 21, 2014 email.

214.    On information and belief, FINRA did not take action to curb inappropriate leaks or disclosures of confidential, non-public, and misleading information regarding the Hurrys, their businesses, or their customers following the March 21, 2014, email.

215.    On April 9, 2014, outside counsel for SCA received a phone call from reporter Bill Meagher. The reporter informed SCA's counsel that the Deal Pipeline would be publishing a story that would disclose that FINRA AML examiners appeared at the SCA offices in March of 2014 and requested account documentation for a number of customer accounts, which he specified by name.

216.    On or about April 16, 2014, the Deal Pipeline published an article written by Meagher disclosing an unannounced FINRA examination of SCA. Under FINRA policies, unannounced examinations of members are non-public and confidential. The article contained details regarding the unannounced examination of SCA that could be known only to FINRA and SCA.

217.    On or about April 17, 2014, SCA's in-house counsel emailed Colby notifying him of the contact from Meagher, the April 16, 2014, article in the Deal Pipeline, and attesting "no

-43-

one at [SCA] disclosed to the press the [unannounced] visit or the documentation [FINRA examiners] requested." He notified Colby that "FINRA Staff are providing information to this reporter on a near real-time basis, with the apparent intent to embarrass and/or financially hurt [SCA], as well as to expose confidential client information." He continued that "[t]his behavior, if coming from FINRA Staff, is a violation of your own policies and unbecoming of a member regulatory organization." He requested that FINRA "thoroughly investigate this matter, and respond" to him or SCA's outside regulatory counsel, "whether anyone on the Staff has in fact violated FINRA policies."

218.    In response to SCA's email, on or about April 17, 2014, Colby confirmed that "[p]roviding information to the press about exams is unacceptable" and promised that he "will review this situation also."

219.    On information and belief, FINRA did not conduct an appropriate, thorough, and adequate investigation regarding the press leaks and inappropriate disclosures following SCA's April 17, 2014, email.

220.    On information and belief, FINRA did not take action to curb inappropriate leaks or disclosures of confidential, non-public, and misleading information regarding the Hurrys, their businesses, or their customers following the April 17, 2014, email from SCA.

### The Leaks to the Deal Pipeline Damage the Hurrys' Reputation, Harm Customer Relationships, and Force Closure of the Hurrys' Bank Accounts

221.    On or about February 3, 2014, Morgan Stanley denied an application by Alpine for an omnibus account. On information and belief, the Morgan Stanley denial of Alpine's application was directly and proximately caused by leaked information appearing in the December 6, 2013,

Deal Pipeline article. Alpine lost at least one major client or prospective client as a direct and proximate result of the Morgan Stanley denial of the omnibus account application. The denial has injured and impaired Alpine's ongoing business operations and business expansion.

222.    On or about February 26, 2014, John Hurry was notified by J.P. Morgan Private Bank, where he had been a longtime client, that the bank was closing his accounts. The bank informed him that based upon a review of its client relationships, it had determined that Mr. Hurry's "interests are no longer served by maintaining a relationship with J.P. Morgan Private Bank." Based upon information and belief, the closure of the Hurrys' accounts by J.P. Morgan Private Bank was directly and proximately caused by leaked information appearing the December 6, 2013, Deal Pipeline article.

223.    The closure of the J.P. Morgan Private Bank accounts impaired numerous prospective and existing business transactions and relationships for the Hurrys.

224.    On or about May 19, 2014, Chase Bank notified the Hurrys that it was closing all accounts associated with the Hurrys and their businesses. Upon information and belief, the closure of the Hurrys' accounts by Chase Bank was directly and proximately caused by Defendants' actions including wrongful and inappropriate leaks of information to Meagher, which was then published by the Deal Pipeline.

225.    The closure of the Chase Bank accounts, including accounts for Plaintiff ISC, which provides administrative and legal services to the Hurrys' other businesses, and accounts for Plaintiff Corner of Paradise, the Hurrys' retail ice cream parlor and bicycle rental shop, has and will directly and substantially impair the Hurrys' business operations.

-45-

226.   On or about September 11, 2014, Zions Bank notified Alpine in writing of its intent to close accounts associated with Alpine and the Hurrys. Upon information and belief, the closure of these accounts by Zions Bank was directly and proximately caused by Defendants' actions including wrongful and inappropriate leaks of information to Meagher, which was then published by the Deal Pipeline.

227.   On or about July 16, 2015, the Hurrys were informed that Comerica Bank was closing their account. These various bank account closures were modeled on tactics used by DOJ, the Treasury Department and the SEC in Operation Choke Point. Indeed, a representative of the Office of the Comptroller of the Currency directly cautioned Zions Bank against doing business with broker-dealers generally, and specifically with the Hurrys' business Alpine Securities.

228.   The closure of the Zions Bank accounts has and will directly and substantially impair the Hurrys' business operations.

229.   On information and belief, other bank accounts for businesses associated with the Hurrys are being negatively impacted in ways similar to the Chase and Zions accounts.

230.   On information and belief, other banks, as a direct and proximate result of the Deal Pipeline articles, have refused to open accounts for businesses associated with the Hurrys or have announced their intent to terminate their customer relationship with those businesses based on perceived "reputational risk."

231.   As Defendants are well aware, maintaining bank accounts and banking relationships is essential to the Hurrys' livelihood and to the viability of each of the Business Plaintiffs and other businesses with which the Hurrys are affiliated. Unless Defendants' unlawful and tortious conduct is stopped, it is likely that the Hurrys will be unable to pursue their entrepreneurial activity

and the Business Plaintiffs will be forced to shut down. At a minimum, the Hurrys will be effectively barred from doing business in the securities industry despite no formal sanction from FINRA or the SEC dictating that result.

### FINRA Wrongfully Interferes with Plaintiff WD Clearing's Acquisition of the Broker-Dealer, Wilson Davis & Co. citing the Deal Pipeline Article

232.   The harm from the Deal Pipeline articles has not been limited to third parties. FINRA, itself, has cited one of the Deal Pipeline articles as a pretext for denying the Hurrys the right to purchase an interest in broker-dealer Wilson Davis & Co.

233.   On April 30, 2013, John Hurry entered into a Financing Agreement with Wilson-Davis & Co., Inc. ("Wilson Davis"), a closely held Utah corporation and securities broker/dealer headquartered in Salt Lake City, and its shareholders ("Wilson Davis Shareholders").

234.   Pursuant to the Financing Agreement, John Hurry lent to Wilson Davis the sum of four million dollars in exchange for (i) a Senior Promissory Note in the principal amount of four million dollars and (ii) an option to purchase one hundred percent of the issued and outstanding equity interests of Wilson Davis (the "Wilson Davis Option").

235.   Absent the loan from the Hurrys, Wilson Davis likely would have ceased operating as a going concern. FINRA received contemporaneous notice of the Financing Agreement and the Wilson Davis Option.

236.   On or about September 16, 2013, John Hurry assigned the Wilson Davis Option to WD Clearing, LLC, a company he formed and controlled, and to various independently controlled trusts formed to acquire ownership interest in Wilson Davis (collectively, the "Wilson Davis Buyers").

237.   On or about September 16, 2013, the Wilson Davis Buyers each exercised their respective rights under the Wilson Davis Option.

238.   On or about December 2, 2013, the Wilson Davis Buyers entered into a Securities Purchase Agreement ("Wilson Davis Purchase Agreement") with Wilson Davis and the Wilson Davis Shareholders to effectuate the transactions contemplated by the exercise of the Wilson Davis Option. Under the Wilson Davis Purchase Agreement, the Wilson Davis Buyers agreed to buy, and the Wilson Davis Shareholders agreed to sell, one hundred percent ownership interest in Wilson Davis. The parties to the transaction agreed that it would close on "the seventh business day of the first month subsequent to the passage of at least 30 days following the filing of a 'substantially complete' [Continuing Membership Application]" with FINRA.

239.   As of February 24, 2014, FINRA had received a "substantially complete" Continuing Membership Application requesting approval of the change in Wilson Davis's firm ownership.

240.   Despite receiving a substantially complete application, FINRA did not approve the change in ownership. Rather, FINRA, acting through agents Leyna Goro, Kathy Gurczynski, Joseph Sheirer, Domingo Diaz, and Jennifer Danby, imposed unjustified, arbitrary, and pretextual requirements upon the Wilson Davis Buyers and—in violation of its own rules—unlawfully directed Wilson Davis not to close the transaction with the Wilson Davis Buyers.

241.   Although FINRA requires advance notice in the form of a change in ownership, it does not require prior approval. NASD Rule 1017(c)(1) states that "[a] member may effect a change in ownership or control prior to the conclusion of the proceeding, but the Department may place new interim restrictions on the member based on the standards in Rule 1014, pending final

-48-

Department action." As FINRA advises in its Continuing Membership Guide, "[i]n the event of a denial, lapse or withdrawal of the application, the new owners (if the transaction has been consummated) may not conduct business."

242.    On February 25, 2014, FINRA purported to impose "interim restrictions" prohibiting Wilson Davis from:

- "Effecting any portion of the . . . ownership change transaction, including unapproved individuals or entities acting in any capacity that would suggests that they are approved direct and/or indirect owners of the Firm"

- "Permitting any trustee, grantor, or beneficiary of the trusts – including, but not limited to, Mr. Hurry – to act in any principal, supervisory or control capacity."

243.    According to FINRA, the interim restrictions on Wilson Davis "are based upon the fact that the Staff is in the process of reviewing the Firm's information to determine whether the Firm meets all of the Standards in Rule 1014, including, but not limited to, 1014(a)(1), (3), (7) and (13)."

244.    FINRA justified its interim restrictions by noting specifically that it had concerns based on "an article relating to an investigation involving Scottsdale Capital and Alpine Securities, which are controlled by Mr. Hurry." On information and belief, the FINRA letter refers to the December 6, 2013, Deal Pipeline article by Meagher, which is based upon non-public, confidential, and misleading information secretly leaked by FINRA or the Individual Defendants.

-49-

245.   As a direct and proximate result of FINRA's interim restrictions, Wilson Davis refused to close the transaction with the Wilson Davis Buyers, resulting in separate litigation by the Wilson Davis Buyers seeking to enforce the agreed transaction ("Wilson Davis litigation").

246.   Moreover, when J.P. Morgan Private Bank terminated its banking relationship with the Hurrys, it also closed accounts for the several trusts that comprise the Wilson Davis Buyers. These account terminations, which were a direct and proximate result of FINRA's and the Individual Defendants' wrongful conduct, have directly and substantially impaired the Wilson Davis transaction.

### *The Deal Pipeline Articles and Pretextual Investigation Conducted by FINRA and Individual Defendants Leads to Additional Harm to the Hurrys, the Business Plaintiffs, and Businesses Associated with the Hurrys*

247.   As a direct and proximate result of improper and wrongful leaks to Bill Meagher and their subsequent and calculated publication in the Deal Pipeline articles, John Hurry has had prospective investments in businesses across various sectors hampered, delayed, or declined.

248.   SCA has been notified by at least one website catering to the OTC investment sector, where SCA has been a longtime advertiser, that the website will no longer accept SCA's advertisements. Based upon information and belief, the rejection of SCA as an advertiser is the direct and proximate result of the Operation Choke Point-like tactics employed by FINRA, including the pretextual examination conducted by FINRA and Individual Defendants and the improper and wrongful leaks of non-public, confidential, and misleading information targeting the Hurrys and published in the Deal Pipeline.

249.  As a direct and proximate result of the inappropriate disclosures to the press and FINRA's failure to investigate and curb these leaks, Plaintiffs have suffered substantial reputational harm and injury to existing and prospective business relationships.

***Continuing its Pattern of Ongoing Harm to the Hurrys, FINRA Issues Premature Wells Notice that Inexplicably Names John Hurry Individually Shortly After He Completes Majority of Filings Necessary to Establish Separate Self-Regulatory Organization and at the Eleventh Hour Before the Wilson Davis Closing***

250.  On August 31, 2014, John Hurry completed the majority of filings with the SEC necessary to advance his goal of establishing a separate self-regulated organization named "Association of Securities Dealers LLC" or "ASD," one of the plaintiffs in this action.

251.  On the morning of September 12, 2014, the Wilson Davis Buyers amended their complaint in the Wilson Davis litigation to include claims of securities fraud based on Wilson Davis' conduct related to the underlying transaction.

252.  Later that same day, on the afternoon of September 12, 2014, FINRA issued a Wells notice that named John Hurry individually. The notice was not related to FINRA Matter No. 20120327319 or any of the facts raised in this Complaint. The Wells notice is the first reportable event against John Hurry under FINRA rules in his more than 20 years in the securities industry. The agents involved in issuing this Wells notice were Blake Snyder, Surveillance Director; Jason Foye, Examination Manager; Eli Renshaw, Regulatory Principal; Laura Leigh Blackston, Senior Regional Counsel; and Aimee Williams-Ramey, Regional Chief Counsel, Enforcement.

253.  The Wells notice that named John Hurry, among others, lacked merit.  Upon information and belief, the Wells Notice was a pretext by FINRA to block the Hurry family trust's purchase the following week of the broker-dealer Wilson Davis & Co. The proximity of the Wells

-51-

Notice on September 12, 2014 and the projected closing date of September 16, 2014 for the sale of Wilson Davis strongly suggests the Wells Notice was a last minute tactic by FINRA and the Individual Defendants to prevent the sale. Indeed, in a dramatic departure from FINRA procedure, Defendants issued the Wells notice before collecting documents or deposing John Hurry.

254. On September 15, 2014, FINRA agents Domingo Diaz, Jennifer Danby, and Allissa Robinson engaged in a conversation with Mark O. Van Wagoner of Wilson Davis, and provided Mr. Van Wagoner with specific information regarding the Wells notice as to John Hurry, apparently deeming it appropriate to provide more notice to this third-party regarding FINRA's concerns than to John Hurry himself.

255. During the September 15, 2014, conversation between FINRA agents and a Wilson Davis representative, the FINRA agents specifically requested that Wilson Davis withdraw its pending application

256. On September 17, 2014, Wilson Davis gave into FINRA's coercive demand and withdrew the pending Continuing Membership Application.

257. On September 22, 2014, the judge in the Wilson Davis litigation issued an order granting a partial summary judgment in that case excusing Wilson Davis' performance of the transaction agreement with the Wilson Davis Buyers on the basis of FINRA's interference. The remaining claims in the Wilson Davis litigation are currently pending discovery. The Wilson Davis Buyers are also pursuing SEC review of FINRA's actions with regard to the Wilson Davis transaction. FINRA has taken the position that the SEC lacks jurisdiction to conduct such review.

# FIRST CAUSE OF ACTION

## Violation of 18 U.S.C. § 1030 (a)(2)(C)

258.    Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

259.    The ISC Computers were "protected" under the CFAA.

260.    Defendants accessed the ISC Computers intentionally.

261.    Defendants accessed the ISC Computers through coercion and deceit.

262.    Defendants accessed the ISC Computers without authorization, or, in the alternative, exceeded authorized access to them.

263.    As a result of the misconduct alleged herein, Plaintiffs suffered a loss of $5,000 or more.

264.    The misconduct alleged herein constitutes violations of 18 U.S.C. § 1030(a)(2)(C).

265.    The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

266.    No rule or statute under which FINRA operates purports to preempt the CFAA.

267.    Plaintiffs have suffered damage and loss through the cost of responding to the offenses, including conducting damage assessments and restoring data, programs, systems and or information to its condition prior to the offenses.

268.    Unless Defendants are enjoined from violating and continuing to violate 18 U.S.C. § 1030(a)(2)(C), Plaintiffs will continue to suffer irreparable injury.

269.    Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

270.  Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Violation of 18 U.S.C. § 1030(a)(5)(C)

271.  Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

272.  The ISC Computers were "protected" under the CFAA.

273.  Defendants accessed the ISC Computers intentionally.

274.  Defendants accessed the ISC Computers through coercion and deceit.

275.  Defendants accessed the ISC Computers without authorization.

276.  Defendants caused damage to the ISC Computers.

277.  As a direct and proximate result of Defendants' unauthorized access of the ISC Computers, Plaintiffs suffered a loss of $5,000 or more.

278.  The misconduct alleged herein constitutes violations of 18 U.S.C. § 1030(a)(5)(C).

279.  The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

280.  No rule or statute under which FINRA operates purports to preempt the CFAA.

281.  Plaintiffs have suffered damage and loss through the cost of responding to the offenses, including conducting damage assessments and restoring data, programs, systems and or information to its condition prior to the offenses.

282.  Unless Defendants are restrained and enjoined from violating and continuing to violate 18 U.S.C. § 1030(a)(5)(C), Plaintiffs will continue to suffer irreparable injury.

-54-

283.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

284.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Trespass Upon Chattel

285.   Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

286.   Defendants accessed the ISC computers through coercion and deceit.

287.   Defendants dispossessed Plaintiffs of the ISC Computers, including for a substantial period of time.

288.   Defendants impaired the ISC Computers.

289.   The misconduct alleged herein constitutes trespass upon chattel.

290.   The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

291.   As a direct and proximate result of Defendants' trespass upon chattel, Plaintiffs have suffered, and continue to suffer, irreparable injury.

292.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

293.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Intrusion Upon Seclusion

294.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

-55-

295.   Defendants, by engaging in the misconduct alleged herein, intruded upon the solitude and seclusion of the private affairs and concerns of Plaintiffs and those individuals and entities who have private, privileged, and proprietary information in Plaintiffs' custody.

296.   Defendants' intrusion was intentional.

297.   Defendants' intrusion would be highly offensive to a reasonable person.

298.   As a direct and proximate result of Defendants' intrusion upon seclusion, Plaintiffs have suffered, and continue to suffer, irreparable injury.

299.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

300.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Conversion

301.   Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

302.   Defendants have wrongfully and intentionally asserted dominion and control over the private, sensitive, personal, confidential, privileged, and proprietary information belonging to Plaintiffs in a manner that is inconsistent with Plaintiffs' ownership of the information.

303.   As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered, and continue to suffer, irreparable injury.

304.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

305.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

-56-

## SIXTH CAUSE OF ACTION

### Misappropriation of Trade Secrets

306.   Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

307.   Defendants, in seizing, accessing and copying the ISC Computers in their entirety, acquired one or more trade secrets of one or more persons.

308.   Defendants knew or had reason to know that the trade secrets were acquired by improper means.

309.   As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs have suffered, and continue to suffer, irreparable injury.

310.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

311.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Prima Facie Tort

312.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

313.   Defendants have intentionally caused injury to Plaintiffs.

314.   Defendants' conduct is culpable and not justifiable under the circumstances.

315.   As a direct and proximate result of misconduct alleged, Plaintiffs have suffered, and continue to suffer, irreparable injury.

316.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

317.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Violation of Privacy Act - 5 U.S.C. § 552a

318.   FINRA is an "agency" subject to the Privacy Act, 5 U.S.C. § 552a, as a government actor acting under color of law or, in the alternative, as a government contractor under 5 U.S.C. § 552a(m)(1).

319.   Andersen, and the Individual Defendants are employees of an agency and are subject to the Privacy Act, 5 U.S.C. § 552a, as government actors acting under color of law or, in the alternative, pursuant to 5 U.S.C. § 552a(m)(1).

320.   Andersen, and the Individual Defendants, by virtue of their employment or official position, have possession of or access to agency records which contain individually identifiable information the disclosure of which is prohibited by the Privacy Act.

321.   On information and belief, Andersen, and the Individual Defendants, separately or in concert willfully disclosed agency records containing individually identifiable information to a person or agency not entitled to receive it.

322.   As a direct and proximate result of the misconduct alleged, Plaintiffs have suffered and continue to suffer irreparable injury.

323.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

324.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**Defamation and Defamation by Implication**

325.    Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

326.    Defendants conspired to malign, harass, humiliate and injure Plaintiffs by making false statements to Meagher of the Deal Pipeline, statements intended for publication in the Deal Pipeline or for other public dissemination.

327.    Defendants falsely stated that John Hurry, Justine Hurry, and/or their businesses were engaged in money laundering.

328.    Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were under investigation by the FBI, and falsely implied they were the target of criminal investigations.

329.    Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were involved in a "pump-and-dump" scheme.

330.    Defendants falsely stated that John Hurry, Justine Hurry and/or businesses associated with the Hurrys allowed Biozoom shareholders to trade in violation of SCA policies and were provided special perks.

331.    Defendants falsely implied that John Hurry and/or Justine Hurry caused SCA to disregard so-called "red flags" regarding the Biozoom trades and failed to follow up.

332.    The false and malicious statements are attributable to FINRA and/or the Individual Defendants.

333.    The Deal Pipeline article dated September 17, 2013 cited "internal documents" obtained by Meagher.   Those documents could only have originated with FINRA and/or the Individual Defendants.    .

334.    When Meagher contacted SCA on December 3, 2013, neither SCA's outside regulatory counsel nor anyone associated with SCA, Alpine, or the Hurrys responded to Meagher's inquiries.

335.    The Deal Pipeline article dated December 6, 2015 made clear that the Deal Pipeline did not receive comments from anyone associated with SCA approached by Meagher.

336.    The Deal Pipeline article dated March 20, 2014 mentioned information that would only be known to FINRA, the SEC, and SCA. The SEC categorically denied disseminating such information to the press.

337.    The Deal Pipeline article dated April 16, 2014 disclosed non-public information regarding FINRA's onsite examination.   SCA's in-house made clear in an inquiry to FINRA that no one at SCA disclosed to the press the unannounced visit or the the documents FINRA examiners requested.

338.    Indeed, following internal inquiries by top leadership of SCA, Plaintiffs are satisfied that the leaks either did not or could not originate with SCA, Alpine, the Hurrys, or any other entity or individual associated with the Hurrys.

339.    The leaks are attributable to Defendants, who possess rare and intimate knowledge of the non-public and confidential information reflected in Meagher's damaging articles.

340.    Defendants made and continue to make these statements and omissions knowing that the statements were and are false; in the alternative, Defendants have acted and continue to

act in reckless disregard of the truth in making each of these defamatory statements; in the alternative, Defendants have been and continue to be negligent in failing to ascertain the truth of each of these defamatory statements before publishing them.

341.    Defendants' defamatory statements were and are published or otherwise disseminated with evil motives and malice toward Plaintiffs, were and are intended and designed to injure and defame Plaintiffs, and did injure and defame and continue to injure and defame Plaintiffs.

342.    Each defamatory statement, singularly or in combination, has impeached and continues to impeach the honesty and integrity of Plaintiffs, leaving their reputation severely damaged and subjecting them to scorn in the eyes of business associates, current and prospective clients, and the general public.

343.    Some of Defendants' false and defamatory statements have imputed egregious conduct onto John Hurry.

344.    Upon information and belief, Defendants continue to make defamatory statements to third parties in an effort to impair the Hurrys' business relationships, to force the Hurrys out of business, prevent the Hurrys from establishing new and competing businesses, and destroy the Hurrys' livelihood.

345.    Many of these false and defamatory statements are made in a secretive manner that inhibits Plaintiffs' ability to discover and respond to the sum and substance of the statements until well after they are made.

346.    Nothing in FINRA Rules permits the "leaking" of internal documents.

347.   Defendants' wrongful conduct bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants. By reason of the false, libelous, and defamatory statements set forth in this Complaint, Plaintiffs have suffered damages and are entitled to an award of compensatory damages in an amount to be proven at trial.

348.   Defendants' wrongful conduct was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## TENTH CAUSE OF ACTION

### Intentional Interference with Contract Relationship or Business Expectancy

349.   John Hurry and his companies have or had a valid contract with Wilson Davis.

350.   The Hurrys and Business Plaintiffs also have or had valid contracts with numerous banking institutions, including JP Morgan Private, Comerica, and Chase.

351.   Defendants are and were aware of these contractual relationships.

352.   Defendants intentionally interfered with the Wilson Davis contract by coercing Wilson Davis into withdrawing its continuing membership application and inducing Wilson Davis to breach the contract and resist the acquisition.

353.   Defendants also intentionally interfered with the banking relationships of the Hurrys and Business Plaintiffs, causing the banks to terminate their business relationships with the Hurrys, Business Plaintiffs, and businesses associated with the Hurrys by knowingly, willfully, and intentionally increasing the Hurrys' "reputational risk" and improperly pressuring banking institutions to terminate or refuse banking relationships with the Hurrys, Business Plaintiffs, and businesses associated with the Hurrys.

354.   In an effort to force the Hurrys out of the microcap securities business, Defendants leaked non-public and confidential information to Meagher for publication in the Deal Pipeline.

355.   Upon information and belief, the dissemination of the non-public and confidential information was intended to inflict reputational harm upon the Hurrys and related businesses.

356.   Upon information and belief, Defendants sought to blemish the Hurrys and related businesses so that banks and other financial institutions would be unwilling to commence or maintain banking relationships.

357.   Upon information and belief, the Wells notice issued in September 2014 was further intended to harm the Hurrys' relationships with financial institutions by causing reputational harm.

358.   On July 16, 2015, Comerica Bank terminated its relationship with the Hurrys, further denying them and related businesses access to critical capital.

359.   Upon information and belief, this recent blow to the Hurrys underscores the efficacy of Defendants' campaign to interfere with the Hurrys' contractual relations as alleged herein.

360.   Defendants' have modeled their actions on the actions on the controversial and unlawful Operation Choke Point, in which government agencies sought to squeeze disfavored but legal companies out of business.

361.   Defendants' wrongful conduct bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

362.   Defendants' intentional acts and defamatory statements have resulted in a loss of beneficial economic relationships and actual profits to Plaintiffs.

-63-

363.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' intentional business interference and are entitled to an award of compensatory damages in an amount to be proven at trial.

364.   Defendants' wrongful conduct was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## ELEVENTH CAUSE OF ACTION

### Public Disclosure of Private Facts

365.   Plaintiffs repeat and incorporate herein by reference all prior allegations of this Complaint as if fully set forth herein.

366.   Defendants intentionally and wrongfully disclosed the private affairs and concerns of Plaintiffs.

367.   Defendants' disclosure of Plaintiffs' private affairs and concerns is highly offensive to Plaintiffs.

368.   Defendants' disclosure of Plaintiffs' private affairs and concerns would be highly offensive to a reasonable person.

369.   Defendants' disclosure of Plaintiffs private affairs and concerns also is not a matter of legitimate concern to the public.

370.   The wrongful disclosure of Plaintiffs' private affairs and concerns, for purposes of this claim, consists of Defendants' leaks to Meagher concerning the on-site examination of SCA on November 12, 2014 and related examinations under FINRA Matter no. 20120327319.

371.   Defendants' misconduct is highly offensive to any reasonable person in that the publicity Defendants gave to FINRA's examination of SCA cast a negative and injurious light on

-64-

Plaintiffs with respect investors, financial institutions and other critical audiences and relationships.

372.    FINRA's examination of SCA is not a matter of legitimate public concern, as evidenced by FINRA's own policies.  FINRA's policy is that examinations under FINRA Rule 8210 are non-public and confidential.  Stated differently, the public is not entitled to know.

373.    Examinations under Rule 8210 are routinely used to gain information regarding FINRA members or associated persons that are not the recipient of the 8210 Request.  In other words, a recipient of an 8210 Request may have done nothing wrong.

374.    As FINRA's 8210 letter explains, the examination "should not be construed as an indication that the Enforcement Department or the Department of Member Regulation or its staff has determined that any violations of federal securities laws or FINRA, NASD, NYSE or MSRB rules have occurred."

375.    After nearly three years, Plaintiffs are not the subject of any regulatory action arising out of FINRA Matter No. 20120327319.  Defendants' disclosure of such examinations, as alleged in this Complaint, has inflicted irrevocable harm.

376.    As a direct and proximate result of Defendants' disclosure of Plaintiffs' private affairs and concerns, Plaintiffs suffered mental anguish and economic harm.

377.    Plaintiffs have sustained damages as a direct and proximate result of Defendants' public disclosure of private facts and are entitled to an award of compensatory damages in an amount to be proven at trial.

378.    Defendants' wrongful conduct is and was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TWELFTH CAUSE OF ACTION

### False Light

379.     Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

380.     Defendants intentionally and wrongfully gave publicity to matters concerning Plaintiffs that place Plaintiffs before the public in a false light and, thus, wrongfully invaded Plaintiffs' privacy.

381.     Defendants falsely stated that John Hurry, Justine Hurry, and/or their businesses were engaged in money laundering.

382.     Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were under investigation by the FBI, and falsely implied they were the target of criminal investigations.

383.     Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were involved in a "pump-and-dump" scheme.

384.     Defendants falsely stated that John Hurry, Justine Hurry and/or businesses associated with the Hurrys allowed Biozoom shareholders to trade in violation of SCA policies and were provided special perks.

385.     Defendants falsely implied that John Hurry and/or Justine Hurry caused SCA to disregard so-called "red flags" regarding the Biozoom trades and failed to follow up.

386.     The false light in which Plaintiffs have been placed is highly offensive to Plaintiffs and would be highly offensive to a reasonable person.

387.   Defendants knew of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed as a result.

388.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' giving publicity to matters concerning Plaintiffs that place Plaintiffs before the public in a false light and are entitled to an award of compensatory damages in an amount to be proven at trial.

389.   Defendants' wrongful conduct is and was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## THIRTEENTH CAUSE OF ACTION

### Deprivation of Constitutional Rights – *Bivens*

390.   Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

391.   By wrongfully coercing access to the ISC Computers, subsequently ordering and/or personally reviewing the Extra-Jurisdictional Materials, and retaining access to the Extra-Jurisdictional Materials beyond any reasonable period, Andersen and the other Individual Defendants deprived Plaintiffs of rights secured by the Constitution of the United States, including the 1st, 4th, 5th, and 14th Amendments.

392.   Defendants Andersen, and the other Individual Defendants, and each of them were acting under color of federal law when they wrongfully coerced access to the ISC Computers, subsequently ordered and/or personally reviewed the Extra-Jurisdictional Materials, and unreasonably retained the Extra-Jurisdictional Materials without any independent authority or basis to do so.

-68-

393.   Acting under color of law, Andersen and Individual Defendants individually and personally conspired to coerce Plaintiffs not to serve or pursue their federal lawsuit or otherwise protect their proprietary and privacy interests by threatening to bring disciplinary action against Plaintiffs or their employees if they persisted.

394.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' unconstitutional conduct and are entitled to an award of compensatory damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

### Conspiracy to Violate Civil Rights – 42 U.S.C. § 1985(2)

395.   Defendant Andersen conspired with Individual Defendants and one or more other persons to deter Plaintiffs from prosecuting their original complaint in this Court by intimidation and threats.

396.   Andersen and Individual Defendants intentionally accessed information on a protected computer under the CFAA in an effort to intimidate and deter the Hurrys, Plaintiff ISC, and the Business Plaintiffs from prosecuting their original complaint in this Court.

397.   Defendant Andersen further conspired with one or more of the Individual Defendants to disclose unlawfully protected information in violation of the Privacy Act and, in so doing, injured Plaintiffs and impaired Plaintiffs' property rights and livelihood—all on account of Plaintiffs having filed a lawsuit against Andersen and FINRA.

398.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' wrongful conduct and are entitled to an award of compensatory damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

A.     For an injunction restraining and enjoining FINRA, Andersen, Individual Defendants, and all other persons or entities acting in concert with them, including but not limited to FINRA's employees, agents, representatives, subsidiaries, affiliates, and attorneys, from:

1.     continuing unlawfully to maintain possession of the ISC Computer data in its entirety, including the Extra-Jurisdictional Materials.

2.     failing to immediately return or certify the destruction of the ISC Computer data, including all Extra-Jurisdictional Materials.

3.     making any further review or use of the ISC Computer data, including all Extra-Jurisdictional Materials.

4.     disclosing or distributing the ISC Computer data, including any Extra-Jurisdictional Materials, either in whole or in part to any person or entity other than the Hurrys or Plaintiff ISC.

5.     further disclosure of information protected under the Privacy Act.

B.     Enjoining Andersen, the Individual Defendants, FINRA, its board officers, employees, and agents from implementing, applying, or taking any action whatsoever or applying informal pressure to banks to encourage them to refuse or terminate business relationships with the Hurrys, Business Plaintiffs, or any businesses associated with the Hurrys.

C.     Awarding actual damages in favor of Plaintiffs against Defendants in an amount to

-70-

1   be determined by the trier of fact.

2

3        D.    Awarding punitive damages in favor of Plaintiffs and against Defendants in an

4   amount no less than $50 million.

5        E.    Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing

6   this action.

7

8        F.    For such further relief the Court deems just and appropriate.

9

10     DATED this 28th day of August, 2015.

11                        MANDEL YOUNG PLC

12                 By: */s/ Taylor C. Young*

13                     Robert A. Mandel

14                     Taylor C. Young
                       Peter A. Silverman

15                     3001 E. Camelback Rd., Suite 140
                     Phoenix, Arizona 85016

16                     *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned certifies that the original of the foregoing was transmitted this 28th day of August 2015 to the Office of the Clerk of the U.S. District Court using the CM/ECF System, which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants for this case.

George Brandon
Gregory A. Davis
Gregory S. Schneider
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
george.brandon@squirepb.com
gregory.davis@squirepb.com
gregory.schneider@squirepb.com
*Attorneys for Defendants*

*/s/ Erin Ford Faulhaber*

# EXHIBIT B

THOMPSON
HINE    ATLANTA        CLEVELAND        DAYTON        WASHINGTON, D.C.
              CINCINNATI        COLUMBUS        NEW YORK

December 19, 2018

Brent J. Fields
Secretary
U.S. Securities and Exchange Commission
100 F. Street NE
Washington, D.C. 20549

*Re: Petition for Rulemaking Regarding Administration of the*
*Financial Industry Regulatory Association*

Dear Mr. Fields:

Pursuant to 5 U.S.C. § 553(e), Rule 192(a) of the SEC's Rules of Practice and Section
19(c) of the Securities Act, 15 U.S.C. § 77s, 78s(c), Alpine Securities Corp. ("Alpine") through
undersigned counsel respectfully petitions the U.S. Securities and Exchange Commission
("SEC") to consider rulemaking proposals designed to return the governance of the Financial
Industry Regulatory Association ("FINRA") to a closer alignment with its members and prevent
continuing damage to particular markets and their participants. The specific proposals include
requirements to ensure equal and fair representation to FINRA member firms on its Board of
Governors and NAC, to require equal consideration of each vote cast by a member firm and to
prevent the issuance and deployment of inappropriate "guidance" which is disproportionately
impacting and damaging certain segments of the market.

As discussed below, these proposals are in response to FINRA's failure to represent a
significant component of member firms as well as issuers and investors who participate in the
microcap markets. To address those issues, we seek both greater representation within FINRA,
so that the interests of those who participate in the market can be considered, and appropriate and
essential constraints on FINRA's inappropriate usage of guidance.[1]

## I. Background

### A. The Formation and Purposes of the SRO

Under the Securities Exchange Act of 1934, Congress established the system of
regulation over the securities industry that included administration of markets and oversight of
industry participants by private organizations. Consistent with established models of self-

---

[1] The SEC, under section 15A(k), has the power to alter or modify association rules where necessary to ensure fair representation
of members and fair procedures for admission and discipline. 15 USC § 78o-3(k)(1).

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 2

regulation in relation to the securities exchanges,[2] the Exchange Act was amended in 1938 by
the Maloney Act to authorize the formation and registration of national securities associations,
which would address conduct of their members under the supervision of the SEC.[3]  As with the
stock exchanges, those associations would administer over-the-counter markets and regulate the
"admission and conduct of members."[4]

The Maloney Act envisaged the following:  the creation of a few organizations,
democratic in character, in which membership would be voluntary; the regulation of relations
between the members and the public; promotion of ethical standards; education of the members;
and reduction of governmental expenses.  It was intended also to prevent "tyranny of the
organization toward its members" and a laxity of standards directed to promote the public
interest.[5]  As confirmed by SEC Commissioner George Matthews, "the industry should
eventually play the predominant role in its own regulation and development along sound
economic and social lines."[6]   The industry organization, Mr. Mathews explained, would
establish standards for conduct while the Commission would then address any "submarginal
element" that refuses to abide by moral or legal standards.

The endeavor was described as a "unique experiment in supervised self-regulation" and,
from the outset, the tension that would be inherent in the effort was acknowledged by the
regulators and industry participants.[7]  As one participant succinctly stated, "those of us who are
large must remember the fears of the small, that they may be dominated by those who do not
understand and appreciate their problems."[8]

### B. The Development of FINRA and Its Increasing Disconnection from its Members

In critical respects, the eventual outcome was not what had been envisioned.  First, only
one organization came into existence, and it possessed "great disadvantages" because of the
diversity of industry participants and the inability of a monolithic entity to serve the interests of

---

[2]  See Peirce, Hester, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, Mercatus Center, George
Mason University, January 2015, available at www.mercatus.org/system/files/Peirce-FINRA.pdf (hereinafter "Peirce Article").

[3]  *See* Bonner, Francis, *The Over the Counter Market and the Maloney Act*, Oct. 28, 1938, at 633, available at
www.sec.gov/news/speech/1938/102338bonner.pdf (hereinafter cited as "Bonner Speech"); OVER-THE-COUNTER
TRADING AND THE MALONEY ACT, 48 Yale L.J. 4 (1939), available at:
http://digitalcommons.law.yale.edu/ylj/vol48/iss4/5] ; Peirce Article at 5.

[4]  Jennings, Richard W., *Self-Regulation in the Securities Industry*, 29 *Self-Regulation, Law & Contemporary Problems* 3 at 663,
available at www.scholarship.law.duke.edu/lcp/vol29/iss3 (hereinafter cited as "Jennings Article").

[5]  Bonner Speech at 5; Hed-Hoffman, Tamar, *The Maloney Act Experiment*, 6 Boston Coll. Law Rev. 2 at 187 (hereinafter
"Maloney Act").

[6]  Mathews, George, *A Discussion of the Maloney Act Program*, available at
www.sec.gov/news/speech/1938/102338mathews.pdf (cited in Peirce Article at 6).

[7]  *See* Maloney Act at 205.

[8]  Bonner Speech at 5. *See also Concept Release Concerning Self-Regulation*, 69 Fed.Reg 71,256, 71,261-262 (Dec. 8, 2004).

2

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 3

all.[9]  Even decades after the formation of the NASD, it was still anticipated that other national associations, better able to address the particular issues and responsibilities of its disparate members, would form.[10]  However, the statutory provisions governing the formation of a national security association, set forth in Section 78o-3(b), include requirements that have the effect if not the purpose of creating a monopoly, *i.e.,* to be recognized, an association must have a sufficient quantity of participants, geographical distribution, and an existing organizational structure.  Given the considerable obstacles to the formation of an alternative association, FINRA will likely remain the only organization through which securities firms can operate in the securities markets.

The diverse mission and goals of a national security association have also arguably been eclipsed, over time, by the view that FINRA should aggressively police and prosecute its own members rather than focusing on its equally critical obligations to "assure fair representation of the interests of all members and market participants," and "to remove impediments to and perfect the mechanism of a free and open market."[11]  Those directives are plainly articulated as core obligations of the association.  Section 15A(b) requires that FINRA's rules assure a fair representation of its members in the administration of its affairs and not enable "unfair discrimination between customers, issuers, brokers or dealers." The statute further expressly provides that FINRA may not fix rates or impose fees or regulations on "matters not related to the purposes of this title" and shall not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of this title."[12]  Those mandates, and FINRA's obligations as a trade association and representative of members, are articulated with equal if not greater weight in its statutory underpinnings.

Included among the various statutory requirements contained in the enabling provision is reference to the promotion of just and equitable principles of trade, often cited as justification for aggressive prosecutorial actions toward members.  It is useful, however, to place those words in the actual context of FINRA's obligations to promote and facilitate transactions, to "perfect" a free and open market, and to prevent unfair discrimination.

The rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest and are not designed to permit unfair discrimination between customers, issuers, brokers or dealers to fix minimum profits, to impose any schedule or fix rates of commissions, allowances,

---

[9]  Maloney Act at 207.

[10]  Maloney Act at 217.

[11]  Jennings Article at 675.

[12]  15 USC § 78o-3(b)(6), (9).

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 4

discounts, or other fees to be charged by its members or to regulate by virtue of any
authority conferred by this chapter matters not related to the purposes of this chapter or
the administration of the association.[13]

FINRA's mission and obligations thus flow to various constituents including the market itself,
issuers and customers – even those customers who are less wealthy and seek the ability to
participate in the purchase and sale of lower priced securities.

While certainly the association was intended to promulgate standards of conduct and
administer dealings as between members, it was not intended to replicate the regulatory functions
of the SEC or, worse, devise and seek to enforce its own substantive interpretations of the federal
securities laws.[14] It was intended to represent not only the interests of the SEC but also the
interests of members, associated persons, customers, issuers, brokers and dealers. It is obligated
to abjure any actions that are destructive to members, impede the operations of free and open
markets, and/or that involve" unfair discrimination" in relation to members, issuers or customers.

## C. FINRA Now Lacks Sufficient Oversight By and Transparency To its Member Firms

Notwithstanding these core obligations, FINRA's separate and more punitive function
has risen to the fore and come to dominate FINRA's role. In 1996, the SEC began pressing to
diminish the industry's role in the supposed self-regulatory organization, acknowledging the
importance of "the knowledge, insight and expertise" of industry participants but insisting that it
must give "primacy" to the protection of investors. It therefore required an increase in the role of
public members on NASD's board and elevating the position and independence of its staff.

The dominance of public over industry representatives increased even more in 2007 when
the NASD merged with the NYSE) and FINRA was formed. Even as of the time of the
consolidation, the shift away from representation of industry participants was underway. As
discussed in Release No. 34-77786, in connection with the 2007 consolidation of the NASD and
NYSE Regulation, the SEC approved changes to the NASD By-Laws "that apportioned public
and industry representation on the FINRA Board of Governors."[15] Notwithstanding the
obligation of fair representation, the By-Laws require "that the number of Public Governors
serving on the FINRA Board *exceed* the number of Industry Governors."[16] With respect to the
NAC, it consisted at that point of 14 members, 7 Industry and 7 Public, usually appointed based
on recommendations from the Nominating Committee. FINRA proposed in 2007 that the NAC
be expanded to 15 members for the precise purpose of having the number of Non-Industry
Members *exceed* the number of Industry Governors.

---

[13]  15 U.S.C. 78o-3(b)(6).

[14]  *See* Maloney Act at 209.

[15]  Sec. & Exch. Comm'n, Rel. No. 34-77786, at 2 (May 9, 2016).

[16]  *Id.* at 3.



THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 5

Since the consolidation in 2007, FINRA has developed a bureaucratic existence and
aggressive regulatory approach that fails adequately to reflect the interests of a significant
component of its members, the needs of certain issuers and investors, and its critical obligation to
develop, not thwart, capital raising activities of start-up companies. For decades, FINRA was
under the control and direction of primarily non-industry members. FINRA's Board of
Governors includes the only member firm representatives who could have any meaningful
impact on the administration of FINRA, and yet the members elect only seven of its 23 members.
By definition, the policies and practices of FINRA are, therefore, determined by unelected
individuals appointed by the FINRA Board from candidates nominated by a nominating
committee.[17] Further, of the seven seats that are elected by FINRA members, only three of those
seats can be filled by "small firm" governors; three other seats are dedicated to representatives of
large firms, i.e., those with more than 500 registered representatives.

As explained by Commissioner Peirce,

The board structure, which is intentionally weighted away from the industry, is not
consistent with self-regulation. An organization run by a board that is dominated by
people who are not in the industry is not an SRO; it is a regulator with industry
representation. Onnig H. Donaldson, professor of law at Tulane University Law School,
has documented the trend away from an SRO staff with deep industry expertise and its
replacement with a bureaucratized staff.[18]

Similarly, of the 31 committees that "provide feedback on rule proposals, regulatory
initiatives and industry issues," only one is focused on "issues of particular interest and concern
to small firms."[19] Yet in 2017, for example, small firms comprised 3,353 of FINRA's total of
3,726 member firms.[20] In terms of distribution by size of firm, 90% of FINRA's membership
consisted of small firms.

Even more critical is that, after a tradition of *industry participants* serving as Chairman of
the Board of Governors, that position was then taken and held for almost twenty years, from
1997 to 2016, by the Chief Executive Officers of NASD and then FINRA. Most recently,
Richard Ketchum obtained and kept the position of Chairman for 7 years, from 2009 through

---

[17] According to the Notice, only 20% of the Nominating Committee members must be industry governors associated with a
FINRA member firm to satisfy the statutory requirements of "fair representation" under SEA 15A(b)(4). *See* FINRA, "Special
Notice: Engagement Initiative" at 4, n. 3 (Mar. 21, 2017), *available at*
http://www.finra.org/sites/default/files/notice_doc_file_ref/Special-Notice-032117.pdf (hereinafter "FINRA Special Notice"). .
A firm not selected by the Nominating Committee must petition for inclusion and challenge the nominee. FINRA By Laws,
Article VI § 6.2.

[18] Peirce Article at 18.

[19] FINRA Special Notice, *2018 Involvement and Election Process Overview*, February 1, 2018, at 5-11.

[20] FINRA, *2018 FINRA Industry Snapshot*, at 12 (Aug. 2018), *available at*
https://www.finra.org/sites/default/files/2018_finra_industry_snapshot.pdf (hereinafter "2018 FINRA Industry Snapshot").

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 6

2016. During the same period, Brad Bennett acted as Chief of Enforcement and touts the dramatic increase that occurred in actions against members and associated persons. According to Mr. Bennett, during his tenure FINRA brought cases "on a scale of size, sanction and sophistication that can *compete* with federal regulators," increased industry bars and expulsions by 20% and increased monetary sanctions from an annual total of $41 million to a total of $175 million in 2016.

These critical issues were examined by now Commissioner Hester Peirce in her 2015 paper, *The Financial Industry Regulatory Authority: Not Self-Regulation After All.* Ms. Peirce observed that "FINRA's structure and monopoly status shield it from oversight."[21] It is not accountable to the industry "in the way a self-regulator would be," "nor is it accountable to the public, Congress, the president or the courts."[22] It has slowly but certainly evolved into what some describe as a "fifth branch of government," "likely to behave as if they are an extension of the Commission's own compliance and enforcement arms, with the added benefit that they are *subsidized directly by industry fees.*"[23] Possible solutions, according to the Peirce Article, include acknowledging that FINRA acts like the SEC and "fold FINRA into the SEC." Alternatively, "*FINRA could be remade into an organization that is run by the industry it regulates,*" and perhaps then, Ms. Peirce suggests, "competing SROs might emerge to tailor regulation to a particular group of firms such as smaller broker-dealers."[24]

### D.  Recent Developments Are Positive But Not Sufficient

Only after an industry participant resumed the position of Chair in 2016 was there any recognition of the extent to which FINRA had become an enforcement agency, apparently seeking to outdo the SEC, while failing to properly consider and address the very legitimate concerns of the members regarding excessive, costly and inconsistent regulation of the industry. Only recently, since the change of control in 2016, has there been a seemingly genuine acknowledgement of FINRA's failure to represent its members: in March 2017, FINRA issued a Special Notice concerning its "Engagement Initiative," in which it reviewed its means of engaging with its member firms, and sought comments regarding how to enhance its mission and effectiveness.[25] The Special Notice acknowledged and sought to address some of these issues,

---

[21] Peirce Article at 2.

[22] *Id.* at 3.

[23] *Id.* at 21. Commissioner Peirce also emphasizes that amounts collected by the SEC as penalties and disgorgement are often used to compensate victims or are paid to the Treasury while amounts collected by FINRA are not subject to Congressional directives. And rulemaking at the SEC level requires actual economic analysis to identify the problem, potential solutions and the costs and benefits, while the SEC has "generally not raised the issue" in relation to SRO rules. FINRA has also, to this point, avoided being classified as a state actor and thereby avoided the kind of accountability that usually exists among those that exercise governmental powers. *Id.* at 22-24.

[24] *Id.* at 28.

[25] *See generally* FINRA Special Notice, 3/21/17, available at www.finra.org/industry/special-notice-032117; FINRA News Release 3/21/17, FINRA Seeks Comment on its Engagement Programs, available at www.finra.org/newsroom/2017/finra-seeks-comment-in-its-engagement-programs.



THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 7

emphasizing that FINRA "can (and should) actively engage with its member firms" and that member firms must be permitted to "participate where appropriate in developing FINRA's rules and programs."[26] FINRA also recognized that "insufficient member engagement may result in FINRA failing to fully achieve the benefits of its SRO model."[27]

Having identified the lack of responsiveness to and participation by members, FINRA's initiative focused on its committee structure as a means of interacting with member firms, and referred to FINRA's election process whereby vacancies to the Board, the NAC and the District Committees are filled. But that initiative failed to tackle the causes of or remedies for FINRA's overzealous enforcement activities and the resultant and real damage to market participants and sectors.

The Progress Report on FINRA360, published in April 2018, reiterated the same themes regarding FINRA's core mission including its need to work with members, investor and other stakeholders to cultivate a deep expertise in the securities industry that enables a more effective regulatory framework and promotes vibrant capital markets."[28] That Report identified some progress that had been made, including trying to increase transparency in relation to operations and working more cooperatively with members, but also confirmed that FINRA360 is a "multi-year initiative" and that there remained "much more work ahead" to improve interactions with member firms and the investing public.[29]

### E. The Damage Done

Under the leadership of non-industry participants, FINRA has engaged in a series of actions that were designed to and have impaired key components of the microcap markets. As participants in that market, we have seen first-hand the regulatory disdain for these markets and watched as increasingly aggressive actions were taken against those who dare to participate in that market.

FINRA's actions were likely an outgrowth of efforts by regulators to "choke" certain businesses, *not* through the pursuit of those who engage in improper conduct but rather through

---

[26] Special Notice at 3.

[27] *Id.* The FINRA Special Notice also discussed the publication and the role of "regulatory guidance," discussed below. *See id.* at 15.

[28] FINRA, "Progress Report on FINRA360," at 1 (Apr. 2018), *available at* https://www.finra.org/sites/default/files/FINRA360ProgressReport_April2018.pdf (hereinafter "Progress Report").

[29] *Id.* at 2. The SEC, on May 25, 2018, provided notice of proposed rule changes relating to "the District Committee structure and governance." Sec. & Exch. Comm'n, Rel. No. 34-83332 (May 25, 2018). FINRA also established two new committees including the Clearing Firm Advisory Committee to "serve as a forum for clearing and introducing firms to advise and make recommendations on issues arising from member firm activities relating to the clearance, carrying and settlement of securities, including issues practices and activities affecting or relating to small member firms such as their access to clearing services." Progress Report at 27. Those actions, while positive, do not address any of the structural issues associated with FINRA's current operation.

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 8

the shift of enormous swaths of regulatory resources to the pursuit of those who engage in legitimate businesses that have, in the past, been used by those who engage in fraud. Through that allocation of regulatory resources, the supposed gatekeepers of business – primarily banks and brokerage houses – have been aggressively investigated, pursued and penalized for their alleged failures to perform investigative functions.[30]  In the process, regulators have extracted literally billions of dollars of corporate earnings from their shareholders, while leaving in place the same precise members of management who engaged in the conduct that was supposedly egregious enough to warrant the massive fines.  Corporate management at large institutions has been able and only too willing to go along with that regime, paying over to regulators what is quite literally other people's (shareholders') money – as long as management kept their own jobs, with resulting economic loss to the shareholders of those companies.  Countless smaller businesses that lack the wherewithal to pay those massive penalties have been driven out of business, all to the benefit of the larger firms.  And these are not companies that are themselves engaged in fraud; these are productive and even critical participants in our economy whose only fault was their supposed failure to "police" the markets.  It constitutes, as stated in the report of the U.S. House of Representative, Committee on Oversight and Government Reform ("House Oversight Committee"), "inappropriate[] demands that bankers act as the moral arbiters and policemen of the commercial world."[31]

The government's aggressive approach led to Congressional inquiries that identified the invalidity of the government's actions.

Forceful prosecution of those who defraud American consumers is both responsible and admirable.  However, Department of Justice initiatives to combat mass market consumer fraud must be legitimate exercises of the Department's legal authorities, and must be executed in a manner that does not unfairly harm legitimate merchants and individuals.

Operation Choke Point fails both these requirements. The Department's radical reinterpretation of what constitutes an actionable violation under § 951 of [Financial Institutions Reform, Recovery, and Enforcement Act of 1989] fundamentally distorts Congress' intent in enacting the law and inappropriately demands that *bankers* act as the moral arbiters and policemen of the commercial world.  In light of the Department's obligation to act within the bounds of the law, and its avowed commitment not to 'discourage or inhibit' the lawful conduct of honest merchants, it is necessary to disavow and dismantle Operation Choke Point.[32]

---

[30] *See* Ruce, Phillip, *The Bank Secrecy Act: Considerations for Continuing Banking Relationships After the Filing of a Suspicious Activity Report*, 30 Quinnipiac L. Rev. 43, 43-44, 55-64 (2011); Allen D. Boyer and Susan Light, *Dirty Money and Bad Luck: Money Laundering in the Brokerage Context*, 3 Va. L.& Bus.Rev. 81, 97-122 (2008).

[31] DARRELL ISSA, H. COMM. ON OVERSIGHT AND GOV'T REFORM, 113TH CONG., *The Department of Justice's "Operation Choke Point": Illegally Choking off Legitimate Businesses?*, at 11 (pub. May, 29, 2014) (hereinafter "Issa, *Operation Choke Point*").

[32] *Id.* (emphasis in original).

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 9

The concerns regarding the "choke point" approach continued even through 2017.  A group of Republican congressmen, on August 10, 2017, sent a letter to regulators asking that they confirm that they are no longer pursuing that choke point approach that forced financial institutions to cease doing business even with legitimate businesses because of the risk of regulatory backlash.[33]

A similar approach has been deployed against the microcap markets.  Given the highly speculative nature of low priced securities, Congress long ago addressed concerns regarding that market, and did so in a manner consistent with the premise of our securities laws: disclosure as opposed to prohibition.  Through the passage of the Penny Stock Reform Act of 1990, Congress ensured that those who participate in those markets would receive more fulsome disclosures and imposed additional requirements on those transactions.

That fundamental concept of disclosure was not, however, enough for regulators who continued to press toward ways to *prevent* transactions in low priced securities.  That process has progressed over years:  provisions of the Patriot Act have been distorted and effectively rewritten by regulators; regulators developed "guidance" that purports to require industry participants not only to report what they see, but also to employ investigators to find, to research and unearth information regarding customers or their transactions.  Superimposed on that structure was the regulators' "red flag" approach pursuant to which the regulators were able to label characteristics of certain kinds of transactions as "suspicious" -- and those "red flags" were then interpreted to encompass any transaction in low priced securities.[34]  .  Slowly but surely the regulators developed a new kind of "conventional wisdom," building a narrative that inherent characteristics of trading in low priced securities are "red flags" and suspicious, and transforming those dubious assumptions into predicates for aggressive regulatory enforcement.  Whether by design or otherwise, the ineluctable consequence of these events is "derisking," resulting in fewer and fewer firms willing to arouse the ire of regulators by participating in the microcap market.

Among the techniques central to FINRA's actions against the microcap markets are its sweeping interpretation of its enforcement authority and its dissemination and use of purported "guidance."  It has relied extensively on its own "guidance" publications in taking the position that microcap transactions constitute a violation of the provisions of the Securities Act of 1933 and the Bank Secrecy Act.  Through that "guidance," FINRA seeks to create law by setting out its own extrapolations of actual statutory provisions, insisting that its interpretations are entitled to "deference," and then using its proclamations "for the purpose of coercing persons or entities

---

[33] Letter from Bob Goodlatte, et al., U.S. Congressmen, to Attorney General Jeff Sessions, et al. (Aug. 10, 2017), *available at* https://judiciary.house.gov/wp-content/uploads/2017/08/081017-Choke-Point-Letter.pdf.

[34] *See e.g.*, Jonathan N. Eisenberg, *AML Obligations of Broker-Dealers*, Harvard Law School Forum on Corporate Governance and Financial Regulation, (September 30, 2016).

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 10

outside the federal government into taking any action or refraining from taking any action beyond what is required by the terms of the applicable statute or regulation."[35] .

That tactic is improper. As a matter of law, agencies do not have the power to make law and are not permitted to simply promulgate guidance and then cite it as binding; an agency has only the power conferred on it by Congress.[36] Congress has plainly mandated that agencies are permitted to engage in "rulemaking," including the promulgation of any "substantive" or "legislative" directive, only in accordance with the comprehensive procedures set forth in the Administrative Procedure Act ("APA"). Absent compliance with the APA, an agency's publications do not have the force of law and are not entitled to the judicial "deference" that would apply to a statute or regulation.

The impropriety of an agency's deployment of its own purported "guidance" was underscored recently by a Justice Department memorandum, *Prohibition on Improper Guidance Documents*, issued in November 2017.[37] That memorandum confirmed that, in the past, guidance documents had been issued without rulemaking and then used to "coerce" persons or entities into engaging in or refraining from conduct beyond that which is required by any statute or regulation. And, according to the memorandum, the Justice Department would cease promulgating "guidance" documents that purport to "impose new requirements" or "create binding standards." It further directed that existing "guidance" be reviewed to identify that which should be repealed, replaced or modified.

Underscoring the prohibition against improper promulgation or use of guidance, Associate Attorney General Rachel Brand issued a subsequent memorandum, dated January 25, 2018, entitled *Limiting Use of Agency Guidance in Affirmative Civil Enforcement Cases*.[38] That memorandum prohibited the Department from acting "to effectively convert agency guidance documents into binding rules" or "using noncompliance with guidance documents as a basis for proving violations of applicable law."[39]

The "crackdown" in relation to the microcap markets, including the aggressive positions taken by FINRA, are crushing those markets and resulting in a dramatic reduction in the ability to purchase and sell those securities.[40] As of July, Bank of America Merrill Lynch announced that it would no longer permit transactions involving low priced securities that trade on the OTC

---

[35] PHILIP HAMBURGER, *Is Administrative Law Unlawful?* University of Chicago Press (2014).

[36] *See La. Public Service Comm. v. FCC,* 476 U.S. 355, 374 (1986).

[37] Dep't. of Justice, Office of the Attorney General, "Prohibition on Improper Guidance Documents" (Nov. 16, 2017), *available at* https://www.justice.gov/opa/press-release/file/1012271/download.

[38] Dep't of Justice, Office of the Assoc. Attorney General, "Limiting Use of Agency Guidance in Affirmative Civil Enforcement Cases" (Jan. 25, 2018), *available at* https://www.justice.gov/file/1028756/download.

[39] *Id.* at 2.

[40] *See* Anthony, Laura, "Shifting Capital Markets," (Oct. 23, 2018), available at http://securities-law-blog/2018/10/23/shifting-capital-markets-bank-of-americas.

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 11

markets, and last month added further restrictions including restricting sales of stock of any low priced security with a market capitalization of less than $300 million. Last month, COR Clearing, in the face of aggressive regulatory action, finally agreed to cease transactions in OTC Market securities below $5.00 per share and will not accept deposits of such securities. COR's action left only a handful of firms that would continue to accept deposits of and clear transactions in low priced securities. Alpine is one of those few, and is itself now under enormous pressure to do precisely what COR did and exit that market.

Consider the impact if these efforts to drive firms out of the microcap market are actually successful. The distaste for the microcap markets that flows through Wall Street obviously reflects a great respect for wealthy and substantial companies, and the brokerage firms that service them, but it utterly fails to appreciate the value and critical importance of those not yet wealthy entrepreneurs and their emerging companies that need to raise capital, or the investors who also want to participate in the markets. Consider the analysis published in December 2016 by the SEC regarding investments in over-the-counter ("OTC") stocks.[41] That paper acknowledged the sheer size of the microcap market: "approximately 10,000 OTC stocks were quoted at the end of 2013 through 2015, generating a total trading volume of over $200 billion per year."[42] That volume increases each year; the "volume traded in 2015 ($200 billion) is almost 50% higher than 2012 ($136 billion)."[43] The obvious reason: there are an enormous quantity of retail investors who, oftentimes shut out of the higher priced stocks, still want to participate in the stock market: "OTC stocks are owned and traded almost exclusively by individual and 'retail' investors."[44] Those investors, according to the report, are drawn to OTC stocks for one of two reasons. Either they "are simply gambling" and actually enjoy the "lottery-like" aspect of the small cap markets, where a positive result is unlikely but, when it comes, is enormous.[45] In fact, "investors in stocks on a national securities exchange with lottery-type payoffs tend to have socioeconomic profiles similar to individuals who participate more often in state lotteries."[46]

The remarks of Chairman Jay Clayton certainly suggest that he is concerned about the impact of over regulation or overly aggressive or misguided enforcement actions on the efficacy of our markets:

The reduction in the number of US listed public companies is a serious issue for our markets and the country more generally. To the extent companies are eschewing our

---

[41] White, Joshua, *Outcomes of Investing in OTC Stocks* (Dec. 16, 2016), available at www.sec.gov/files/White-OutcomesOTC-Investing.pdf.

[42] *Id.* at 1.

[43] *Id.* at 2.

[44] *Id.*

[45] *Id.* at 3.

[46] *Id.* at 14.

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 12

public markets, the vast majority of Main Street investors will be unable to participate in their growth. The potential lasting effects of such an outcome.

These actions are having a demonstrable and unhealthy impact on the marketplace and causing what may be a clearing firm crisis. Start-up companies will not be able to obtain services or investors because it will become impossible for any investor or service provider to sell those securities.[47] It is irrational and flatly contrary to its mandates for FINRA to so enthusiastically participate in the decimation of a legitimate marketplace, and its willingness to do so appears to be an outgrowth of the content of its leadership.

II.     **NSCC Fees and Charges Are Also Contributing to the Rapid Demise of the Microcap Markets**

The actions of FINRA directed at microcap transactions have been combined with NSCC's imposition of fees and charges associated with those transactions that are also preventing Alpine from processing lawful customer transactions and rendering it difficult if not impossible to clear even relatively small sales of microcap stocks.[48] A series of changes in the calculation of charges relating to microcap transactions, including the Clearing Fund Premium, "Illiquid" Charges and Credit Risk calculations as well as elimination of offsets pertaining to stock held at DTC, have combined to create an irrational monetary requirement for microcap transactions that is cost prohibitive and that bears no relationship to the underlying transaction. Those charges, and the impact on clearing firms who participate in the microcap markets, are detailed in a separate Petition, also filed by Alpine on this date, seeking rulemaking in relation to certain practices and rules of the NSCC.

---

[47] FINRA's position is demonstrably more extreme and more damaging to the market than is the position generally taken by the SEC. It was FINRA, for example, who took an approach against Sterne Agee that would have rendered virtually any microcap transaction by definition "suspicious" and reportable under the Bank Secrecy Act. That argument, fortunately, was rejected even by the Hearing Panel in that case but is still being trotted out and used to pursue other firms based on the view of a former FINRA employee that the Hearing Panel decision was "wrong."

[48] Attached as Exhibit A is the Rulemaking Petition filed by Alpine that details the various fees and charges at issue and their impact on microcap stock transactions.

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 13

## III.  PROPOSALS

### 1.  FINRA'S BOARD OF GOVERNORS SHOULD BE COMPRISED OF A MAJORITY OF INDUSTRY GOVERNORS

This petition requests that the Commission amend FINRA's By-Laws to eliminate the requirement that the number of non-Industry Governors exceed the number of Industry representatives, and approve a new requirement that the Board of Governors be composed of a majority of industry governors.

### 2.  THE NOMINATING COMMITTEE SHOULD BE COMPOSED OF A MAJORITY OF INDUSTRY GOVERNORS

This petition requests that the Commission amend FINRA By Laws to require that the majority of the Nominating Committee be composed of industry members.

### 2.  ANY FINRA INDUSTRY MEMBER SHOULD BE ABLE TO PLACE THEIR NAME ON THE BALLOT AND STAND FOR ELECTION WITHOUT HAVING TO CHALLENGE THE ACTIONS OF THE NOMINATING COMMITTEE

This petition requests that the Commission amend FINRA By Laws to permit any industry member to place their name on the ballot and stand for election without having to challenge the nominee selected by the Nominating Committee.

### 3.  FINRA RULES SHOULD PROHIBIT THE IMPROPER ISSUANCE AND USE OF "GUIDANCE"

This petition requests that the Commission prevent the further improper issuance and use of "guidance" by:

- Adopting rules prohibiting FINRA from issuing any "legislative rule" without full compliance with the submission and notice and comment requirements;
- Requiring that FINRA identify any other publication or pronouncement as "guidance,"
- Requiring that FINRA affirmatively state in "guidance" that it does not have the force of effect of law,
- Requiring that FINRA state in "guidance" that it may not be used to coerce industry participants to take action or refrain from action beyond that which is required by any applicable statute; and
- Confirming that "guidance" may not be used as a basis for or evidence of any violation of law.

THOMPSON
HINE

Brent J. Fields
December 19, 2018
Page 14

4. NAC SHOULD HAVE AN EQUAL OR GREATER NUMBER OF INDUSTRY
REPRESENTATIVES

This petition requests that the Commission amend FINRA's By-Laws to eliminate the
requirement that the number of non-Industry members of NAC exceed the number of
Industry representatives, and reinstate the requirement that NAC be composed of an
equal or greater number of industry governors.

Respectfully,

Maranda E. Fritz

cc:     Financial Industry Regulatory Authority

# EXHIBIT C



**BrokerCheck Report**

# SCOTTSDALE CAPITAL ADVISORS CORP

CRD# 118786

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Firm Profile | 2 - 6 |
| Firm History | 7 |
| Firm Operations | 8 - 14 |
| Disclosure Events | 15 |



## About BrokerCheck®

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**

   BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

   Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**

   The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:

   o   information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and

   o   information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**

   Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**

   To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**

   FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck



User Guidance

# SCOTTSDALE CAPITAL ADVISORS CORP

CRD# 118786

SEC# 8-53685

## Main Office Location

7170 E. MCDONALD RD. SUITE 6
SCOTTSDALE AZ, AZ  85253
Regulated by FINRA Denver Office

## Mailing Address

7170 E. MCDONALD RD. SUITE 6
SCOTTSDALE AZ, AZ  85253

## Business Telephone Number

480-603-4900

This firm is a brokerage firm and an investment adviser firm.  For more information about investment adviser firms, visit the SEC's Investment Adviser Public Disclosure website at:

https://www.adviserinfo.sec.gov

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Firm Profile

This firm is classified as a corporation.

This firm was formed in Arizona on 06/30/2001.

Its fiscal year ends in June.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

**This firm is registered with:**

- the SEC
- 1 Self-Regulatory Organization
- 53 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?  **No**

This firm conducts 11 types of businesses.

This firm is affiliated with financial or investment institutions.

This firm has referral or financial arrangements with other brokers or dealers.

## Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?     **Yes**

**The following types of disclosures have been reported:**

| Type | Count |
|---|---|
| Regulatory Event | 5 |

©2019 FINRA. All rights reserved.     Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance



# Firm Profile

This firm is classified as a corporation.

This firm was formed in Arizona on 06/30/2001.

Its fiscal year ends in June.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**SCOTTSDALE CAPITAL ADVISORS CORP**
**Doing business as SCOTTSDALE CAPITAL ADVISORS CORP**

**CRD#** 118786

**SEC#** 8-53685

**Main Office Location**

7170 E. MCDONALD RD. SUITE 6
SCOTTSDALE AZ, AZ 85253
**Regulated by FINRA Denver Office**

**Mailing Address**

7170 E. MCDONALD RD. SUITE 6
SCOTTSDALE AZ, AZ 85253

**Business Telephone Number**

480-603-4900

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance

FINT

# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SCOTTSDALE CAPITAL ADVIORS HOLDINGS LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | SOLE SHAREHOLDER |
| **Position Start Date** | 07/2002 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DIBLASI, TIMOTHY BRIAN |
| | 4623652 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | PRESIDENT |
| **Position Start Date** | 12/2018 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DIBLASI, TIMOTHY BRIAN |
| | 4623652 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF COMPLIANCE OFFICER |
| **Position Start Date** | 10/2013 |

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



www.finra.org/brokercheck
User Guidance

## Firm Profile

### Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DIBLASI, TIMOTHY BRIAN |
| | 4623652 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | AML OFFICER |
| **Position Start Date** | 06/2012 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DIBLASI, TIMOTHY BRIAN |
| | 4623652 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MSRB PRINCIPAL |
| **Position Start Date** | 04/2015 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | GEORGE, KENNETH RONALD |

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



www.finra.org/brokercheck
User Guidance

# Firm Profile

## Direct Owners and Executive Officers (continued)

2643369

**Is this a domestic or foreign entity or an individual?**
Individual

**Position**
FINOP

**Position Start Date**
01/2013

**Percentage of Ownership**
Less than 5%

**Does this owner direct the management or policies of the firm?**
No

**Is this a public reporting company?**
No

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP


www.finra.org/brokercheck
User Guidance

# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

**Legal Name & CRD# (if any):**  SCA CLEARING LLC

**Is this a domestic or foreign entity or an individual?**  Domestic Entity

**Company through which indirect ownership is established**  SCOTTSDALE CAPITAL DVISORS HOLDINGS LLC

**Relationship to Direct Owner**  MANAGER

**Relationship Established**  07/2017

**Percentage of Ownership**  Other General Partners

**Does this owner direct the management or policies of the firm?**  Yes

**Is this a public reporting company?**  No

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



www.finra.org/brokercheck

User Guidance

# Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance

## Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 53 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 05/22/2002 |

## SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:    Yes

A broker-dealer and government securities broker or dealer:    Yes

A government securities broker or dealer only:    No

This firm has ceased activity as a government securities broker or dealer:    No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 05/22/2002 |

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck
User Guidance

# Firm Operations

## Registrations (continued)

| U.S. States & Territories | Status | Date Effective | U.S. States & Territories | Status | Date Effective |
| --- | --- | --- | --- | --- | --- |
| Alabama | Approved | 06/07/2002 | North Carolina | Approved | 05/29/2002 |
| Alaska | Approved | 06/10/2002 | North Dakota | Approved | 05/24/2002 |
| Arizona | Approved | 05/28/2002 | Ohio | Approved | 05/31/2002 |
| Arkansas | Approved | 05/31/2002 | Oklahoma | Approved | 05/29/2002 |
| California | Approved | 06/07/2002 | Oregon | Approved | 06/17/2002 |
| Colorado | Approved | 06/05/2002 | Pennsylvania | Approved | 05/29/2002 |
| Connecticut | Approved | 05/24/2002 | Puerto Rico | Approved | 06/12/2002 |
| Delaware | Approved | 06/06/2002 | Rhode Island | Approved | 05/24/2002 |
| District of Columbia | Approved | 02/08/2002 | South Carolina | Approved | 06/11/2002 |
| Florida | Approved | 06/11/2002 | South Dakota | Approved | 05/31/2002 |
| Georgia | Approved | 05/24/2001 | Tennessee | Approved | 06/26/2007 |
| Hawaii | Approved | 05/30/2002 | Texas | Approved | 03/19/2002 |
| Idaho | Approved | 05/24/2002 | Utah | Approved | 05/24/2002 |
| Illinois | Approved | 05/30/2002 | Vermont | Approved | 06/24/2002 |
| Indiana | Approved | 05/29/2002 | Virgin Islands | Approved | 04/28/2009 |
| Iowa | Approved | 05/29/2002 | Virginia | Approved | 05/24/2002 |
| Kansas | Approved | 05/28/2002 | Washington | Approved | 05/29/2002 |
| Kentucky | Approved | 05/29/2002 | West Virginia | Approved | 05/29/2002 |
| Louisiana | Approved | 06/05/2002 | Wisconsin | Approved | 05/23/2002 |
| Maine | Approved | 05/24/2002 | Wyoming | Approved | 06/13/2002 |
| Maryland | Approved | 05/29/2002 | | | |
| Massachusetts | Approved | 05/24/2002 | | | |
| Michigan | Approved | 12/20/2001 | | | |
| Minnesota | Approved | 05/23/2002 | | | |
| Mississippi | Approved | 06/12/2002 | | | |
| Missouri | Approved | 06/04/2002 | | | |
| Montana | Approved | 05/28/2002 | | | |
| Nebraska | Approved | 05/30/2002 | | | |
| Nevada | Approved | 06/04/2002 | | | |
| New Hampshire | Approved | 05/05/2009 | | | |
| New Jersey | Approved | 06/03/2002 | | | |
| New Mexico | Approved | 06/04/2002 | | | |
| New York | Approved | 06/11/2002 | | | |

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



www.finra.org/brokercheck

User Guidance

# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 11 types of businesses.**

### Types of Business

Broker or dealer retailing corporate equity securities over-the-counter

Broker or dealer selling corporate debt securities

Mutual fund retailer

U S. government securities broker

Municipal securities broker

Broker or dealer selling variable life insurance or annuities

Put and call broker or dealer or option writer

Investment advisory services

Non-exchange member arranging for transactions in listed securities by exchange member

Private placements of securities

Other - ADVISORY FEES: INCLUDING INVESTMENT BANKING, MERGER & ACQUISITION, CORPORATE FINANCE, AND CONSULTING FEES. UNDERWRITER OR SELLING GROUP PARTICIPANT IN BEST-EFFORTS AND FIRM-COMMITMENT OFFERINGS.

### Other Types of Business

This firm does not effect transactions in commodities, commodity futures, or commodity options.

This firm does engage in other non-securities business.

Non-Securities Business Description:  MORTGAGE LOAN ORIGINATIONS, AS WELL AS LIFE AND HEALTH
                                     INSURANCE.



©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance



# Firm Operations

## Clearing Arrangements

**This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).**

## Introducing Arrangements

**This firm does refer or introduce customers to other brokers and dealers.**

**Name:** ALPINE SECURITIES CORPORATION

**CRD #:** 14952

**Business Address:** 440 EAST 400 SOUTH
SALT LAKE CITY, UT 84111

**Effective Date:** 03/03/2009

**Description:** ALPINE WILL PROVIDE CLEARING, TRADING AND SUPORT FOR SCA

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance



# Firm Operations

## Industry Arrangements

**This firm does have books or records maintained by a third party.**

**Name:** SMARSH, INC.

**Business Address:** 921 SW WASHINGTON STREET
SUITE 540
PORTLAND, OR 97205

**Effective Date:** 08/18/2011

**Description:** ELECTRONIC COMMUNICATION ARCHIVING AND RETENTION VENDOR,
RETAINS FIRM'S ELECTRONIC COMMUNICATIONS.

**Name:** ALPINE SECURITIES CORPORATION

**CRD #:** 14952

**Business Address:** 440 EAST 400 SOUTH
SALT LAKE CITY, UT 84111

**Effective Date:** 03/03/2009

**Description:** ALPINE WILL MAINTAIN RECORDS FOR SCA.

**This firm does have accounts, funds, or securities maintained by a third party.**

**Name:** ALPINE SECURITIES CORPORATION

**CRD #:** 14952

**Business Address:** 440 EAST 400 SOUTH
SALT LAKE CITY, UT 84111

**Effective Date:** 03/03/2009

**Description:** ALPINE WILL MAINTAIN FUNDS ACCOUNTS AND SECURITIES OF THE
APPLICANT

**This firm does have customer accounts, funds, or securities maintained by a third party.**

**Name:** ALPINE SECURITIES CORPORATION

**CRD #:** 14952

**Business Address:** 440 EAST 400 SOUTH
SALT LAKE CITY, UT 84111

**Effective Date:** 03/03/2009

**Description:** ALPINE WILL MAINTAIN ACCOUNTS, FUNDS AND SECURITIES OF
CUSTOMERS

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

12

www.finra.org/brokercheck
User Guidance

FINRA

## Firm Operations

## Industry Arrangements (continued)

### Control Persons/Financing

**This firm does not have individuals who control its management or policies through agreement.**

**This firm does not have individuals who wholly or partly finance the firm's business.**

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance

**FINRA**

# Firm Operations

## Organization Affiliates

This section provides information on control relationships the firm has with other firms in the securities, investment advisory, or banking business.

**This firm is, directly or indirectly:**

· in control of
· controlled by
· or under common control with

the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.

**ALPINE SECURITIES CORPORATION is under common control with the firm.**

| | |
|---|---|
| **CRD #:** | 14952 |
| **Business Address:** | 39 EXCHANGE PLACE<br>SALT LAKE CITY, UT 84111 |
| **Effective Date:** | 03/11/2011 |
| **Foreign Entity:** | No |
| **Country:** | |
| **Securities Activities:** | Yes |
| **Investment Advisory Activities:** | No |
| **Description:** | ALPINE SECURITIES AND SCOTTSDALE CAPITAL ADVISORS ARE AFFILIATED THROUGH COMMON INDIRECT OWNERSHIP AND CONTROL. |

**This firm is not directly or indirectly, controlled by the following:**

· bank holding company
· national bank
· state member bank of the Federal Reserve System
· state non-member bank
· savings bank or association
· credit union
· or foreign bank

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance



# Disclosure Events

All firms registered to sell securities or provide investment advice are required to disclose regulatory actions, criminal or civil judicial proceedings, and certain financial matters in which the firm or one of its control affiliates has been involved. For your convenience, below is a matrix of the number and status of disclosure events involving this brokerage firm or one of its control affiliates. Further information regarding these events can be found in the subsequent pages of this report.

| | Pending | Final | On Appeal |
|---|---|---|---|
| Regulatory Event | 0 | 4 | 1 |

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance



# Disclosure Event Details

**What you should know about reported disclosure events:**

1. **BrokerCheck provides details for any disclosure event that was reported in CRD. It also includes summary information regarding FINRA arbitration awards in cases where the brokerage firm was named as a respondent.**

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   o A law enforcement agency must file formal charges before a brokerage firm is required to disclose a particular criminal event.

3. **Disclosure events in BrokerCheck reports come from different sources:**
   o Disclosure events for this brokerage firm were reported by the firm and/or regulators. When the firm and a regulator report information for the same event, both versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. **There are different statuses and dispositions for disclosure events:**
   o A disclosure event may have a status of *pending, on appeal, or final.*
     § A "pending" event involves allegations that have not been proven or formally adjudicated.
     § An event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     § A "final" event has been concluded and its resolution is not subject to change.
   o A final event generally has a disposition of *adjudicated, settled or otherwise resolved.*
     § An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     § A "settled" matter generally involves an agreement by the parties to resolve the matter. Please note that firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     § A "resolved" matter usually involves no payment to the customer and no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

5. **You may wish to contact the brokerage firm to obtain further information regarding any of the disclosure events contained in this BrokerCheck report.**

## Regulatory - Final

This type of disclosure event involves (1) a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, self-regulatory organization, federal regulator such as the U.S. Securities and Exchange Commission, foreign financial regulatory body) for a violation of investment-related rules or regulations; or (2) a revocation or suspension of the authority of a brokerage firm or its control affiliate to act as an attorney, accountant or federal contractor.

**Disclosure 1 of 4**

**Reporting Source:**     Regulator

**Current Status:**     Final

©2019 FINRA. All rights reserved.     Report about SCOTTSDALE CAPITAL ADVISORS CORP

16



www.finra.org/brokercheck

**Allegations:** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO THE SANCTIONS AND TO THE ENTRY OF FINDINGS THAT THE FIRM, THROUGH ITS ORDER SENDING ORGANIZATIONS (OSOS), TRANSMITTED TO THE ORDER AUDIT TRAIL SYSTEM (OATS) REPORTS THAT CONTAINED INACCURATE, INCOMPLETE, OR IMPROPERLY FORMATTED DATA. THE FINDINGS STATED THAT ALTHOUGH THE FIRM'S OSOS MADE ERRORS WITH RESPECT TO THE FIRM'S SUBMISSIONS TO OATS, THE FIRM IS RESPONSIBLE FOR ENSURING THAT ITS REPORTABLE ORDER EVENTS ARE ACCURATELY REPORTED TO OATS.

**Initiated By:** FINRA

**Date Initiated:** 11/19/2015

**Docket/Case Number:** 2014039940101

**Principal Product Type:** No Product

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:**

**Other Sanction(s)/Relief Sought:**

**Resolution:** Acceptance, Waiver & Consent(AWC)

**Resolution Date:** 11/19/2015

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Sanctions Ordered:** Censure
Monetary/Fine $10,000.00

**Other Sanctions Ordered:**

**Sanction Details:** THE FIRM WAS CENSURED AND FINED $10,000.
FINE PAID IN FULL ON DECEMBER 8, 2015.

**Reporting Source:** Firm

**Current Status:** Final

**Allegations:** THE FIRM, THROUGH ITS ORDER SENDING ORGANIZATIONS, TRANSMITTED TO OATS 51 REPORTS THAT CONTAINED INACCURATE,

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

**FINRA**

INCOMPLETE, OR IMPROPERLY FORMATTED DATA IN VIOLATION OF FINRA RULE 7450.

**Initiated By:** FINRA

**Date Initiated:** 11/19/2015

**Docket/Case Number:** 20140399401-01

**Principal Product Type:** Penny Stock(s)

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:** Civil and Administrative Penalt(ies) /Fine(s)

**Other Sanction(s)/Relief Sought:**

**Resolution:** Acceptance, Waiver & Consent(AWC)

**Resolution Date:** 11/19/2015

**Sanctions Ordered:** Censure
Monetary/Fine $10,000.00

**Other Sanctions Ordered:**

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO A CENSURE AND A FINE OF $10,000.

**Firm Statement** DURING THE RELEVANT TIME PERIOD SCA ENTERED ALL CUSTOMER ORDERS THROUGH THE ORDER ENTRY SYSTEM PROVIDED BY ITS CLEARING FIRM, WHO ACTED AS THE REPORTING AGENT FOR SCA. PURSUANT TO A WRITTEN AGREEMENT, THE CLEARING FIRM AGREED TO FILE OATS REPORTS ON BEHALF OF SCA. BECAUSE SCA IS THE REPORTING MEMBER (AS DEFINED IN FINRA RULE 7410) WITH RESPECT TO THE OATS REPORTS, SCA IS PRIMARILY RESPONSIBLE TO ENSURE THAT TIMELY, ACCURATE, AND COMPLETE INFORMATION IS REPORTED TO FINRA, EVEN IF REPORTED BY A 3RD PARTY VENDOR. ACCORDINGLY, SCA HAS IDENTIFIED AND CORRECTED THE ROOT CAUSE WHICH GAVE RISE TO THE OATS EXCEPTIONS NOTED IN THE AWC. ADDITIONALLY, SCA IMPLEMENTED ENHANCEMENTS TO ITS PROCEDURES TO REVIEW 3RD PARTY OATS REPORTS TO VERIFY THE ACCURACY OF THE DATA SUBMITTED ON BEHALF OF THE FIRM. THIS INCLUDES DAILY REVIEW BY THE FIRM'S TRADING MANAGER OF FINRA OATS REPORTS FOR REJECTIONS AND OUT OF SEQUENCE EVENTS, AS WELL AS A DAILY REVIEW OF OATS DATA SUBMITTED ON BEHALF OF THE FIRM. SCA RESOLVED THIS ISSUE VIA AN AWC IN WHICH THE FIRM NEITHER ADMITTED NOR DENIED THE FINDINGS AND AGREED TO A CENSURE AND FINE OF $10K.

www.finra.org/brokercheck

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

www.finra.org/brokercheck

19

## Disclosure 2 of 4

**Reporting Source:** Regulator

**Current Status:** Final

**Allegations:** FINRA RULE 2010 AND NASD RULE 3010: AN INDIVIDUAL ASSOCIATED WITH THE FIRM, PERMITTED HIS NAME TO BE UTILIZED IN STOCK PROMOTION PRESS RELEASES AND ON WEBSITES CREATED BY THREE RELATED PUBLIC RELATIONS FIRMS. THE PRESS RELEASES PUBLISHED BY THE PUBLIC RELATIONS FIRMS CONTAINED RECOMMENDATIONS OF SPECIFIC SECURITIES TO THE PUBLIC. THE RELEASES IMPLIED THAT THE RECOMMENDATIONS WERE MADE BY THE INDIVIDUAL, WHOM THEY IDENTIFIED BY NAME AND/OR CRD NUMBER, ALTHOUGH THEY ELSEWHERE CLAIMED THAT THE INDIVIDUAL HAD NO PART IN THE CREATION OF THE REPORTS OR RECOMMENDATIONS. SOME OF THE RELEASES STATED THAT THE INDIVIDUAL WAS A REGISTERED PERSON EMPLOYED BY THE PUBLIC RELATIONS FIRM WHEN HE WAS NOT. THE INDIVIDUAL NOTIFIED SCOTTSDALE OF THE POSSIBILITY OF HIS WORKING WITH THE PUBLIC RELATIONS FIRMS. THE FIRM ADVISED THE INDIVIDUAL THAT THE PUBLIC RELATIONS FIRMS COULD NOT USE HIS NAME AND CRD NUMBER AS PROPOSED, BUT THE WEBSITES PUBLISHED THE PRESS RELEASES WITH THE INDIVIDUAL'S NAME AND/OR CRD NUMBER.
SCOTTSDALE KNEW OR SHOULD HAVE KNOWN THAT THE PRESS RELEASES WERE BEING ISSUED WITH THE INDIVIDUAL'S NAME AND/OR CRD NUMBER AND SHOULD HAVE TAKEN STEPS TO ENSURE THAT THE IMPROPER ACTIVITY CEASED. THE FIRM FAILED TO TAKE APPROPRIATE ACTION DESPITE BEING NOTIFIED REPEATEDLY OF CONCERNS ABOUT THE PRESS RELEASES.

**Initiated By:** FINRA

**Date Initiated:** 09/24/2012

**Docket/Case Number:** 2009020646702

**Principal Product Type:** No Product

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:** Other

**Other Sanction(s)/Relief Sought:** N/A

**Resolution:** Acceptance, Waiver & Consent(AWC)

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP

User Guidance

FINra

**Resolution Date:** 09/24/2012

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Sanctions Ordered:** Censure
Monetary/Fine $7,500.00

**Other Sanctions Ordered:**

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE FINDINGS THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS, THEREFORE THE FIRM IS CENSURED AND FINED $7,500. FINE PAID IN FULL ON SEPTEMBER 25, 2012.

**Reporting Source:** Firm

**Current Status:** Final

**Allegations:** FINRA ALLEGED FIRM VIOLATED NASD CONDUCT RULE 3010 AND FINRA CONDUCT RULE 2010 FOR FAILURE TO SUPERVISE JOSEPH PADDILLA REGARDING THE USE OF HIS NAME OR CRD NUMBER IN PRESS RELEASES AND RESEARCH REPORTS BY ENTITIES NOT ASSOCIATED WITH FIRM.

**Initiated By:** FINANCIAL INDUSTRY REGULATORY AUTHORITY

**Date Initiated:** 05/01/2012

**Docket/Case Number:** 20090206467

**Principal Product Type:** No Product

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:** Other

**Other Sanction(s)/Relief Sought:** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO A CENSURE AND A FINE IN THE AMOUNT OF $7,500.

**Resolution:** Acceptance, Waiver & Consent(AWC)

**Resolution Date:** 09/24/2012

**Sanctions Ordered:** Censure
Monetary/Fine $7,500.00

www.finra.org/brokercheck

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

www.finra.org/brokercheck

**Other Sanctions Ordered:**

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO A CENSURE AND FINE IN THE AMOUNT OF $7,500. THE FIRM PAID THE ENTIRE AMOUNT OF THE FINE. NO PRINCIPALS OR OTHER INDIVIDUALS WERE INCLUDED IN THE AWC DATED 9/27/2012.

**Firm Statement** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO A CENSURE AND FINE IN THE AMOUNT OF $7,500. THE SUBJECT REPRESENTATIVE IS NO LONGER ASSOCIATED WITH THE FIRM AND THE MATTER IS CONSIDERED CLOSED.

## Disclosure 3 of 4

**Reporting Source:** Regulator

**Current Status:** Final

**Allegations:** SEC SECTION 5 OF THE SECURITIES ACT OF 1933, FINRA RULE 2010, NASD RULES 2110, 3010(A) AND (B), 3010(C)(1)(A), 3010(C)(2), 3011, 3011(A) AND (B), 3012, 3013, MSRB RULE G-41: THE FIRM'S AML PROCEDURES STATED THAT THE FIRM WOULD MONITOR A SUFFICIENT AMOUNT OF ACCOUNT ACTIVITY TO PERMIT IDENTIFICATION OF UNUSUAL SIZE, VOLUME, PATTERN OR TYPE OF TRANSACTIONS OR ANY OF THE "RED FLAGS" IDENTIFIED IN ITS PROCEDURES. THE FIRM'S WRITTEN AML PROGRAM REQUIRED THE FIRM'S AML COMPLIANCE OFFICER, TO MONITOR FOR "RED FLAGS," TO INVESTIGATE ANY "RED FLAGS" DETECTED, TO DOCUMENT ANY SUCH INVESTIGATION AND FILE SUSPICIOUS ACTIVITY REPORT (SAR-SFS) WHEN APPROPRIATE. THE FIRM'S PROCEDURES IDENTIFIED A NUMBER OF RED FLAGS ASSOCIATED WITH ITS CUSTOMER AND CUSTOMER'S ACCOUNT. THE FIRM FAILED, HOWEVER, TO IMPLEMENT ITS AML PROCEDURES AS IT DID NOT ADEQUATELY MONITOR FOR AND/OR INVESTIGATE FACTS AND CIRCUMSTANCES PRESENT IN CERTAIN CUSTOMER ACCOUNTS THAT CONSTITUTED RED FLAGS AS DESCRIBED IN THE WRITTEN AML COMPLIANCE PROGRAM. THESE FACTS AND CIRCUMSTANCES AROSE AS A RESULT OF THE FIRM'S ASSOCIATION OF TWO REGISTERED REPRESENTATIVES WITH THE FIRM AND ACTIVITY INVOLVING CERTAIN CUSTOMER ACCOUNTS INTRODUCED TO THE FIRM BY THE REGISTERED REPRESENTATIVES. THE FIRM FAILED TO DEVELOP AND IMPLEMENT A SYSTEMATIC MEANS TO IDENTIFY CUSTOMERS WHOSE ACCOUNTS RAISED THE MULTIPLE ACCOUNT RED FLAG, AND NEITHER THE COMPLIANCE OFFICER NOR ANYONE ELSE AT THE FIRM TOOK STEPS TO MONITOR FOR THIS RED FLAG, AND THEREFORE FAILED TO DETECT, AND INVESTIGATE FOR ACTIVITY THAT RAISED THE MULTIPLE ACCOUNT RED FLAG, THE PENNY STOCK RED FLAG, AND THE WIRE TRANSFER RED FLAG. THE FIRM FAILED TO INVESTIGATE WHETHER THESE TRANSFERS CONSTITUTED "RED FLAG" OR WHETHER THEY HAD LEGITIMATE

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

www.finra.org/brokercheck

PURPOSES. THE FIRM, ACTING THROUGH THE COMPLIANCE OFFICER, FAILED TO IMPLEMENT ITS WRITTEN AML COMPLIANCE PROGRAM BY FAILING TO FILE SAR-SF FORMS TO REPORT SUSPICIOUS ACTIVITIES, AND THE FIRM ALSO FAILED TO FILE A FORM SAR-SF TO REPORT SUSPICIOUS ACTIVITY. THE FIRM'S CHIEF COMPLIANCE OFFICER FAILED TO CREATE, OR CAUSE THE AML COMPLIANCE OFFICER TO CREATE A RECORD OF QUESTIONABLE BACKGROUND REVIEWS AND THE FIRM'S AML PROCEDURES PERTAINING TO THE DISCIPLINARY BACKGROUND RED FLAG WERE NOT SUFFICIENTLY SPECIFIC TO PROVIDE ANY MEANINGFUL GUIDANCE AS TO WHERE AND HOW THE FIRM WOULD LOOK FOR CUSTOMERS WITH QUESTIONABLE BACKGROUNDS. AS A RESULT THE FIRM WILLFULLY VIOLATED MSRB RULE G-41. THE FIRM UTILIZED A MEANS OF INTERSTATE COMMERCE IN CONNECTION WITH ITS SALES OF UNREGISTERED SHARES AND THE TRANSACTIONS WERE NOT EXEMPT FROM REGISTRATION. THE FIRM, ACTING THROUGH THE AML COMPLIANCE OFFICER, FAILED TO DESIGNATE AND SPECIFICALLY IDENTIFY TO FINRA AT LEAST ONE PRINCIPAL TO ESTABLISH, MAINTAIN AND ENFORCE A SYSTEM OF SUPERVISORY CONTROL POLICIES AND PROCEDURES, AND THE FIRM, ACTING THROUGH THE AML COMPLIANCE OFFICER, ALSO FAILED TO ESTABLISH, MAINTAIN AND ENFORCE WRITTEN SUPERVISORY CONTROL POLICIES AND PROCEDURES. THE FIRM FAILED TO ENFORCE ITS SUPERVISORY CONTROL PROCEDURES REQUIRING THE REVIEW AND SUPERVISION OF CUSTOMER ACCOUNT ACTIVITY CONDUCTED BY ITS PRODUCING MANAGERS AS IT FAILED IN THE FIRST INSTANCE TO EVEN IDENTIFY ITS PRODUCING MANAGERS. THE FIRM, ACTING THROUGH THE AML COMPLIANCE OFFICER, FAILED TO SUBMIT AN ANNUAL REPORT TO MANAGEMENT DETAILING THE FIRM'S SYSTEM OF SUPERVISORY CONTROLS, THE SUMMARY OF TEST RESULTS AND SIGNIFICANT IDENTIFIED EXCEPTIONS. THE FIRM DID NOT COMPLETE A RULE IM-3013 REPORT IN 2006 OR 2007. THE FIRMS WRITTEN SUPERVISORY PROCEDURES WERE INADEQUATE AND IT FAILED TO IMPLEMENT WRITTEN SUPERVISORY PROCEDURES RELEVANT TO ADDRESSING HEIGHTENED OFFICE INSPECTIONS OF BRANCH AND NON-BRANCH LOCATIONS, ENFORCEMENT PROCEDURES REQUIRED FOR THE REVIEW AND APPROVAL OF INVESTMENTS IN REGISTERED OFFERINGS, AND ENFORCEMENT PROCEDURES PERTAINING TO LETTER OF AUTHORIZATION.

**Initiated By:**

FINRA

**Date Initiated:**

10/21/2010

**Docket/Case Number:**

2008011593301

**Principal Product Type:**

Other

**Other Product Type(s):**

LOW PRICED EQUITY SECURITIES AND UNREGISTERED SHARES

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

**Principal Sanction(s)/Relief Sought:** Other

**Other Sanction(s)/Relief Sought:** N/A

**Resolution:** Decision & Order of Offer of Settlement

**Resolution Date:** 11/14/2011

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Sanctions Ordered:** Censure
Monetary/Fine $125,000.00

**Other Sanctions Ordered:**

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE IT IS CENSURED AND FINED $125,000 ($40,000 OF WHICH PERTAINS TO THE VIOLATIONS OF MSRB RULE G-41), WHICH INCLUDES THE DISGORGEMENT OF $18,000 OF COMMISSION EARNED IN CONNECTION WITH VIOLATIVE SALES OF UNREGISTERED SECURITIES. FINE PAID IN FULL ON DECEMBER 8, 2014.

**Regulator Statement** WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS THAT THE FIRM, ACTING THROUGH ITS AML COMPLIANCE OFFICER, FAILED TO IMPLEMENT ITS WRITTEN AML COMPLIANCE PROGRAM BY NOT ADEQUATELY MONITORING AND/OR INVESTIGATING FACTS AND CIRCUMSTANCES PRESENT IN CERTAIN CUSTOMER ACCOUNTS THAT CONSTITUTED RED FLAGS, AND BY FAILING TO FILE SAR-SF FORMS TO REPORT SUSPICIOUS ACTIVITY. THE FIRM, ACTING THROUGH ITS CCO AND LEGAL COUNSEL, FAILED DOCUMENT RED FLAG INVESTIGATIONS. THE FIRM'S AML PROCEDURES PERTAINING TO DISCIPLINARY RED FLAGS WERE INADEQUATE. THE FIRM ALSO CAUSED THE SALE OF SECURITIES THAT WERE NEITHER REGISTERED NOR EXEMPT FROM REGISTRATION. THE FIRM, ACTING THROUGH ITS PRINCIPAL, FAILED TO DESIGNATE AND SPECIFICALLY IDENTIFY TO FINRA AT LEAST ONE PRINCIPAL TO ESTABLISH, MAINTAIN AND ENFORCE A SYSTEM OF SUPERVISORY CONTROL POLICIES AND PROCEDURES AS SET FORTH IN CONDUCT RULE 3012. THE FIRM, ACTING THROUGH ITS PRINCIPAL, FAILED TO ESTABLISH, MAINTAIN AND ENFORCE WRITTEN SUPERVISORY CONTROL POLICIES AND PROCEDURES PURSUANT TO

www.finra.org/brokercheck          ©2019 FINRA. All rights reserved.     Report about SCOTTSDALE CAPITAL ADVISORS CORP



CONDUCT RULE 3012. THE FIRM, ACTING THROUGH ITS PRINCIPAL, DID NOT SUBMIT AN ANNUAL REPORT TO FIRM MANAGEMENT DETAILING THE FIRM'S SYSTEM OF SUPERVISORY CONTROLS, THE SUMMARY OF TEST RESULTS AND SIGNIFICANT EXCEPTIONS, AND ANY ADDITIONAL OR AMENDED SUPERVISORY PROCEDURES IN RESPONSE TO THE TEST RESULTS. THE FIRM DID NOT COMPLETE ITS 3013 REPORT AS REQUIRED UNDER IM-3013 FOR TWO YEARS. THE FIRM'S WRITTEN SUPERVISORY PROCEDURES AND RECORDS OF BRANCH AND HOME OFFICE INSPECTIONS WERE INADEQUATE. THE FIRM DID NOT ENFORCE ITS WRITTEN SUPERVISORY PROCEDURES PERTAINING TO LETTERS OF AUTHORIZATION. THE FIRM FILED SARS WHICH CONTAINED INACCURATE OR INCOMPLETE INFORMATION AND FILED SARS THAT FAILED TO PROVIDE ADEQUATE INFORMATION FOR DETERMINING THAT THE REPORTED ACTIVITY WAS SUSPICIOUS. THE FIRM FAILED TO ESTABLISH AND IMPLEMENT POLICIES AND PROCEDURES REASONABLY EXPECTED TO DETECT AND CAUSE THE REPORTING OF TRANSACTIONS REQUIRED UNDER 31 U.S.C. 5318(G) AND THE IMPLEMENTING REGULATIONS THEREUNDER. THEREFORE, THE FIRM CENSURED AND FINED $125,000 ($40,000 OF WHICH PERTAINS TO VIOLATIONS OF MSRB RULE G41), WHICH INCLUDES THE DISGORGEMENT OF $18,000 OF COMMISSIONS EARNED IN CONNECTION WITH VIOLATIVE SALES OF UNREGISTERED SECURITIES.

ADDITIONAL VIOLATIONS INCLUDED IN THE ORDER ACCEPTANCE OFFER OF SETTLEMENT INCLUDED FINRA RULE 3310(A), NASD RULES 3010, 3110, FOR SUPERVISORY SYSTEM WRITTEN PROCEDURES, INTERNAL INSPECTIONS, AND RECORDS.

**Reporting Source:** Firm

**Current Status:** Final

**Allegations:** SEC SECTION 5 OF THE SECURITIES ACT OF 1933, FINRA RULE 2010, NASD RULES 2110, 3010(A) AND (B), 3010(C)(1)(A), 3010(C)(2), 3011(A) AND (B), 3012, 3013: THE FIRM'S AML PROCEDURES STATED THAT THE FIRM WOULD MONITOR A SUFFICIENT AMOUNT OF ACCOUNT ACTIVITY TO PERMIT IDENTIFICATION OF UNUSUAL SIZE, VOLUME, PATTERN OR TYPE OF TRANSACTIONS OR ANY OF THE "RED FLAGS" IDENTIFIED IN ITS PROCEDURES. THE FIRM'S WRITTEN AML PROGRAM REQUIRED HURRY., THE FIRM'S AML COMPLIANCE OFFICER, TO MONITOR FOR "RED FLAGS," TO INVESTIGATE ANY "RED FLAGS" DETECTED, TO DOCUMENT ANY SUCH INVESTIGATION AND FILE SUSPICIOUS ACTIVITY REPORT (SAR-SFS) WHEN APPROPRIATE. THE FIRM'S PROCEDURES IDENTIFIED A NUMBER OF RED FLAGS ASSOCIATED WITH ITS CUSTOMER AND CUSTOMER'S ACCOUNT. THE FIRM FAILED, HOWEVER, TO IMPLEMENT ITS AML PROCEDURES AS IT

www.finra.org/brokercheck          ©2019 FINRA. All rights reserved.     Report about SCOTTSDALE CAPITAL ADVISORS CORP

User Guidance

User Guidance

FINRA

DID NOT ADEQUATELY MONITOR FOR AND/OR INVESTIGATE FACTS AND CIRCUMSTANCES PRESENT IN CERTAIN CUSTOMER ACCOUNTS THAT CONSTITUTED RED FLAGS AS DESCRIBED IN THE WRITTEN AML COMPLIANCE PROGRAM. THESE FACTS AND CIRCUMSTANCES AROSE AS A RESULT OF THE FIRM'S ASSOCIATION OF TWO REGISTERED REPRESENTATIVES WITH THE FIRM AND ACTIVITY INVOLVING CERTAIN CUSTOMER ACCOUNTS INTRODUCED TO THE FIRM BY THE REGISTERED REPRESENTATIVES, WHICH PRIMARY ACTIVITY OF THESE CUSTOMERS INVOLVED THE DEPOSIT AND IMMEDIATE LIQUIDATION OF LARGE POSITIONS OF LOW PRICED EQUITY SECURITIES. NEITHER HURRY NOR ANYONE AT THE FIRM TOOK STEPS TO MONITOR FOR THE DISCIPLINARY BACKGROUND RED FLAG. THE FIRM FAILED TO DEVELOP AND IMPLEMENT A SYSTEMATIC MEANS TO IDENTIFY CUSTOMERS WHOSE ACCOUNTS RAISED THE MULTIPLE ACCOUNT RED FLAG, AND NEITHER HURRY NOR ANYONE ELSE AT THE FIRM TOOK STEPS TO MONITOR FOR THIS RED FLAG, AND THEREFORE FAILED TO DETECT, AND INVESTIGATE FOR ACTIVITY THAT RAISED THE MULTIPLE ACCOUNT RED FLAG, THE PENNY STOCK RED FLAG, AND THE WIRE TRANSFER RED FLAG. NEITHER HURRY NOR ANYONE AT THE FIRM TOOK STEPS TO MONITOR FOR TRANSACTIONS TRIGGERING THE JOURNAL TRANSFER RED FLAG, THOUGH HURRY WAS AWARE GENERALLY THAT CUSTOMERS WERE ENGAGED IN JOURNAL TRANSFERS BETWEEN ACCOUNTS. HURRY AND THE FIRM FAILED TO INVESTIGATE WHETHER THESE TRANSFERS CONSTITUTED "RED FLAG" OR WHETHER THEY HAD LEGITIMATE PURPOSES. THE FIRM, ACTING THROUGH HURRY, FAILED TO IMPLEMENT ITS WRITTEN AML COMPLIANCE PROGRAM BY FAILING TO FILE SAR-SF FORMS TO REPORT SUSPICIOUS ACTIVITIES, AND THE FIRM ALSO FAILED TO FILE A FORM SAR-SF TO REPORT SUSPICIOUS ACTIVITY. THE FIRM'S CHIEF COMPLIANCE OFFICER FAILED TO CREATE, OR CAUSE HURRY TO CREATE A RECORD OF QUESTIONABLE BACKGROUND REVIEWS AND THE FIRM'S AML PROCEDURES PERTAINING TO THE DISCIPLINARY BACKGROUND RED FLAG WERE NOT SUFFICIENTLY SPECIFIC TO PROVIDE ANY MEANINGFUL GUIDANCE AS TO WHERE AND HOW THE FIRM WOULD LOOK FOR CUSTOMERS WITH QUESTIONABLE BACKGROUNDS, AS A RESULT THE FIRM WILLFULLY VIOLATED MSRB RULE G-41. THE FIRM UTILIZED A MEANS OF INTERSTATE COMMERCE IN CONNECTION WITH ITS SALES OF UNREGISTERED SHARES AND THE TRANSACTIONS WERE NOT EXEMPT FROM REGISTRATION. THE FIRM, ACTING THROUGH HURRY, FAILED TO DESIGNATE AND SPECIFICALLY IDENTIFY TO FINRA AT LEAST ONE PRINCIPAL TO ESTABLISH, MAINTAIN AND ENFORCE A SYSTEM OF SUPERVISORY CONTROL POLICIES AND PROCEDURES, AND THE FIRM, ACTING THROUGH HURRY, ALSO FAILED TO ESTABLISH, MAINTAIN AND ENFORCE WRITTEN SUPERVISORY CONTROL POLICIES AND PROCEDURES. THE FIRM FAILED TO ENFORCE ITS SUPERVISORY CONTROL PROCEDURES REQUIRING THE REVIEW AND SUPERVISION OF

Report about SCOTTSDALE CAPITAL ADVISORS CORP

©2019 FINRA. All rights reserved.

www.finra.org/brokercheck



User Guidance

26

**Initiated By:** FINRA DEPARTMENT OF ENFORCEMENT

**Date Initiated:** 10/21/2010

**Docket/Case Number:** 2008011593301

**Principal Product Type:** Penny Stock(s)

**Other Product Type(s):** UNREGISTERED SHARES

**Principal Sanction(s)/Relief Sought:** Suspension

**Other Sanction(s)/Relief Sought:**

**Resolution:** Decision & Order of Offer of Settlement

**Resolution Date:** 11/14/2011

**Sanctions Ordered:** Censure
Monetary/Fine $125,000.00
Suspension

**Other Sanctions Ordered:** WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE IT IS CENSURED AND FINED $125,000 ($40,000 OF WHICH PERTAINS TO THE VIOLATIONS OF MSRB RULE G-41), WHICH INCLUDES THE DISGORGEMENT OF $18,000 OF COMMISSIONS EARNED IN CONNECTION WITH VIOLATIVE SALES OF UNREGISTERED SECURITIES. WITHOUT ADMITTING OR DENYING THE ALLEGATIONS IN THE COMPLAINT, THE CONTROL AFFILIATE CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE CONTROL AFFILIATE IS SUSPENDED FROM ASSOCIATING WITH ANY MEMBER IN ANY PRINCIPAL CAPACITY (OTHER THAN FINOP) FOR 40 BUSINESS DAYS, AND FINED $7,500.

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE IT IS CENSURED AND FINED $125,000 ($40,000 OF WHICH PERTAINS TO THE VIOLATIONS OF MSRB RULE G-41), WHICH INCLUDES THE DISGORGEMENT OF $18,000 OF COMMISSIONS EARNED IN CONNECTION WITH VIOLATIVE SALES OF UNREGISTERED SECURITIES.

CUSTOMER ACCOUNT ACTIVITY CONDUCTED BY ITS PRODUCING MANAGERS AS IT FAILED IN THE FIRST INSTANCE TO EVEN IDENTIFY ITS PRODUCING MANAGERS. THE FIRM, ACTING THROUGH HURRY, FAILED TO SUBMIT AN ANNUAL REPORT TO MANAGEMENT DETAILING THE FIRM'S SYSTEM OF SUPERVISORY CONTROLS, THE SUMMARY OF TEST RESULTS, AND SIGNIFICANT IDENTIFIED EXCEPTIONS. THE FIRM DID NOT COMPLETE A RULE IM-3013 REPORT IN 2006 OR 2007. (CONT. IN COMMENT)

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP

www.finra.org/brokercheck

User Guidance

FINCA

27

## Disclosure 4 of 4

**Reporting Source:** Regulator

**Current Status:** Final

**Allegations:** NASD RULES 2110, 2440, NASD INTERPRETATIVE MATERIAL-2440 - SCOTTSDALE CAPITAL ADVISORS CORP. BOUGHT CORPORATE BONDS FROM CUSTOMERS AND FAILED TO BUY SUCH BONDS AT A PRICE THAT WAS FAIR, TAKING INTO CONSIDERATION ALL RELEVANT CIRCUMSTANCES, INCLUDING MARKET CONDITIONS WITH RESPECT TO EACH BOND AT THE TIME OF TRANSACTION. THE EXPENSE INVOLVED AND THAT THE FIRM WAS ENTITLED TO A PROFIT.

**Initiated By:** FINRA

**Date Initiated:** 09/28/2009

**Docket/Case Number:** 2007008075101

**Principal Product Type:** Debt - Corporate

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:**

**Other Sanction(s)/Relief Sought:**

**Resolution:** Acceptance, Waiver & Consent(AWC)

**Resolution Date:** 09/28/2009

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Sanctions Ordered:** Censure
Monetary/Fine $7,500.00

**Other Sanctions Ordered:**

**Sanction Details:** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED

CONTROL AFFILIATE IS SUSPENDED FROM ASSOCIATING WITH ANY MEMBER IN ANY PRINCIPAL CAPACITY (OTHER THAN FINOP) FOR 40 BUSINESS DAYS, BEGINNING ON DECEMBER 5, 2011 AND ENDING ON FEBRUARY 1, 2012.

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

**Reporting Source:** Firm

**Current Status:** Final

**Allegations:** NASD RULES 2110, 2440, NASD INTERPRETATIVE MATERIAL-2440 - SCOTTSDALE CAPITAL ADVISORS CORP. BOUGHT CORPORATE BONDS FROM CUSTOMERS AND FAILED TO BUY SUCH BONDS AT A PRICE THAT WAS FAIR, TAKING INTO CONSIDERATION ALL RELEVANT CIRCUMSTANCES, INCLUDING MARKET CONDITIONS WITH RESPECT TO EACH BOND AT THE TIME OF TRANSACTION, THE EXPENSE INVOLVED AND THAT THE FIRM WAS ENTITLED TO A PROFIT

**Initiated By:** FINRA

**Date Initiated:** 09/28/2009

**Docket/Case Number:** 2007008075101

**Principal Product Type:** Debt - Corporate

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:**

**Other Sanction(s)/Relief Sought:**

**Resolution:** Acceptance, Waiver & Consent(AWC)

**Resolution Date:** 09/28/2009

**Sanctions Ordered:** Censure
Monetary/Fine $7,500.00

**Other Sanctions Ordered:** NONE

**Sanction Details:** NONE

**Firm Statement** WITHOUT ADMITTING OR DENYING THE FINDINGS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE, THE FIRM IS CENSURED AND FINED $7,500. THE FIRM PROVIDED EVIDENCE THAT RESTITUTION WAS MADE TO THE IDENTIFIED CUSTOMERS.

TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS; THEREFORE, THE FIRM IS CENSURED AND FINED $7,500. THE FIRM PROVIDED EVIDENCE THAT RESTITUTION WAS MADE TO THE IDENTIFIED CUSTOMERS.

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

## Regulatory - On Appeal

This type of disclosure event involves (1) a formal proceeding initiated by a regulatory authority (e.g., a state securities agency, self-regulatory organization, federal regulator such as the Securities and Exchange Commission, foreign financial regulatory body) for a violation of investment-related rules or regulations that is currently on appeal; or (2) a revocation or suspension of the authority of a brokerage firm or its control affiliate to act as an attorney, accountant or federal contractor that is currently on appeal.

**Disclosure 1 of 1**

**Reporting Source:** Regulator

**Current Status:** On Appeal

**Appealed To and Date Appeal Filed:** ON JULY 23, 2018, THIS MATTER WAS APPEALED TO THE SEC.

**Allegations:** THE FIRM WAS NAMED A RESPONDENT IN A FINRA COMPLAINT ALLEGING THAT IT ENGAGED AND PARTICIPATED IN SALES OF SECURITIES THAT WERE NOT REGISTERED WITH THE SEC, IN TRANSACTIONS THAT WERE NOT EXEMPT FROM REGISTRATION, IN CONTRAVENTION OF SECTION 5 OF THE SECURITIES ACT OF 1933. THE COMPLAINT ALLEGES THAT THE FIRM FAILED TO ESTABLISH AND MAINTAIN A SUPERVISORY SYSTEM, INCLUDING WRITTEN SUPERVISORY PROCEDURES (WSPS), REASONABLY DESIGNED TO ACHIEVE COMPLIANCE WITH SECTION 5 OF THE SECURITIES ACT OF 1933 FOR SALES OF UNREGISTERED SHARES OF MICROCAP STOCKS. THE WSPS PROVIDED INSUFFICIENT GUIDANCE ON IDENTIFYING THE TRUE BENEFICIAL OWNERS OF MICROCAP STOCKS SOLD FOR CUSTOMERS INTRODUCED THROUGH FOREIGN FINANCIAL INSTITUTIONS. THE PROCEDURES FOR CONDUCTING A REASONABLE INQUIRY OF THE CIRCUMSTANCES SURROUNDING DEPOSITS AND SALES OF MICROCAP STOCKS FOR SUCH CUSTOMERS RELIED TOO HEAVILY ON INFORMATION OBTAINED FROM INTERESTED PARTIES. THE WSPS FAILED TO REQUIRE THAT THE INQUIRY INCLUDE APPROPRIATE INDEPENDENT DUE DILIGENCE AND ANALYSIS OF THE CLAIMED REGISTRATION EXEMPTIONS. THE COMPLAINT ALSO ALLEGES THAT THE FIRM FAILED TO CONDUCT REASONABLE INQUIRIES INTO THE CIRCUMSTANCES SURROUNDING THE ILLEGAL SALES OF STOCK BY THE FIRM FOR ANOTHER BROKER-DEALER. THE FIRM'S PRESIDENT/APPROVING PRINCIPAL PERFORMED INADEQUATE INQUIRIES ON THE CLAIMED REGISTRATION EXEMPTIONS FOR SALES OF THE MICROCAP STOCKS, DESPITE THE PRESENCE OF NUMEROUS "RED FLAGS" SUGGESTING THAT THE SALES WERE, OR COULD BE, ILLEGAL DISTRIBUTIONS OF UNREGISTERED STOCKS. ALTHOUGH THE PRESIDENT/APPROVING PRINCIPAL COLLECTED SOME DOCUMENTS AND INFORMATION ON THE DEPOSITS AND SALES, HE FAILED TO ADEQUATELY AND MEANINGFULLY ANALYZE THE COLLECTED DOCUMENTS AND INFORMATION-SOME OF WHICH WERE INCONSISTENT AND INCOMPLETE-AND ALSO FAILED TO

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

www.finra.org/brokercheck

**Initiated By:** FINRA

**Date Initiated:** 05/15/2015

**Docket/Case Number:** 2014041724601

**Principal Product Type:** Other

**Other Product Type(s):** MICROCAP STOCKS

**Principal Sanction(s)/Relief Sought:** Other

**Other Sanction(s)/Relief Sought:** N/A

**Resolution:** Other

**Resolution Date:** 07/23/2018

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Regulator Statement** EXTENDED HEARING PANEL DECISION RENDERED MARCH 31, 2017 WHEREIN THE FIRM WAS FINED $1,500,000 AND ORDERED TO PAY COSTS, JOINTLY AND SEVERALLY, IN THE AMOUNT OF $22,124.29. THE SANCTIONS WERE BASED ON FINDINGS THAT THE FIRM, BY ENGAGING AND PARTICIPATING IN SALES OF SECURITIES THAT WERE NOT REGISTERED WITH THE SEC, IN TRANSACTIONS THAT WERE NOT EXEMPT FROM REGISTRATION, ACTED IN CONTRAVENTION OF SECTION 5 OF THE SECURITIES ACT OF 1933.
THE FINDINGS STATED THAT THE FIRM'S INDIRECT OWNER, LIKEWISE ACTED IN CONTRAVENTION OF SECTION 5 OF THE SECURITIES ACT OF 1933 BY BEING A NECESSARY PARTICIPANT AND SUBSTANTIAL FACTOR IN THE SALES OF UNREGISTERED SECURITIES.
THE FINDINGS ALSO STATED THAT THE FIRM, THROUGH ITS CHIEF COMPLIANCE OFFICER, FAILED TO ESTABLISH AND MAINTAIN A SUPERVISORY SYSTEM, INCLUDING WSPS, REASONABLY DESIGNED TO ACHIEVE COMPLIANCE WITH SECTION 5 OF THE SECURITIES ACT OF 1933 FOR SALES OF UNREGISTERED SHARES OF MICROCAP STOCKS. THE WSPS PROVIDED INSUFFICIENT GUIDANCE ON IDENTIFYING THE TRUE BENEFICIAL OWNERS OF MICROCAP STOCKS SOLD FOR CUSTOMERS INTRODUCED THROUGH FOREIGN FINANCIAL INSTITUTIONS. IN ADDITION, THE FIRM'S PROCEDURES FOR CONDUCTING A REASONABLE INQUIRY OF

INDEPENDENTLY VERIFY THE PROVIDED INFORMATION.

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

31

THE CIRCUMSTANCES SURROUNDING DEPOSITS AND SALES OF MICROCAP STOCKS FOR SUCH CUSTOMERS RELIED TOO HEAVILY ON INFORMATION OBTAINED FROM INTERESTED PARTIES AND ALSO FAILED TO REQUIRE THAT THE INQUIRY INCLUDE APPROPRIATE INDEPENDENT DUE DILIGENCE AND ANALYSIS OF THE CLAIMED REGISTRATION EXEMPTIONS.

THE FINDINGS ALSO INCLUDED THAT THE FIRM, THROUGH ITS PRESIDENT/APPROVING PRINCIPAL, FAILED TO CONDUCT REASONABLE INQUIRIES INTO THE CIRCUMSTANCES SURROUNDING THE ILLEGAL SALES OF STOCK BY THE FIRM FOR ANOTHER BROKER-DEALER. ON APRIL 26, 2017, THIS MATTER WAS APPEALED TO THE NATIONAL ADJUDICATORY COUNCIL (NAC) AND THE SANCTIONS ARE NOT IN EFFECT PENDING REVIEW. ON JUNE 20, 2017, AN AMENDED EXTENDED HEARING PANEL DECISION WAS ISSUED TO CORRECT A FACTUAL ERROR. THE AMENDMENT DOES NOT CHANGE THE SUBSTANCE OF THE DECISION AND REMAINS ON APPEAL WITH THE NAC.

NAC DECISION RENDERED JULY 20, 2018, WHEREIN THE FIRM WAS FINED $1,500,000 AND REQUIRED TO OBTAIN AN INDEPENDENT CONSULTANT TO MONITOR ITS ACCEPTANCE AND LIQUIDATION OF MICROCAP SECURITIES DEPOSITS AND REVIEW ITS SUPERVISORY PROCEDURES RELATED TO ITS MICROCAP SECURITIES LIQUIDATION BUSINESS. RESPONDENT WAS ORDERED TO PAY $22,124.29, JOINTLY AND SEVERALLY, IN COSTS AND TO PAY, SEPARATELY, $1,394.20 IN COSTS. THE NAC AFFIRMED THE FINDINGS AND THE SANCTIONS IMPOSED BY THE OHO. THE SANCTIONS WERE BASED ON FINDINGS THAT THE FIRM ACTED IN CONTRAVENTION OF SECTION 5 OF THE SECURITIES ACT OF 1933 AND SOLD MILLIONS OF SHARES OF UNREGISTERED MICROCAP SECURITIES WITHOUT THE BENEFIT OF A REGISTRATION EXEMPTION. THE FIRM AND ITS CHIEF OPERATING OFFICER (COO) FAILED TO ESTABLISH AND MAINTAIN SUPERVISORY SYSTEMS, INCLUDING WSPS THAT WERE REASONABLY DESIGNED TO ACHIEVE COMPLIANCE WITH SECTION 5 OF THE SECURITIES ACT. THE FIRM'S WSPS WERE DEFICIENT. THE FINDINGS ALSO INCLUDED THAT THE FIRM'S PRESIDENT WAS AWARE OF THE NUMEROUS RED FLAGS THAT SURROUNDED THE SPECIFIC DEPOSITS THAT ARE THE SUBJECT OF THIS CASE, AND FAILED TO SUPERVISE THE FIRM'S MICROCAP LIQUIDATION BUSINESS BY NOT ADDRESSING THE RED FLAGS. AS A CONSEQUENCE, THE FIRM FAILED TO SUPERVISE ITS MICROCAP LIQUIDATION BUSINESS.

ON JULY 23, 2018, THIS MATTER WAS APPEALED TO THE SEC. THE SANCTIONS ARE NOT IN EFFECT PENDING THE REVIEW.

**Reporting Source:**     Firm

www.finra.org/brokercheck

©2019 FINRA. All rights reserved.     Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

**Current Status:** On Appeal

**Appealed To and Date Appeal Filed:** APPEALED TO THE SEC 7/23/2018

**Allegations:** ON MAY 15, 2015, FINRA FILED A COMPLAINT AGAINST THE FIRM, AND INDIVIDUALS JOHN HURRY, TIMOTHY DIBLASI AND MIKE CRUZ, WHICH THE FIRM IS CONTESTING. THE COMPLAINT ALLEGES THAT THE FIRM VIOLATED FINRA RULE 2010 BY SELLING UNREGISTERED SHARES IN THREE LOW-PRICED STOCKS FOR A CUSTOMER THAT WERE NOT EXEMPT FROM REGISTRATION WITH THE SEC IN CONTRAVENTION OF SECTION 5 OF THE SECURITIES ACT OF 1933. THE COMPLAINT FURTHER ALLEGES THAT THE FIRM AND ITS THEN-PRESIDENT VIOLATED NASD RULE 3010(B) AND FINRA RULE 2010 BY NOT PERFORMING ADEQUATE INQUIRIES ON WHETHER THE CLAIMED REGISTRATION EXEMPTIONS APPLIED TO THE SALES OF THE THREE STOCKS. THE COMPLAINT ALSO ALLEGES THAT THE FIRM AND ITS CHIEF COMPLIANCE OFFICER VIOLATED NASD RULE 3010(A), (B) AND FINRA RULE 2010 BY NOT ESTABLISHING AND MAINTAINING A SUPERVISORY SYSTEM REASONABLY DESIGNED TO ACHIEVE COMPLIANCE WITH SECTION 5 FOR SALES OF UNREGISTERED LOW-PRICED STOCKS.

**Initiated By:** FINRA

**Date Initiated:** 05/15/2015

**Docket/Case Number:** 2014041724601

**Principal Product Type:** Penny Stock(s)

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:** Disgorgement

**Other Sanction(s)/Relief Sought:** IN ADDITION TO DISGORGEMENT, THE COMPLAINT REQUESTS OTHER UNSPECIFIED RELIEF.

**Resolution:** Other

**Resolution Date:** 07/23/2018

**Sanctions Ordered:**

**Other Sanctions Ordered:** ANY POTENTIAL SANCTIONS HAVE BEEN STAYED PENDING SEC REVIEW.

**Sanction Details:** ANY POTENTIAL SANCTIONS HAVE BEEN STAYED PENDING SEC REVIEW.

**Firm Statement** ON MARCH 31, 2017, A FINRA HEARING PANEL ISSUED A DECISION FINDING THAT THE FIRM VIOLATED: (1) FINRA RULE 2010 BY SELLING UNREGISTERED SECURITIES OF THREE ISSUERS WITHOUT AN

©2019 FINRA. All rights reserved.   Report about SCOTTSDALE CAPITAL ADVISORS CORP

32



User Guidance

33

EXEMPTION, CONTRARY TO SECTION 5 OF THE SECURITIES ACT OF 1933; AND (2) FINRA RULE 2010 AND NASD RULE 3010 BY FAILING TO ESTABLISH AND MAINTAIN A SUPERVISORY SYSTEM, INCLUDING WRITTEN SUPERVISORY PROCEDURES, REASONABLY DESIGNED TO ENSURE COMPLIANCE WITH SECTION 5, AND BY FAILING TO SUPERVISE THE VIOLATIVE TRANSACTIONS. THE PANEL ASSESSED A FINE OF $1.5 MILLION ON THE FIRM AND IMPOSED SANCTIONS ON THREE INDIVIDUALS. THE FIRM APPEALED THE DECISION TO FINRA'S NATIONAL ADJUDICATORY COUNCIL WHICH RULED IN FINRA'S FAVOR ON JULY 20, 2018. THE FIRM HAS APPEALED THE NAC DECISION TO THE SEC AND ALL SANCTIONS IMPOSED BY THE HEARING PANEL WILL BE STAYED PENDING A FINAL DECISION BY THAT BODY.

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP



User Guidance

**End of Report**

**This page is intentionally left blank.**

www.finra.org/brokercheck

©2019 FINRA. All rights reserved.    Report about SCOTTSDALE CAPITAL ADVISORS CORP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of February, 2019, I filed the foregoing Motion, and accompanying Brief in Support, exhibits and proposed order, with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record for all parties.

DATED:  February 11, 2019

By:       /s/ Terri L. Reicher

Terri L. Reicher

Terri L. Reicher (D.C. Bar No. 414685)
FINRA Office of General Counsel
1735 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 728-8967
Fax: (202) 728-8294
Email: Terri.Reicher@finra.org

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:18-cv-2973 (CRC) |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, | |
| Defendant. | |

**[PROPOSED] ORDER**

Upon consideration of the Motion to Dismiss Complaint filed by Defendant Financial

Industry Regulatory Authority, Inc. (FINRA), it is hereby:

ORDERED that FINRA's motion is hereby GRANTED; and it is further

ORDERED that all claims against FINRA are DISMISSED with prejudice.


DATED:

_____
Christopher R. Cooper
United States District Judge