**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **SCOTTSDALE CAPITAL ADVISORS CORPORATION**, |
| Plaintiff, |
| v. |
| **FINANCIAL INDUSTRY REGULATORY AUTHORITY**, |
| Defendant. |

Case No. 18-cv-2973 (CRC)

## MEMORANDUM OPINION

Jack Dempsey once observed that "the best defense is a good offense."  In boxing, perhaps, but not always in litigation.  This case proves the point.

For the past decade, Arizona-based securities brokerage Scottsdale Capital Advisors has been in the cross-hairs of its regulator, the Financial Industry Regulatory Authority ("FINRA").  FINRA has fined, sanctioned, and censured Scottsdale and its officers multiple times for a host of violations involving Scottsdale's dealings in unregistered penny stocks.  Scottsdale has vigorously defended itself against these actions, complaining that FINRA has unfairly targeted its segment of the securities industry.  It has also gone on offense by suing FINRA in federal court.  Its most recent suit failed in the District Court for the District of Maryland and then at the Fourth Circuit Court of Appeals for lack of subject-matter jurisdiction.  Scottsdale now turns to this Court.

Scottsdale's newest claim is not a precise mirror of its previous one.  Here, it sues FINRA for alleged breaches of the membership agreement Scottsdale entered when joining the organization.  But while Scottsdale brings an ostensible breach of contract claim, this Court's jurisdiction turns on the substance of that claim rather than the label affixed to it.  Examining the

substance, Scottsdale's allegations are all intertwined with FINRA's governance and regulatory decisions, which Congress has mandated be challenged administratively and reviewed by appellate courts.  So, different label, same result:  This Court lacks the power to hear Scottsdale's claims and will dismiss the case in its entirety.

## I.  Background

### A.  Regulatory Background

The Securities Exchange Act of 1934 ("Exchange Act") authorizes the Securities and Exchange Commission ("SEC") to register self-regulatory organizations ("SROs").  See 15 U.S.C. § 78o-3(a).  Pursuant to that authority, the SEC registered FINRA, a non-profit membership corporation comprised of financial brokers and dealers.[1]  FINRA "promulgates rules to enforce broker-dealer compliance with the Exchange Act, 'the rules and regulations thereunder . . .  and the rules of the association.'"  Scottsdale Capital Advisors Corp. v. FINRA ("Scottsdale I"), 844 F.3d 414, 417–18 (4th Cir. 2016) (quoting 15 U.S.C. § 78o-3(b)(2)).  FINRA "must maintain rules that . . . 'remove impediments to . . . a free and open market and a national market system, and . . . protect investors and the public interest,' while permitting neither 'unfair discrimination between customers, issuers, brokers, or dealers' . . . nor the imposition of 'any burden upon competition not necessary or appropriate in furtherance of the purposes' of the Act."  Domestic Secs., Inc. v. SEC, 333 F.3d 239, 242 (D.C. Cir. 2003) (quoting 15 U.S.C. § 78o-3(b)(6), (9)).  All rules promulgated by FINRA must be approved by the SEC and must be consistent with the Exchange Act.  15 U.S.C. §§ 78o-3(b)(6), 78s(b)(2)(C).  The

---

[1] FINRA is the successor organization to the National Association of Securities Dealers, Inc. ("NASD").  It was formed with the 2007 merger of NASD and the New York Stock Exchange's regulation committee.  See Notice, 72 Fed. Reg. 42169, 42170 (Aug. 1, 2007).

SEC also has power to amend any existing FINRA rule to ensure that it comports with the purposes and requirements of the Exchange Act. Id. § 78s(b)(1), (c).

FINRA also has enforcement powers. It operates as a "'quasi-governmental agency' authorized 'to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or . . . [SEC] regulations issued pursuant thereto.'" North v. Smarsh, Inc., 160 F. Supp. 3d 63, 72 (D.D.C. 2015) (quoting NASD v. SEC, 431 F.3d 803, 804 (D.C. Cir. 2005)) (alteration in original). When FINRA believes a member has violated any of its rules, it can initiate a disciplinary proceeding against the member through a Hearing Panel and impose sanctions on violators. See 15 U.S.C. § 78o-3(h).

The Exchange Act also sets out the process by which members can challenge FINRA's disciplinary decisions. First, a member firm can appeal a FINRA Hearing Panel decision to the National Adjudicatory Council ("NAC"), a FINRA Committee. North, 160 F. Supp. 3d at 72. The NAC can affirm, modify, or reverse a decision. Id. If the NAC affirms a FINRA decision, the member firm can file an Application for Review of the decision with the SEC. See 15 U.S.C. § 78s(d). If the SEC affirms that decision, member firms still have one final option: appeal to the appropriate circuit court of appeals. See id. § 78y(b).

   B.  Scottsdale's Allegations

The following allegations are drawn from Scottsdale's Complaint. As it must at this stage in the litigation, the Court assumes the truth of well-pleaded factual allegations, though it need not accept a plaintiff's legal conclusions. See, e.g., Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citations omitted). "Virtually all firms in the purchase and sale of securities *must* be members of FINRA." Compl. ¶ 15. Scottsdale, as one such firm, has been a

member of FINRA since 2002. <u>Id.</u> ¶ 7. When it joined, Scottsdale entered into FINRA's standard membership agreement. <u>Id.</u> ¶ 28. FINRA describes the membership agreement as a "contractual relationship between [a member] and FINRA." <u>Id.</u> (citation omitted). FINRA's By-Laws are incorporated into the membership agreement, which expressly requires compliance with those By-Laws. <u>Id.</u> ¶ 29.

Scottsdale alleges that FINRA has violated its By-Laws and the Exchange Act in several ways. First, the composition of its board. The Exchange Act requires that FINRA "assure fair representation of its members" and "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. 15 U.S.C. § 78o-3(b)(4), (9); <u>see</u> Compl. ¶ 31. Scottsdale contends that FINRA has violated this covenant by permitting members to elect only seven of its twenty-three governors. Compl. ¶ 34. Aggravating that situation, according to Scottsdale, is the fact that only three of those seven seats can be filled by governors from "small firms" like Scottsdale. <u>Id.</u>

Second, the use of internal guidance. Scottsdale alleges that FINRA has promulgated guidance containing its interpretation of SEC rules and regulations as well as federal statutes. <u>Id.</u> ¶ 38; <u>see also</u> <u>id.</u> ¶ 39 (including example in which FINRA guidance "directly target[ed] transactions involving microcap and low-priced securities"). Per Scottsdale, this guidance is not issued pursuant to the procedures articulated in FINRA's By-Laws, nor does it conform to the requirements of the Exchange Act. <u>Id.</u> ¶ 38. Nevertheless, Scottsdale claims, FINRA has taken the view that the guidance is binding on its members, with disciplinary consequences for failure to comply. <u>Id.</u> Scottsdale offers several examples where FINRA has "wielded this guidance against its members," <u>id.</u> ¶ 41, pursuing disciplinary actions "based on its dim view of the microcap and low-priced securities market segment," <u>id.</u> ¶ 42. As Scottsdale frames it,

"FINRA's crusade against the microcap and low-priced securities market has directly impacted Scottsdale, which engages in that industry." Id. ¶ 48. Specifically, it complains that FINRA has targeted it for "examinations, extensive document requests, and prosecutions, and sought to levy fines against it for its day-to-day business activities." Id.

Third, *ultra vires* enforcement. Scottsdale alleges that FINRA has engaged in improper enforcement of FINRA Rule 2010. See id. ¶¶ 52–61. That rule provides that each FINRA member "in the conduct of its business[] shall observe high standards of commercial honor and just and equitable principles of trade." FINRA R. 2010; see also Compl. ¶ 52. The SEC approved that rule in 2008 on the basis of Section 15A(b)(6) of the Exchange Act, which requires SROs to "promote just and equitable principles of trade." Compl. ¶ 53. The Complaint alleges that, in disciplinary proceedings against Scottsdale, FINRA "propounded a contrary interpretation of FINRA Rule 2010" when it accused Scottsdale of violating not the 1934 Exchange Act, but a section of the 1933 Securities Act. Id. ¶ 54. According to Scottsdale, this exceeds FINRA's authority because its By-Laws and rules require it to pursue only claims under the 1934 Act. See id. ¶¶ 54–61, 66.

These actions, Scottsdale says, stifle its business and violate the membership agreement, which functions as a contract between the parties. As a result, it claims it has lost revenue and seeks damages. See Compl. ¶¶ 5–6; id. Prayer for Relief ¶ 2.

C. FINRA's Discipline of Scottsdale and Scottsdale's Regulatory Efforts

As Scottsdale acknowledges, it is the subject of ongoing FINRA disciplinary proceedings. See id. ¶ 54. In June 2017, a FINRA Hearing Panel fined Scottsdale and sanctioned individual officers over the sales of unregistered, non-exempt penny stock securities

in violation of Section 5 of the Securities Act.  See Mot. Dismiss ("MTD") Ex. A.[2]  Scottsdale

appealed that decision to FINRA's NAC, which affirmed.  See id.  Scottsdale has appealed the

NAC's decision to the SEC.  See id.  That appeal is currently pending.  Scottsdale also filed suit

in the United States District Court for the District of Maryland, seeking to enjoin the disciplinary

proceedings.  In that case, as it does here, Scottsdale alleged that FINRA acted beyond its legal

authority when it sought to enforce provisions of the 1933 Securities Act, rather than the 1934

Exchange Act.  See Scottsdale I, 844 F.3d at 419.  The District Court dismissed the case for lack

of subject-matter jurisdiction, and the Fourth Circuit affirmed.  Id. at 424 ("Congress, through

the Exchange Act, intended to channel objections to FINRA's authority through the agency and

the courts of appeals.  In so doing, it is clear Congress sought to preclude federal district-court

jurisdiction.").

    Two days after filing this case, a Scottsdale affiliate, owned by the same person,

petitioned the SEC for a rulemaking.  See MTD Ex. B.  That petition discusses many of the same

concerns that Scottsdale raises in this suit regarding the consequences of FINRA's structure and

regulatory actions for microcap securities firms.  It specifically asks for reforms to the process by

which FINRA nominates and elects its Board of Governors, seeking a greater number of

"Industry representatives."  See id. at 13–14.  It also asks the Commission to "prevent the further

improper issuance and use of 'guidance,'" id. at 13, citing the same guidance Scottsdale

challenges in this suit, id. at 9–10.

---

[2] Because FINRA moves to dismiss for lack of subject-matter jurisdiction, the Court may
look beyond the pleadings in assessing whether it can hear the case.  See, e.g., Jerome Stevens
Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Here, the Court takes judicial notice
of several official public documents that FINRA has appended to its Motion to Dismiss.

## II.   Legal Standard

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citation omitted).  FINRA has moved to dismiss the case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[3]  To defeat a 12(b)(1) motion, a plaintiff must show "by a preponderance of the evidence that the Court has subject matter jurisdiction[.]" Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004).  When analyzing a motion to dismiss under Rule 12(b)(1) the Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." Am. Nat'l Ins. Co., 642 F.3d at 1139 (citations omitted).  The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm., 402 F.3d at 1253 (citation omitted).

## III.   Analysis

Scottsdale brings a single breach of contract claim.  As noted above, the Complaint alleges that FINRA has taken a series of actions that violate its By-Laws.  These By-Laws, Scottsdale insists, were part of a covenant that FINRA entered when the two parties executed FINRA's standard membership agreement.  FINRA moves to dismiss, contending that, whatever regulatory actions it may have taken against Scottsdale, this Court lacks power to hear

---

[3] FINRA also moves to dismiss under Rule 12(b)(6).  Because the Court ultimately concludes that it lacks subject-matter jurisdiction over Scottsdale's claim, it need not reach FINRA's 12(b)(6) arguments.  See, e.g., Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n, 317 F. Supp. 3d 504, 513–14 (D.D.C. 2018).

Scottsdale's case.  It argues that by creating an exclusive administrative review process, the Exchange Act divests the Court of subject-matter jurisdiction.

Federal courts possess only the power authorized by the Constitution and by statute. Jarkesy v. SEC, 803 F.3d 9, 15 (D.C. Cir. 2015).  A district court is precluded from hearing a claim that is subject to an exclusive administrative review process.  See Thunder Basin Coal Co. v. Reich ("Thunder Basin"), 510 U.S. 200, 207 (1994).   And the Exchange Act mandates that the SEC review challenges to FINRA's actions or rules in the first instance.  See Jarkesy, 803 F.3d at 14 ("[T]he statute grants the SEC the power to institute and resolve [an enforcement proceeding] as an initial matter.") (internal quotation marks omitted).  The question, then, is whether this Court "has jurisdiction over . . . [Scottsdale's] claims, or whether Congress has implicitly precluded [Scottsdale's] district-court suit by channeling [its] challenges through the securities laws' scheme of administrative adjudication and judicial review in a court of appeals." Jarkesy, 803 F.3d at 15.

In Thunder Basin, the Supreme Court established a two-part "framework for determining when a statutory scheme of administrative and judicial review forecloses parallel district-court jurisdiction."  Id. at 12.  Courts consider whether "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review" by looking first to whether "such intent is 'fairly discernible in the statutory scheme.'"  Id. at 15 (quoting Thunder Basin, 510 U.S. at 212) (alteration in original).  If congressional intent is apparent, courts must then look to whether "the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"  Id. (quoting Thunder Basin, 510 U.S. at 212).

Scottsdale does not seem to dispute that the first part of the Thunder Basin framework is met.  See Opp'n at 7–8 (contending that Exchange Act's review process does not preclude

Scottsdale's claims, but not disputing Congress's intent to create an administrative review scheme).  Nor can it.  In Jarkesy v. SEC, the D.C. Circuit applied the Thunder Basin framework to the Exchange Act in a suit challenging an SEC enforcement action.  It held that "'[g]iven the painstaking detail with which' Congress set forth the rules governing the court of appeals' review of Commission action, 'it is fairly discernible that Congress intended to deny [aggrieved respondents] an additional avenue of review in district court.'"  Jarkesy, 803 F.3d at 17.  While Jarkesy dealt with SEC action, courts elsewhere have consistently held that FINRA and other SRO actions, too, fall within the scope of the Exchange Act's exclusive scheme.  See, e.g., City of Providence, Rhode Island v. BATS Glob. Mkts., Inc., 878 F.3d 36, 44 (2d Cir. 2017), cert. denied 139 S. Ct. 341 (2018) ("Plainly, Congress created a detailed scheme of administrative and judicial review for challenges to certain actions of SROs.  For example, a party who objects to an SRO's disciplinary action or rule must raise its objection under the exclusive review scheme Congress devised for such challenges and not in an action in district court."); Scottsdale I, 844 F.3d at 422 ("Neither party disputes that it is 'fairly discernible' that Congress intended to preclude district court jurisdiction."); Charles Schwab & Co. v. FINRA, 861 F. Supp. 2d 1063, 1072 (N.D. Cal. 2012) ("The Exchange Act's administrative review process is very similar to the administrative process at issue in Thunder Basin.").

Scottsdale maintains, instead, that its claim can proceed in this Court because it clears the second part of the Thunder Basin framework.  Because the Exchange Act creates an exclusive scheme, the question is whether Scottsdale's claim is "the type Congress intended to be reviewed within [the] statutory structure."  Thunder Basin, 510 U.S. at 212.  If so, the Court lacks jurisdiction; if not, the case can proceed.  Scottsdale insists that, because it brings a contract claim, its case falls outside the statutory review scheme and thus within the Court's jurisdiction.

But even a cursory examination of Scottsdale's Complaint reveals that its claim flunks the second part of the Thunder Basin test.  Thunder Basin identified three factors to determine whether a litigant's claim is the type Congress did not intend for review through the statutory scheme: whether "adjudication of petitioner's claims through the statutory-review provisions [would] violate due process by depriving petitioner of meaningful review," id. at 214; whether the claims are "wholly collateral" to the statute's review provisions, id. at 212 (citation and quotation marks omitted); and whether the claims are "outside the agency's expertise."  Id.

Scottsdale's claim meets none of these standards.  The Complaint identifies three alleged breaches of contract: (1) that FINRA has exceeded its statutory authority in using its Rule 2010 to punish Scottsdale for violations of Section 5 of the Securities Act; (2) that FINRA has improperly issued guidance and relied on that guidance to unfairly discipline smaller member firms who are engaged in the microcap and low-priced securities business; and (3) that FINRA's board does not adequately represent industry members.  Scottsdale ties each of these alleged misdeeds to one of FINRA's By-Laws.  Scottsdale insists that FINRA acts beyond its authority in disciplining violations of the Securities Act because FINRA can only adopt rules that "carry out the purposes of the [Exchange] Act" and are consistent with "applicable law."  Opp'n at 3 (citing FINRA By-Laws, art. VII, § 1(a)(ii)–(iii); art. XI, § 1).  It accuses FINRA of improperly promulgating guidance with the force of law because FINRA's rules must be approved by the SEC before being given effect.  See id. (citing FINRA By-Laws, art. XI, § 1).  And it attacks the composition of FINRA's Board of Governors as failing to "assure fair representation of its members in the . . . administration of its affairs."  Id. (citing 15 U.S.C. § 78o-3(b)(4)).

The problem for Scottsdale is that FINRA's rules are broadly defined to include its "constitution, articles of incorporation, [and] bylaws," 15 U.S.C. § 78c(a)(27), and those rules

must be approved by the SEC, id. § 78s.  "[T]he Exchange Act lays out a comprehensive oversight scheme whereby Congress gives the SEC the authority to supervise FINRA's rules, including approving or modifying FINRA rules in any way the agency deems appropriate or necessary."  Scottsdale I, 844 F.3d at 424.  The composition of the Board of Governors is also set pursuant to SEC-approved regulation.  See Notice, 72 Fed. Reg. at 42182 (concluding, after considering comments, that proposed rule change delineating number and composition of governors "is consistent with the requirements of the Exchange Act").  While Scottsdale's Complaint rests entirely on FINRA actions that allegedly violated its By-Laws, the propriety of FINRA's actions or rules is "the type of question[] that the [SEC] has frequently resolved in the past."  Elk Run Coal Co. v. United States Dep't of Labor, 804 F. Supp. 2d 8, 32 (D.D.C. 2011).

The upshot?  Each of the issues that Scottsdale raises is closely tied to FINRA's governance, structure, and regulations, and "inextricably intertwined" with powers "the statute grants [to] the SEC . . . as an initial matter."  Jarkesy, 803 F.3d at 14.  Those are precisely the types of issues that Congress has committed to the SEC's expertise and competence.  Put another way, the issues are neither "wholly collateral" to the statutory review provisions nor "outside of the agency's expertise."  Thunder Basin, 510 U.S. at 212.  Claims that arise from actions FINRA took within the administrative enforcement scheme or that seek the same relief the plaintiff could obtain in the agency proceeding are not collateral at all, let alone "wholly" so.  Jarkesy, 803 F.3d at 23.

And while Scottsdale's Complaint does not formally seek to enjoin or overturn any FINRA disciplinary efforts against it, the actions of which it complains are integral to those efforts.  See Compl. ¶¶ 3, 41–44 (alleging that FINRA improperly deployed guidance against small member firms like Scottsdale); id. ¶¶ 3, 54 (alleging that FINRA has exceeded its authority

under the Exchange Act to deploy Rule 2010 in disciplinary proceedings against Scottsdale).  In this regard, the ostensible breach of contract claim operates as a collateral attack on FINRA's disciplinary action.  Consider, for example, Scottsdale's claim regarding Rule 2010.  It alleges that FINRA improperly used that Rule to discipline Scottsdale, see Compl. ¶¶ 52–61, and asks the Court to (1) declare as much and (2) determine that, by taking that allegedly *ultra vires* action, FINRA violated its By-Laws and thus breached its contract with Scottsdale, id. Prayer for Relief ¶¶ 1–2.  Were the Court to do that, it would be tantamount to asserting that FINRA had no authority to discipline Scottsdale in the way it did.  Again, this Court lacks power to do that.  It is the SEC's role "to review 'a final disciplinary sanction imposed by' FINRA and determine whether its rules 'were applied in a manner[] consistent with the purposes' of the Exchange Act." Scottsdale I, 844 F.3d at 424 (citing 15 U.S.C. § 78s(e)(1)) (alteration in original).  And only a court of appeals may review an SEC decision to uphold the sanction.  This Court has no role in that process.

To avoid doubt, there is no serious argument to be made that Scottsdale will be denied review in the administrative scheme.  As explained, because its claims are closely tied to the disciplinary proceedings, Scottsdale will have the opportunity to make its case to an appellate court at the appropriate time.  In fact, Scottsdale is currently working its way through that scheme.  See MTD Ex. A.  It failed to convince the NAC to overturn the FINRA Hearing Panel's decision and currently awaits resolution at the SEC level.  Id.  Should the SEC uphold the decision, Scottsdale can turn to an appellate court.  See 15 U.S.C. § 78y(b).  Likewise, Scottsdale's sister firm has petitioned the SEC for a rulemaking to achieve a regulatory fix to many of the same issues animating this suit.  Its petition—seeking changes to the composition of FINRA's Board of Governors and regulatory revisions to prevent FINRA from issuing what

Scottsdale views as improper guidance—is currently before the agency.  See MTD Ex. B.
Scottsdale cannot have its cake and eat it, too.  It cannot at once insist that this suit seeks relief
that falls outside the SEC's area of expertise and that is not otherwise available to it, while also
seeking precisely that same relief before the SEC.

Scottsdale's counterarguments fall flat.  They all stem from one simple idea:  that it is not
challenging FINRA's rules and regulations but merely alleging a breach of contract between two
private corporations.  Opp'n at 1.  Scottsdale repeats this line as if it were an incantation.  But
this mantra does not obscure the true nature of its claims.  As explained above, Scottsdale's
breach of contract claim is nothing more than an artifice designed to obscure its challenges to
FINRA's regulatory and disciplinary actions.

In the recent words of the Chief Justice, the Court need not "exhibit a naiveté from which
ordinary citizens are free."  Dep't of Commerce v. New York, __ S. Ct. __, __ (June 27, 2019)
(slip op. at 28) (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977)).  "It
would require the suspension of disbelief to ascribe to Congress the design to allow its careful
and thorough remedial scheme to be circumvented by artful pleading."  Brown v. Gen. Servs.
Admin., 425 U.S. 820, 833 (1976); see also Brooks v. District of Columbia, 375 F. Supp. 3d 41,
45 (D.D.C. 2019) ("Plaintiffs' crafty pleading cannot hide the true nature of their claims.  Nor
can Plaintiffs' clever phrasing be used to avoid a bar on judicial review." (citation omitted)).
Instead, the Court looks through the form of the Complaint to the substance of the allegations to
determine the true nature of Scottsdale's claim.  See Valley Forge Christian Coll. v. Ams. United
for Separation of Church & State, Inc., 454 U.S. 464, 477 (1982).  The form of Scottsdale's
Complaint may say contract, but its substance screams a challenge to FINRA's regulatory and
disciplinary actions.

Scottsdale relies on easily distinguishable cases for the notion that its claim lies outside "the Commission's competence and expertise" and is not "of the type Congress intended to be reviewed within th[e] statutory structure." Opp'n at 7 (citation omitted). First, it notes that in Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court carved out an exception to the Thunder Basin framework. That much is true, but Scottsdale does not explain how that exception applies in this case, and none of the facts informing Free Enterprise's holding apply to Scottsdale's claim. First, the Free Enterprise plaintiffs challenged the constitutionality of the Public Company Accounting Oversight Board's structure, an issue that is not within the SEC's expertise. Id. at 491. Scottsdale does not challenge the validity of FINRA's existence or advance constitutional claims; it attacks the propriety of FINRA's rules and actions. These issues, unlike the Article II questions animating Free Enterprise, are firmly within the SEC's expertise.

Second, the Free Enterprise plaintiffs weren't subject to a disciplinary sanction and so could not effectively access the administrative review process. Id. at 490. As the Supreme Court explained, the Free Enterprise "petitioners object[ed] to the Board's existence, not to any of its auditing standards," meaning their "general challenge to the Board [was] 'collateral' to any Commission orders or rules from which review might be sought. Id. As a consequence, the Court was unable to "see how petitioners could meaningfully pursue their constitutional claims under the Government's theory" of exclusive administrative review. Id. Scottsdale, by contrast, is the subject of a disciplinary sanction and thus has access to the administrative review process. See MTD Ex. A. Finally, the issues raised in Free Enterprise "d[id] not require technical considerations of [agency policy]," prompting the Supreme Court to conclude that they were wholly outside the SEC's expertise. 561 U.S. at 491 (second alteration in original) (citation

omitted).  As discussed, Scottsdale's claim functionally challenges several FINRA rules and actions that *are* within the SEC's expertise.

Scottsdale cites two other cases to support its contention that its claim is not the type intended to be reviewed in the statutory scheme.  See Opp'n at 7.  Both miss the mark. Scottsdale relies on Kaiser Steel Corp. v. Mullins, a pre-Thunder Basin case, to insist that contract claims arising from regulatory actions are reviewable by a district court.  Id. at 7 (citing Kaiser Steel, 455 U.S. 72, 83–84 (1982)).  But Kaiser Steel does not reach as far as Scottsdale suggests.  The district court there enforced a contract between the United Mine Workers of America and Kaiser Steel.  455 U.S. at 76.  In the process, it refused to consider Kaiser Steel's defense that the contract violated the Sherman Act and the National Labor Relations Act.  Id. The Supreme Court reversed, concluding "that a federal court has a duty to determine whether a contract violates federal law before enforcing it."  Id. at 83.  Unlike this case, Kaiser Steel did not involve a purported contract between a regulatory corporation and a member firm, and the contract claim itself was not grounded in administrative law.  Moreover, this is not an instance where the Court is otherwise enforcing a contract and declining to consider a proffered defense due to its relationship to administrative law.  Finally, the Kaiser Steel Court concluded that the text of the statute at issue indicated that "a court must reach the merits of an illegality defense in order to determine whether the contract clause at issue has any legal effect in the first place."  Id. at 84.  These distinctions are fatal to Scottsdale's reliance on Kaiser Steel because that case did not involve any issues that, if adjudicated by the district court, would encroach on the exclusive administrative review mechanism that Congress had established.

Finally, Scottsdale points to City of Providence, Rhode Island v. BATS Global Markets, Inc., to argue that its claim presents an exception to the general rule that suits related to

regulatory actions subject to a statutory review scheme cannot be adjudicated by district courts. Opp'n at 7 (citing City of Providence, 878 F.3d at 44–45). While City of Providence, unlike the other cases Scottsdale invokes, at least involves an action against regulatory bodies subject to the Exchange Act, it is still inapposite in this context. The plaintiffs in City of Providence filed a securities-fraud class action against seven national securities exchanges. 878 F.3d at 40. The Second Circuit found that the plaintiffs were "challeng[ing] particular actions taken by the defendants individually and not as part of a 'national market system plan'" and therefore the claims were not subject to the Exchange Act's review scheme. Id. at 45. The City of Providence plaintiffs were "not challeng[ing] the SEC's authority or decision to generally approve these products or services as inconsistent with the Exchange Act . . . [but] instead . . . claim[ing] that . . . the exchanges engaged in fraudulent, manipulative conduct." Id. In other words, City of Providence alleged securities fraud by entities that were both regulators and regulated. The Second Circuit specifically noted that the actions at issue dealt with defendants' "actions as a *regulated* entity—not a *regulator*." Id. at 48. Here, by contrast, Scottsdale challenges only actions that FINRA took in its role as a regulator.

At its core, unlike the issues in the cases it cites, Scottsdale's claim "concern[s] (what [it] perceives to be) substantive or procedural deficiencies in [FINRA's] enforcement of the securities laws." Jarkesy, 803 F.3d at 22. Under Thunder Basin, that claim must be reviewed within the statutory scheme provided by the Exchange Act.

This conclusion should come as no surprise to Scottsdale since its prior attempt to skirt the statutory review process met the same fate. Scottsdale attempted to avoid a disciplinary action by claiming several of FINRA's regulatory actions were outside the scope of the Exchange Act, the same claim it makes here. Scottsdale I, 844 F.3d at 417; see also Compl.

¶¶ 52–61.  The district court rejected that effort, and the Fourth Circuit affirmed.  The Circuit put it succinctly:

> Congress, through the Exchange Act, intended to channel objections to FINRA's authority through the agency and the courts of appeals.  In so doing, it is clear Congress sought to preclude federal district-court jurisdiction.  Because Scottsdale can obtain meaningful judicial review of its claim . . .  following the appeal process outlined in the Exchange Act, . . . its challenge to FINRA's authority is the type of claim Congress intended to be reviewed within the statutory scheme.

Scottsdale I, 844 F.3d at 424.  The same is true here.  Scottsdale's gambit fails again.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  July 16, 2019